# In the United States Court of Federal Claims

### No. 14-102C
### June 24, 2014
### Redacted Version Issued for Publication: July 31, 2014[1]

* * * * * * * * * * * * * * * * * * *    *

**AMERICAN AUTO LOGISTICS, LP**

    **Protestor,**

      **v.**

**UNITED STATES,**

    **Defendant,**

      **v.**

**INTERNATIONAL AUTO LOGISTICS, LLC**

    **Defendant-Intervenor.**

**United States Transportation Command; Past Performance Evaluation; Performance Price Tradeoff; Commercial Marketplace; Global Privately-Owned Vehicle Contract.**

* * * * * * * * * * * * * * * * * *

    **Timothy Sullivan**, Law Offices of Thompson Coburn, LLP, Washington, D.C., for protestor. With him was **Katherine S. Nucci**, Thompson Coburn, LLP, **Scott F. Lane**, Thompson Coburn, LLP, and **Jayna Marie Rust**, Thompson Coburn, LLP, of counsel.

    **J. Byran Warnock**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Martin F. Hockey, Jr.**, Assistant Director, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, Civil Division, and **Stuart F. Delery**, Assistant Attorney General, Civil Division. Also with him were **J. Toby Harryman**, Agency Counsel, United States Transportation Command, and **Christopher S. Cole**, Trial Attorney, Air Force Legal Operations Agency, of counsel.

    **Jon Davidson Levin**, of counsel, Law Offices of Maynard, Cooper, & Gale, PC, for defendant-intervenor. With him were **Gary L. Rigney**, Maynard, Cooper, & Gale, PC, **W. Brad English**, Maynard, Cooper, & Gale, PC, and **J. Andrew Watson, III**, Maynard, Cooper, & Gale, PC, of counsel.

---

[1] This opinion was issued under seal on June 24, 2014. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed. Some additional redactions, although not proposed by the parties, are added in the interest of consistency. Words which are redacted are reflected with the following notation: "[redacted]."

**O P I N I O N**

**HORN, J.**

Protestor, American Auto Logistics, LP, filed a post-award bid protest on February 5, 2014, challenging the award by the United States Transportation Command (TRANSCOM) of a procurement contract, for "transportation and storage services with respect to privately-owned vehicles" of military service members and Department of Defense civilian employees, to International Auto Logistics, LLC. The contract was awarded under solicitation HTC711-13-R-R003, also known as the Global Privately-Owned Vehicle Contract III (GPC III) solicitation. International Auto Logistics intervened in the protest. Before bringing suit in this court, protestor filed a post-award protest with the Government Accountability Office (the GAO), which was denied. Protestor alleges in this court that "TRANSCOM's evaluation of IAL's [International Auto Logistics'] past performance proposal submitted in response to the RFP [Request for Proposal] was unreasonable and contrary to applicable law and the terms of the RFP," and that TRANSCOM's source selection decision, favoring International Auto Logistics' lower price over American Auto Logistics' higher past performance rating, "was unreasonable and contrary to applicable law and the terms of the RFP." In a hearing before this court, protestor also alleged that, in order to perform the awarded contract, International Auto Logistics proposed to subcontract with "a fairly notoriously debarred company," with protestor alleging the name of the debarred or suspended company to be Agility International or Agility Defense and Government Services.

Protestor seeks "injunctive and declaratory relief prohibiting TRANSCOM and IAL [International Auto Logistics] from proceeding with performance of the GPC III Contract awarded to IAL," a finding that the source selection authority's decision was "arbitrary and capricious, an abuse of discretion, and contrary to the RFP's criteria and applicable law," and an order from the court "requiring TRANSCOM to conduct a new evaluation of IAL's past performance proposal and make a new source selection decision in strict accordance with the RFP and applicable law." Defendant agreed to stay further performance of the TRANSCOM contract awarded to International Auto Logistics for a brief period of time in order to allow the litigation to proceed. The court issued an oral decision to the parties denying protestor's motion for injunction relief. This opinion reduces to writing the prior oral decision delivered to the parties.

**FINDINGS OF FACT**

TRANSCOM describes itself in its GAO agency report as:

responsible for the movement of Department of Defense (DoD) personnel and cargo worldwide in support of peace, wartime, and contingency operations. As part of its mission, USTRANSCOM supports the requirement of its Component Command, the Military Surface Deployment and Distribution Command (SDDC), for complete transportation services for the movement of privately-owned vehicles (POVs) belonging to U.S.

Military Service Members and civilian employees of U.S. Government globally.

In the GAO agency report, TRANSCOM indicated that its component command, the United States Army Military Surface Deployment and Distribution Command, provides "receipt, delivery, and processing of POVs, arranging for ocean transportation, customs clearance and agriculture inspections, transportation between vehicle processing centers (VPCs) and ports," as well as long-term storage. See also Component Commands, About USTRANSCOM, U.S. Transp. Command, http://www.transcom.mil/about/cocom.cfm (last modified Feb. 8, 2012). It appears that "[a]s part of its mission, USTRANSCOM supports the requirement[s] of its Component Command," the Military Surface Deployment and Distribution Command. Protestor maintains that it has performed these services for fifteen years for TRANSCOM under two contracts, the Global Privately-Owned Vehicle Contract I (GPC I), and then the Global Privately-Owned Vehicle Contract II (GPC II).

According to defendant's agency report to the GAO: "Because the GPCII contract was 10 years old, the Agency conducted extensive market research, including numerous opportunities for industry engagement, to determine the best commercial solution for the GPCIII requirement." Defendant further maintained in its agency report that on November 14, 2011, the agency made a request for information in preparation for the GPC III solicitation as part of this market research. The request for information, titled "Global Privately Owned Vehicle (POV) Contract (GPC III) Request for Information," stated:

> USTRANSCOM is seeking information to determine the availability and technical capability of the business community to provide complete logistics of transportation and storage services of Privately Owned Vehicles (POVs) belonging to U.S. service members and DOD civilian employees worldwide. The overall scope of this program is to provide for the receipt, processing, transportation, storage, and delivery of vehicles at Continental United States (CONUS) and Outside the Continental United States (OCONUS) locations worldwide.
>
> Services include operating multiple vehicle processing centers (VPCs) in CONUS and OCONUS to receive/deliver customers' POVs, preparing POVs for shipment, and ensuring all necessary agriculture and customs clearances are accomplished; arranging for and/or providing ocean and inland transportation of the POVs between VPCs and other designated locations; providing information on the status and location of POV shipments as well as other program information; resolving POV loss and/or damage claims with customers, and with the Government; and storage to include maintenance of POVs.

Global Privately Owned Vehicle (POV) Contract (GPC III) Request for Information, FedBizOps.Gov (Nov. 14, 2011, 11:23 a.m.),

https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=f6c51b361ab6fb97 9c21d6e428361c41&_cview=1. The request for information issued by TRANSCOM inquired, in part:

> Is the work associated with this contract [GPC III] considered "commercial" as defined at Federal Acquisition Regulation (FAR) 2.101(services [sic] of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions)? Please provide your rationale.[2]

The record before the court indicates that on December 12, 2011, five companies responded to the request for information, with four respondents responding affirmatively to the above question. [Redacted] responded: "Yes. All of our POV Storage work has been performed under a Government Contract." [Redacted] stated:

> [Redacted] considers the work associated with this contract as commercial based on the definition provided in FAR 2.101. The specific services included within the scope of this bid are of a type and quantity transacted in the commercial marketplace. Vehicle handling, storage, transportation and repair work are all services performed and achieved under commercial terms and conditions. The company performs many of these services within its other commercial contracts today.

Another respondent, [redacted], stated: "Yes. The storage and transporting of vehicles is a service that is offered, sold and available to the general public by specific companies and independent contractors on a commercial basis." [Redacted] remarked that "[d]ue to the definition of a 'commercial item' held within the Federal Acquisition Regulation (FAR), this contract would be considered 'commercial.'" (quoting FAR 2.101(b)). Protestor, American Auto Logistics, responded, however, that it "does not consider the work associated with this contract as 'commercial' as defined in FAR 2.101. AAL [American Auto Logistics] solely supplies its services to the Military Surface Deployment and Distribution Command and does not participate in the commercial market."

Subsequently, TRANSCOM published a "**MARKET RESEARCH REPORT**" for the "**Global Privately Owned Vehicle Contract (GPC) III**," dated May 18, 2012. (emphasis and capitalization in original). The government's market research report stated:

> The Global Privately-Owned Vehicle Contract III (GPC III) requirement includes (1) operating multiple vehicle processing centers (VPCs) in the

---

[2] As explained more fully below, the term "commercial item" is defined in 48 C.F.R. § 2.101 (2013).

Continental United States (CONUS) and Outside of the Continental United States (OCONUS) to receive and/or deliver customers' POVs, (2) preparing POVs for shipment, and ensuring all necessary agriculture and customs clearances are accomplished; (3) arranging for and/or providing ocean and inland transportation of the POVs between VPCs and other designated locations; (4) providing information on the status and location of POV shipments as well as other program information; (5) resolving POV loss and/or damage claims with customers and with the Government; and (6) storing POVs in accordance with this contract. Although the movement of POVs is worldwide, the long term storage of POVs will happen in CONUS.

The May 18, 2012 market research report further stated that "[t]he objective of this market research report is to gather and analyze information on all aspects of logistics required in the movement and/or storage of privately-owned vehicles (POVs) which are the property of U.S. service members and/or civilians." The market research report continued:

USTRANSCOM posted a Request for Information (RFI) to FedBizOpps (FBO) on 14 November 2011. A market research questionnaire was included for data collection and analysis purposes. . . . In addition, a review of Internet sources, historical acquisition information, previous market research from the 2003 SDDC Contracting Center for the GPC II, was undertaken to locate sources.

Using the findings from the November 14, 2011 request for information in its market research report, TRANSCOM made a positive determination as to the commercial nature of the work involved within the GPC III program:

The work associated with the GPC II contract was determined a "commercial item" under the Federal Acquisition Regulation (FAR) at subpart 2.101. FAR subpart 2.101 defines a service as a commercial item when it is "a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions." The GPC II was awarded following FAR Part 12 (Acquisition of Commercial Items) procedures. The GPC III requirement is the continuation of the work performed under the GPC II contract and it too is determined a commercial item. This determination agrees with the market survey where four (4) of the five (5) [80%] of the RFI respondents agreed that the services associated with this effort are commercial. These RFI respondents provide the transportation and/or storage of vehicles as a service commonly offered to the general public, in substantial quantities, and at competitive market prices.

The incumbent contractor's response states that the services sought under the GPC III requirement are not commercial. The basis for its response is that the incumbent does not offer the same services commercially. The incumbent's interpretation, however, does not preclude the services from being "commercial" under the FAR definition. As noted above, 80% of the companies which responded to the RFI concluded that the services were commercial (See, Attachment 1). Because the services fall within the definition in FAR 2.101 and it is very probable the needs of the Government can be met through the commercial market, it has been determined that this requirement is "commercial." (See, FAR 2.101 and DFARS 212.102).

(brackets in original). The market research report also discussed TRANSCOM's findings regarding other elements of the GPC III solicitation, including the pricing arrangement, period of performance and performance incentives, contractor transition, technical requirements, and small business concerns. The report came to the following conclusions:

As a result of the market research, a determination has been made that the Government needs can be met through the commercial marketplace. Therefore, it has been determined this requirement is commercial. The requirement will have a firm-fixed price (FFP) CLIN structure and will be a commercial services contract under FAR Part 12 --Acquisition of Commercial Items-- and the Government will solicit bids on a full and open competitive basis.

After issuing the May 18, 2012 market research report, on October 25, 2012, another request for information was submitted via e-mail, by Ms. Marie T. Pendergast, a contracting officer for TRANSCOM, under the subject heading "Market Research - Global Privately Owned Vehicle (POV) Contract (GPC III)." Eight companies responded to the e-mail request for information, including the protestor, as well as International Auto Processing, the parent company of intervenor, International Auto Logistics. The other companies that responded were [redacted]. Under the topic of pricing, TRANSCOM asked: "How can the Government simplify the pricing structure?" Three respondents, [redacted], [redacted], and [redacted], indicated in separate, but identical responses, that the current arrangement "is as simple as possible," while [redacted] stated it "is simpler that [sic] what is done commercially," and [redacted] stated that "the current structure of a VPC to VPC rate provides the best value to the government." American Auto Logistics, [redacted] and [redacted] did not respond to the question.

TRANSCOM also asked about: "Vehicle Processing Centers Network (VPC). Is there a commercial alternative to the VPC network?  How can the Government simplify POV processing?" To the first question, American Auto Logistics responded, "[s]hould the Government desire to simplify POV processing, it would need to balance the benefits of simplification to the consequences of Quality of Life and Quality Assurance objectives of the program . . . ." [Redacted] indicated "[t]here is, but your service level

would not be the same," and [redacted] stated "[t]here isn't a commercial network that can handle the volume and seasonality of the GPC. Most commercial systems handle only a few cars a day, at most, and certainly doesn't have the storage capability to handle this contract." [Redacted] stated, "[m]ixing this program with a commercial program could and most likely would reduce the extremely high level of service." [Redacted] and [redacted] both made separate responses, but stated, in identical language, that "[t]here are potentially multiple commercial networks that might work." Both also stated, "[h]owever, currently 99 % of all revenue generated at the current VPC network is generated from the GPC making it virtually an exclusive network. . . . Most commercial alternatives would not have the excess space or acreage needed [sic] handle the GPC, negating most of or all cost advantage," and that "[m]ost foreign VPCs are GOCOs [Government-Owned, Contractor-Operated]. An alternative to a commercial solution could be to make the US VPC's [sic] GOCOs." [Redacted] responded, "[w]hile there is the option of using a completely commercial solution for this requirement, [redacted] believes this would reduce the level of service currently provided." [Redacted] indicated that it uses a commercial VPC, but, with regards to the TRANSCOM Privately-Owned Vehicle Contract, "[t]he issue we see is finding the land within the port area to handle the operation." [Redacted] offered no response to this question. On December 12, 2012, TRANSCOM sent a follow up e-mail to members of the industry, stating: "Previously, we asked for information on any commercial alternatives to the VPC network currently in place. More specifically, we are seeking input on the concept of door-to-door service which is more commercial in nature." [Redacted], in its response, noted that: "We think there is a lot of merit in exploring existing commercial infrastructure as an alternative to contractors setting up and maintaining separate VPC's [sic] outside of a commercial structure."

On November 27, 2012, TRANSCOM held a "Global POV Contract III Industry Day" to discuss the GPC III solicitation, which was attended by some of the industry participants which had responded to the prior requests for information. From the minutes of the event provided in the record, American Auto Logistics and [redacted], among others, sent a joint delegation, and [redacted] and [redacted] sent a joint delegation. The "Industry Day" meeting included a "**Procurement & Requirements Overview**" with Ms. Pendergast, the TRANSCOM contracting officer, a question and answer session, and individual breakouts. (emphasis in original). In one of the "Industry Day" presentations, the slides of which are in the record, TRANSCOM listed a "Requirements Snap Shot," which stated: "Contractor shall provide all personnel, supervision, training, and equipment necessary to perform PWS [Performance Work Statement] tasks for shipment and storage of POVs globally." The expected transportation volume of privately-owned vehicles was estimated in the presentation to be "[a]pproximately 66,500 a year," with "[a]pproximately 8,500 POVs in storage at a time." The presentation also made clear that the upcoming solicitation would be a firm fixed price contract and a best value source selection. The minutes from the "Industry Day" meeting also reflect that TRANSCOM was asked, but was unable to clarify at that time, what factors would be used to determine "best value." Subsequently, the agency issued draft performance work statements. Both performance work statements discussed the technical requirements offerors were to meet under GPC III.

On February 12, 2013, TRANSCOM issued an "**ACQUISITION PLAN**" for the "**GLOBAL PRIVATELY OWNED VEHICLE CONTRACT III (GPC III)**." (emphasis and capitalization in original). The acquisition plan discussed the proposed technical and price requirements for the GPC III solicitation, and gave the background of the prior GPC I and GPC II contracts. Under "**Capability or Performance**," the acquisition plan stated, "[t]he Government will require the contractor to deliver POVs on time to the correct destination for 98% of shipments per month," and "[t]he contractor is required to achieve a satisfactory or better overall customer service level on 95% of comment cards submitted." (emphasis in original). Under "**Trade-offs**" (emphasis in original), the document stated:

> The Government will conduct a Past Performance Price Tradeoff (PPT) source selection in which competing offerors' past performance history will be evaluated on a basis approximately equal to cost or price considerations. Each offeror's business proposal, technical proposal, and small business subcontracting plan will be evaluated on an Acceptable/Unacceptable basis.

Under "**Source Selection Procedures**" in the ACQUISITION PLAN, TRANSCOM stated, "[c]ompeting offerors' past performance history will be evaluated on a basis of importance approximately equal to price." (emphasis in original).

On February 25, 2013, TRANSCOM issued a "**SOURCE SELECTION PLAN FOR GLOBAL PRIVATELY-OWNED VEHICLE CONTRACT III**." (emphasis and capitalization in original). Under "**Planned Acquisition Approach**," TRANSCOM stated that the government would "evaluate using a Past Performance Price Tradeoff (PPT) source selection approach in accordance with the mandatory DoD Source Selection Procedures, with past performance and price considered approximately equal." (emphasis in original). A document contained in the record, titled "**ACQUISITION STRATEGY PANEL**," also stated that the source selection process would be "Best Value Source Selection using Past-Performance/ Price Tradeoff (PPT) procedures," with "[p]ast performance and price considered approximately equal." (emphasis and capitalization in original). Another document in the record, titled "**ACQUISITION OF SERVICES**," dated March 20, 2013, also made similar statements regarding the GPC III solicitation performance and price tradeoff. (emphasis and capitalization in original).

The solicitation at issue in the above captioned case, solicitation HTC711-13-R-R003, was issued on May 1, 2013 by TRANSCOM. It was amended ten times. The administrative record contains the "[c]onformed" solicitation, which is the version this court considers and references in this opinion. The conformed solicitation, which includes all ten amendments, required submission of "signed and dated offers on or before **12:00 pm Central Time on 15 July 2013**."[3] (emphasis in original).

---

[3] The ninth amendment to the solicitation was dated July 1, 2013, fifteen days before proposals were due. The tenth and final amendment to the solicitation was dated

The performance work statement, attachment 1 to the solicitation, described the scope of work required under the solicitation:

> **1.2.  Scope of Work.** The contractor shall provide all personnel, supervision, training, and equipment necessary to perform all tasks as identified in the PWS for shipments and storage of POVs globally in accordance with the Defense Transportation Regulation (DTR), Joint Travel Regulations (JTR), Joint Federal Travel Regulations (JFTR), and all applicable regulations. The contractor shall assume all responsibility, liability, and costs for receipt/delivery, processing, and transportation of the POV from point of receipt to final delivery. The contractor's responsibilities include, but are not limited to: (1) operating multiple vehicle processing centers (VPCs), preparing POVs for shipment, and ensuring all necessary agriculture and customs clearances are accomplished; (2) arranging for and/or providing inland and ocean transportation of the POVs; (3) providing Intransit Visibility (ITV) of POV shipments; (4) storage of POVs; and (5) resolving POV loss and/or damage claims.

(emphasis in original). The performance work statement also explained that, "[t]he contractor shall operate Vehicle Processing Centers (VPCs) and Quality of Life Sites (QoLs) in accordance with Appendices A," including "construction, upkeep, purchase, lease or rental of any commercial structure, land, or equipment for CO/CO [contractor-owned and contractor-operated] facilities."[4]   In the performance work statement, TRANSCOM listed the following performance objectives in chart form:

---

August 27, 2013, six weeks after the proposals was due. The cover sheet to the tenth amendment indicated that the amendment made only minor changes which are not relevant to the current dispute before this court. The tenth amendment stated, specifically, that "[t]he purpose of this [tenth] Amendment is to correct the evaluation language in the Addendum to FAR 52.212-2 for Technical Subfactor 1 - Transition Plan." Protestor's counsel in the February 7, 2014 hearing alleged, however, "the tenth amendment here changed the evaluation language somewhat, and that's the language you have to focus on with respect to the past performance evaluation."

[4] Appendix A of the solicitation listed nineteen CO/CO vehicle processing centers, located in the United States and abroad, as well as fifteen government-owned, but contractor-operated vehicle processing centers, fourteen located outside of the United States, and one in Guam. Appendix A also listed four Quality of Life sites, all located outside of the United States.

| PERFORMANCE OBJECTIVE | PWS [Performance Work Statement] PARA [Paragraph] | PERFORMANCE THRESHOLD |
|---|---|---|
| Transport POVs within RDDs [Required Delivery Dates] | 1.3.5.1. & Attachment 4 to the contract | 98% per month |
| Resolve claims directly with customers using on-site settlement process | 1.3.11. | 95% per quarter |
| Settle claims within 90 days from the date the claim was filed | 1.3.11. | 99% per quarter |
| Rated satisfactory or better for overall customer service on comment cards submitted | 1.3.10. | 95% per month |
| Adhere to VISA [Voluntary Intermodal Sealift Agreement] preferences | 4.0 | 100% of shipments |

(emphasis and capitalization in original).

The contract was projected to cover two base periods of, first, ten months,[5] and then, one year. There also were three option years and an additional, optional, six-month extension described in the solicitation. The solicitation further specified, "[t]he total duration of this contract, including the exercise of any options under this clause, shall not exceed <u>65 months (includes the 6 month extension)</u>." (emphasis in original).

The record contains two independent government cost estimates, which include an estimated cost to the government for each period of performance of the GPC III contract. The cost estimates were both broken down into the following seven categories: "Full Service," "Partial Service," "Ocean Transportation," "Homeport Move," "Storage," "Door to Door," and "Out of Pocket." In a March 6, 2013 estimate, the government estimated that the cost to the government of the GPC III effort would be $1,348,114,177.44 for the maximum 65 month term of the contract. In an October 4, 2013 estimate, the government estimated that the cost to the government of the GPC III effort would be $1,189,863,420.21 for the maximum term of the contract. The October 4, 2013 estimate was used in the government's final "price analysis," signed October 17, 2013.

The solicitation stated that "[t]he Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered." According to the solicitation, "[t]he following factors shall be used to evaluate offers:"

---

[5] The record indicates that amendment seven to the solicitation, issued June 25, 2013, changed the period of performance of the solicitation's first base period from eleven months to ten months. The solicitation, as amended, indicated that the first base period of performance would be from December 1, 2013 to September 30, 2014.

    (1) Business Proposal
    (2) Technical Proposal
        (A) Subfactor 1 – Transition Plan
        (B) Subfactor 2 – Technical Approach
        (C) Subfactor 3 – Information Assurance & Cyber Security
    (3) Past Performance Proposal
    (4) Small Business Proposal
        (A) Subfactor 1 – Small Business Subcontracting Plan
        (B) Subfactor 2 – Small Business Utilization Strategy
    (5) Price Proposal

The solicitation also described TRANSCOM's evaluation strategy:

> This is a competitive best value source selection. The Government will conduct a Performance Price Tradeoff (PPT) source selection in which competing offerors' past performance history will be evaluated on a basis approximately equal to cost or price considerations. Award will be made to the offeror who is deemed responsible IAW [in accordance with] FAR Part 9, who submits an acceptable business proposal, technical proposal, and small business proposal, and is judged, based on their past performance and total evaluated price, to represent the best value to the Government. This may result in an award to a higher rated, higher priced offeror, where the decision is consistent with the evaluation factors and the Source Selection Authority (SSA) reasonably determines that the superior past performance of the higher priced offeror outweighs the cost difference. However, the Government will not pay a price premium that it considers to be disproportionate to the benefits associated with the proposed margin of service superiority.

The solicitation continued: "The Government intends to evaluate proposals and award a single contract after conducting discussions with offerors whose proposals have been determined to be within the competitive range." TRANSCOM reiterated, in response to a question from industry, that it "intends to conduct discussions with offerors whose proposals have been determined to be within the competitive range."

The business proposal was to be "evaluated to determine whether it complies with all terms and conditions of the solicitation. Business proposals will be rated as Acceptable or Unacceptable." Both the technical and small business proposals were to be "evaluated as Acceptable or Unacceptable at the subfactor level." If any subfactor for either the technical or small business proposals were "rated as Unacceptable" that particular proposal section would be rated as "Unacceptable."

Regarding the price proposal, the solicitation stated that a "Total Evaluated Price" would be determined based on a number of factors and formulas, and that "[t]he summation of the extended prices for the base period, all options, and the 6-month

extension will constitute the TEP [Total Evaluated Price]." The solicitation also stated, "[i]n order to be considered for award, the Total Evaluated Price (TEP) must be determined fair, reasonable, and realistic," and that TRANSCOM would conduct price reasonableness and realism evaluations as well as separately check for "[u]nbalanced pricing." Protestor has not contested the government's evaluation of any offerors' business, technical, small business, or pricing proposals.

According to the solicitation, an offeror's past performance proposal would be evaluated along a scale:

> Using the Past Performance questionnaires submitted by the offeror's references , [sic] the offeror's Past Performance proposal, and other information independently obtained from Government or commercial sources (i.e. Past Performance Information Retrieval System, Federal Awardee Performance and Integrity Information System, electronic Subcontracting Reporting System (eSRS), Questionnaires tailored to the circumstances for this acquisition, through Defense Contract Management Agency channels, or through interviews with Program Managers, Contracting Officer Representatives and Contracting Officers), the Government will assign an overall confidence assessment for each offeror. The purpose of the past performance evaluation is to allow the Government to assess the offeror's ability to perform the effort described in this RFP, based on the offeror's demonstrated past performance. Each Past Performance effort will be evaluated on the basis of recency and relevancy.

The solicitation explained that the government first would "perform an independent assessment" of the individual past performance references submitted by the offerors, "determining the recency and then the relevancy of each past performance effort. To be considered a recent effort, the effort must be currently ongoing or have been performed within 3 years of proposal submission." (emphasis in original). According to the solicitation, the ratings given to each past performance reference were to be as follows:

| RATING | DESCRIPTION |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |

| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

The solicitation stated:

> Relevancy in regard to scope and magnitude of effort and complexity will be assessed based on, but not limited to, the similarities between a given past performance effort and this solicitation in terms of the following for CONUS and/or OCONUS operations: POV processing, arranging for or providing ocean transportation, arranging for or providing inland transportation, customer service, and storage.

The solicitation also stated:

> The offeror shall submit no more than three past performance references for the offeror (prime contractor), public or private, for which the offeror has performed services within the previous three calendar years similar in nature to the services described in this solicitation. The offeror shall submit no more than three past performance references for **each** major subcontractor, public or private, for which each subcontractor has performed services within the previous three calendar years similar in nature to the services described in this solicitation.

(emphasis in original). For each past performance reference provided, TRANSCOM instructed offerors to "send out a Past Performance Questionnaire (Attachment L-1) to each of the offeror's references identified in a proposal, along with a request for the reference to complete the questionnaire and return it to the Government by the date specified for receipt of offers."

The solicitation explained that, after individually rating each past performance reference, "overall Past Performance Confidence Assessment ratings will be assigned to each offeror using the following definitions:"

| RATING | DESCRIPTION |
|--------|-------------|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |

| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
|---|---|
| Unknown Confidence (Neutral) | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

The solicitation also stated that "[t]he relevancy of each contract reference will be considered in the overall confidence assessment rating for the offeror," and that "[i]n assigning an overall confidence assessment for each offeror, the Government will consider at a minimum: POV processing, arranging for or providing ocean transportation, arranging for or providing inland transportation, customer service, storage, overall performance, and small business utilization." The solicitation also stated that "[i]n evaluating past performance, the Government will give greater consideration to information on those contracts deemed most relevant to the effort described in this RFP." Additionally, the solicitation stated that: "Past performance regarding predecessor companies or principal subcontractors that will perform major or critical aspects of this requirement will be weighted the same (equally as important) as the past performance information for the offeror."

The record contains a document with questions asked by industry about the solicitation. Among the relevant questions, one industry member asked whether "[t]he past performance evaluation weighting gives the most consideration to relevancy of past performance, meaning that only the incumbent, as the sole provider of these services for the past 15 years, will benefit from the price benefit of the tradeoff." The government responded: "In this source selection, past performance and price will be weighted approximately equally. Recency and relevancy of each past performance effort provided will be considered in the overall confidence assessment rating."

American Auto Logistics' proposal was dated July 15, 2013 and described the protestor's asserted advantage as "our unmatched experience as contractor of the Global POV Contract, during which we have established an exclusive network of facilities, transportation assets, and processes to provide the highest level of customer service for Service Members . . . ." In its proposal, American Auto Logistics listed under "**The AAL Team Advantage**" its "10 years excellent past performance on GPC II," "99.4% RDD compliance," "99.8% customer satisfaction ratings of Excellent/Good," "[e]stablished global network of proven subcontractors and affiliates," "[e]stablished and exclusive VPC and storage facilities," "[p]roven and efficient claims site settlement process," "[p]roprietary and copyrighted logistics management system with enhanced functionality to meet or exceed GPC III requirements," "[e]ffective utilization of qualified Small Business concerns," and "[o]pen, collaborative working environment with USTRANSCOM and GPC program stakeholders." (emphasis in original). American Auto Logistics provided a graphic that identified major parts of the "AAL Team:"



FIGURE II-2-1: **The Global Reach and GPC Experience of the AAL Team.** Our team companies are proven performers on GPC II, eliminating USTRANSCOM's performance risk for the new contract and sustaining continuous-improvement momentum.

American Auto Logistics explained in its proposal that it would work with six "major subcontractors,"[6] each of which "played critical support roles in providing the highest level of GPC support during the past decade," and each of which "are our current subcontractors in GPC II." The following is a summary of American Auto Logistics' descriptions of its "major subcontractors," as discussed in its proposal:

| American Auto Logistics' Major Subcontractors | |
|---|---|
| **Subcontractor** | **Description** |
| American Roll-on Roll-off Carrier | American Roll-on Roll-off Carrier, "a related company to AAL, is a vessel operating company and provides Ro-Ro liner services in the U.S. and internationally." |
| American Logistics Network | American Logistics Network, "another related company to AAL, operates a number of VPCs, as well as four storage facilities in the U.S." |
| AP Logistics | AP Logistics "is a 50/50 joint venture between ALN [American Logistics Network] and Pasha established to operate our two Alaska VPCs." |
| Matson Terminals | Matson Terminals "manages the Honolulu, Hawaii, VPC, which is the highest volume full service VPC in the program." |

---

[6] Although at the start of its past performance proposal American Auto Logistics stated that it has "five major subcontractors," later on, under its **BRIEF OVERVIEW OF OUR GPC III MAJOR SUBCONTRACTORS,**" American Auto Logistics discussed six companies, all six of which are described in the accompanying chart. (emphasis and capitalization in original).

| The Pasha Group[7] | The Pasha Group "manages CONUS and OCONUS VPCs, and provides inland distribution. Pasha also manages POV storage operations in the states of California and Washington for AAL." |
| Transcar | "Transcar, a related company to AAL, is responsible for operations in Europe and has been an AAL partner in the GPC since the inception of the P5 program in 1994." |

American Auto Logistics stated in its proposal that, "[a]ll major subcontractors are exclusive to AAL for the life of the GPC III contract."

American Auto Logistics stated in its small business proposal that, "for the GPC II contract term to date, AAL has awarded $288 million, representing 45.2% of subcontracted dollars to small business," and that "[o]ur Small Business Subcontracting Plan (Subfactor 1) complies fully with FAR 52.219-9." American Auto Logistics' final, offered, "**Total Evaluated Price**" was $957,535,151.41. (emphasis in original).

The winning bid was submitted by International Auto Logistics, the intervenor in this protest, and was dated July 1, 2013. International Auto Logistics explained that it "is a wholly owned subsidiary of International Auto Processing, Inc. (IAP)," and that:

> IAL was established in 2012 as a special-purpose company to source government bid opportunities, including GPC III. IAL has at its disposal, complete access to IAP's robust resources, including port and vehicle processing expertise, rail and trucking networks, IT systems, quality and training processes, and commercial business best practice techniques. IAP has been active in the POV processing business since 1986 and has processed over 4 million vehicles since its inception.[8]

International Auto Logistics stated in its proposal that, "[o]ur GPC III approach provides high standards of services to each and every SM [service member]. Our approach improves overall vehicle processing center (VPC) and vehicle storage facilities (VSF), reduces vehicle damage, and mitigates legal liability providing SDDC a best value solution at the lowest cost." International Auto Logistics highlighted its "Team

---

[7] Although not listed as a "major subcontractor" by American Auto Logistics, the protestor presented past performance references for a seventh subcontractor, Pasha Hawaii Transport Lines. According to American Auto Logistics' proposal, Pasha Hawaii Transport Lines was created from The Pasha Group in order to "provide new and competitive service for the movement of rolling stock between the Pacific Coast and Hawaii." According to American Auto Logistics, "PHTL [Pasha Hawaii Transport Lines] has carried 12,091 military POVs for AAL in support of GPC II on our U.S. Flag Jones Act qualified vessel; we anticipate that 3,865 additional vehicles will load onto PHTL vessels during the peak summer months of 2013."

[8] Elsewhere the proposal states that International Auto Processing "has processed over 6,000,000 vehicles since its inception."

IAL" approach, stating that, "Team IAL's key personnel have over 100 years combined, highly-relevant experience with the GPC Program, starting with the P5 Pilot Program (94-98), GPC I (98-03), GPC II (03-13), U.S. Flag Ocean Privately Owned Vehicle (POV) Shipping and Trucking, U.S. Army Installation Management Command (IMCOM) Deployment Storage, and 2nd POV programs."

International Auto Logistics further stated in its proposal that "Team IAL consists of prime offeror International Auto Logistics (IAL), and the following subcontractors:"

- Liberty Global Logistics, LLC
- Horizon Lines, Inc.
- Trans Global Auto Logistics Inc./Global Auto Logistics, LLC
- SDV Command Source, LLC
- Posey Transport Group
- Boyle Transportation
- Vehicle Processing Center of Fayetteville, Inc. (VPC of Fayetteville)
- North American Consulting & Services Company
- Lincoln Properties

International Auto Logistics continued:

Each Team IAL member was handpicked on the basis of experience and successful performance on highly-relevant GPC, POV, or automotive processing efforts. Out [sic] team includes experienced U.S. Flag/VISA and Jones Act participants. In addition, the key personnel that lead our team have extensive GPC, POV, automobile processing and transportation experience.

The court summarized International Auto Logistics' descriptions of its "Team IAL" subcontractors, as follows:

| International Auto Logistics' "Team IAL" Subcontractors | | |
|---|---|---|
| Subcontractor | Description | Responsibility Area for GPC III |
| Liberty Global Logistics | Liberty Global Logistics "has been a USTRANSCOM/SDDC transportation partner since February 2009 and transports cargo between U.S. and international destinations via truck, air, sea and rail." | "US Flag ocean shipping and POV logistics" |
| Horizon Lines | "Horizon is comprised of two primary operating subsidiaries. Horizon Lines, LLC, owns or leases a fleet of 15 U.S.-flag container ships and 5 port terminals linking the continental United States with Alaska, Hawaii, Micronesia and Puerto Rico. Horizon Logistics, LLC, offers customized logistics | "VPC operations and US Flag Jones Act ocean shipping;" Horizon Lines was proposed to operate the |

| | | |
|---|---|---|
| | solutions to shippers from a suite of transportation and distribution management services, information technology developed by Horizon Services Group, as well as intermodal trucking and warehousing services provided by Sea-Logix." | vehicle processing center in Honolulu, Hawaii. |
| Trans Global Auto Logistics/Global Auto Logistics | "Global Auto Logistics, LLC (GAL) is a woman-owned small business concern located in a HUBZone and shares common ownership with Trans Global Auto Logistics, Inc. (TGAL). TGAL was established June 2002 and has offices in Texas, Florida, Germany, the U.K., and France . . . ." "TGAL is a licensed NVOCC [Non-Vessel Operating Common Carrier] and freight forwarder, and was originally formed to facilitate Global 2nd POV movements that were not included as part of the GPC programs. . . . TGAL transports automobiles and all types of military, industrial and infrastructure cargo types." "GAL was formed as a special purpose company, with the goal of participating in bidding and obtaining support contracts with the U.S. Government. GAL relies on TGAL and its principals for its past performance." "For more than 11 years, in the U.S. and in conjunction with our European offices, we have been serving U.S. Service Members by facilitating the shipment of their 2nd POVs." | "VPC and VSF [vehicle storage facility] operations, OTR [over-the-road] CONUS/OCONUS transport and customs clearance Services;" Global Auto Logistics was proposed to operate seventeen vehicle processing centers and two vehicle storage facilities.[9] |
| SDV Command Source | SDV is a "Veteran's Administration CVE [Center for Veterans Enterprise] certified, Service-Disabled Veteran-Owned Small Business (SDVOSB) . . . . SDV's mission is to provide employment | "VPC and VSF operations;" SDV Command Source was |

[9] According to the International Auto Logistics proposal, Global Auto Logistics was proposed to operate the contractor-owned and operated vehicle processing centers in or near Dallas, Texas, San Diego, California, Brandon, United Kingdom, and Rota, Spain. Intervenor's proposal also stated that Global Auto Logistics would manage a contractor-owned and operated vehicle processing center in "Ausano, Italy," however, the court could not identify a city by that name. The solicitation, as well as American Auto Logistics' proposal, however, indicate that this vehicle processing center is to be located in "Aviano, Italy." The International Auto Logistics proposal also stated that "[a]ll GO/COs [will be] operated by GAL except Guam, Taegu & Seoul (operated by IAL) and Ankara [operated by North American Consulting Services Company];" which consists of twelve government-owned, contractor-operated vehicle processing centers in Europe, located, according to the solicitation, in or near: Chievres, Belgium, Schinnen, the Netherlands, Baumholder, Germany, Boeblingen, Germany, Grafenwoehr, Germany, Kaiserslautern, Germany, Schweinfurt, Germany, Spangdahlem, Germany, Wiesbaden, Germany, Naples, Italy, Sigonella, Italy, and Vicenza, Italy. Global Auto Logistics also was proposed to operate the Arlington, Texas, and Lacey, Washington vehicle storage facilities.

| | | |
|---|---|---|
| | opportunities to service-disabled Veterans and their family members through work on Government (Federal, State and local) and select private sector contracts," "most recently in processing, storing, maintaining and out-processing POVs for Soldiers deployed to Iraq, Afghanistan, and other selected AORs [Areas of Responsibility]." "As the prime contractor on the U.S. Army Installation Management Command (IMCOM) POV Storage – West Region contract, SDV Command Source operated VPC and Vehicle Storage Facilities (VSF) at seven (7) locations/installations in five (5) western States." | proposed to operate the Atlanta, Georgia, St. Louis, Missouri, and San Juan, Puerto Rico vehicle processing centers. It was proposed to manage the Kingstree, South Carolina vehicle storage facility. |
| Posey Transport Group | "Posey Transport Group (Posey) provides vehicle transport services across the continental United States and Canada." (emphasis removed). "Beginning in 2010, Posey provided POV transport services as a subcontractor to SDV Command Source (also a Team IAL member company) under an Army IMCOM contract.<br><br>Posey's services include relocation services for auto dealerships, specialty vehicle manufacturers, and individuals. Our truck brokering services are built on an extensive network of carrier and driver resource." | "OTR CONUS transport." |
| Boyle Transportation | "Boyle Transportation is the premier Transportation Protective Services provider to the DOD and defense industry shippers of security-sensitive cargo." Its capabilities include "operation of a VPC and three VSF sites for the Global POV Contract II, and servicing approximately 3,000 vehicles each month." Boyle Transportation also provides consulting services related to "VPC and storage facility operations for IMCOM requirements." | "VPC and VSF operations;" Boyle Transportation was proposed to operate the Charleston, South Carolina vehicle processing center, and the Graniteville, South Carolina vehicle storage facility. |
| VPC of Fayetteville | VPC of Fayetteville provides "POV storage solutions for service members," and "ensure[s] each vehicle is indoors, protected from the elements and vandalism, and monitored 24 hours a day. VPC of Fayetteville is experienced in military affairs and specializes in assisting service members." (emphasis removed). | "VPC and VSF operations;" VPC of Fayetteville was proposed to operate the Winnsboro, South Caroline vehicle storage facility. |
| North American Consulting Services | North American Consulting Services "has provided vehicle processing, transportation, and customer services since 2003." (emphasis removed), with "[o]ver 35 years of experience operating VPCs and | "VPC operations and OTR transport (Turkey);" North American |

| | | |
|---|---|---|
| | coordinating transportation of items." (emphasis removed). "NACS provides OCONUS vehicle processing and over the road transportation services, as well, focusing on markets in Turkey." | Consulting Services was proposed to operate the Incirlik, Turkey, Izimir, Turkey, and Ankara, Turkey vehicle processing centers. It also was proposed to operate the Pomona, California, and Chino, California vehicle storage facilities. |
| Lincoln Property Company | "Lincoln offers a full range of asset management, property management, and construction management services." "Lincoln's experience relevant to GPC III includes the identification, qualification, assessment and leasing of over 1.2 million sq. ft. of vehicle processing and storage facilities under an IMCOM POV Storage – West contract." "As part of the proposal development process, Lincoln advised and assisted Team IAL in identifying and selecting every CO/CO VPC and storage location we have proposed . . . ." | "[R]eal estate advisory and agent services." |
| Didlake[10] | Didlake is an "AbilityOne directed subcontractor providing Norfolk, VA VPC operations." "Didlake offers new, life-enriching opportunities for people with disabilities." | Didlake was proposed to operate the Norfolk, Virginia vehicle processing center. |

Unlike American Auto Logistics, International Auto Logistics spent a significant portion of its proposal discussing its proposed personnel as "very relevant and applicable to the Government's assessment of our team's past performance." According to International Auto Logistics, that included "team member company personnel performing and/or supporting major or critical elements of the GPC III contract." In its proposal, International Auto Logistics profiled eighteen individuals from "Team IAL," including Doug Tipton, the president of International Auto Logistics, and a Senior Vice President of the parent company, International Auto Processing, who "was an executive for 5 years with American Shipping & Logistics, Inc., the parent of the incumbent American Auto Logistics, Inc. (AAL)." The International Auto Logistics proposal noted that, "as Executive Vice President and COO [Chief Operating Officer] of AAL, Mr. Tipton traveled to over 75% of the current VPCs and storage sites while

---

[10] Didlake was not included as a subcontractor in the list of subcontractors on the first page of intervenor's past performance proposal, and no past performance references were offered for Didlake. Didlake was included, however, elsewhere in the intervenor's proposal.

Program Manager for the GPC II." Additionally, the proposal noted that Rob Miller, the "Chairman of International Auto Logistics," is the President and Chief Executive Officer of the intervenor's parent company, International Auto Processing. The proposal also profiled the leadership of many of the subcontractors of "Team IAL." Of particular relevance, International Auto Logistics profiled three members from Global Auto Logistics and Trans Global Auto Logistics. The proposal profiled Kay Lester, president and owner of both Global Auto Logistics and Trans Global Auto Logistics. The proposal stated Ms. Lester has "30+ years experience in the field of POV handling, transportation and shipping for Commercial Customers," and "13+ years experience in setting up VPCs." The proposal also profiled Anthony Lester, stating that he is the Vice President of Trans Global Auto Logistics [TGAL], and that "Tony has been with TGAL since its inception in 1997, providing management and logistics of 2nd POV door to door shipments for U.S. Military force members both Domestic and Overseas." In addition, International Auto Logistics profiled Joachim Wetz, the "TGAL General Manager, Vice President of European Operations," and "General Manager and VP of Transglobal Auto Shipping European Branch." The proposal stated that Mr. Wetz has "30+ years experience in POV – shipping, customer service, and claims handling," and "[o]perational experience with GPC I and GPC II with TRANSCAR (subcontractor of AAL)."

International Auto Logistics also submitted a small business proposal, in which it described its small business utilization strategy, stating, "[w]e have assigned a GPC III Subcontract Plan Administrator (SPA) to ensure we meet our obligations under FAR 52.219-9, Small Business Subcontracting." The proposal also noted that "**Team IAL is a Small Business and Veteran Participation Leader—We Exceed Small Business and Veteran-owned Small Business Subcontracting Goals**." (emphasis in original). International Auto Logistics indicated in a chart in its proposal that its goal was to award 24.6% of its total contract dollars to small businesses, as follows:

### GOALS AS A PERCENTAGE OF TOTAL CONTRACT DOLLARS

| Goal (%) | | Base Year 1 | Base Year 2 | Option Year 1 | Option Year 2 | Option Year 3 |
|---|---|---|---|---|---|---|
| **Total Contracted Dollars** | | 138,217,828 | 167,983,516 | 172,209,826 | 176,337,204 | 179,574,433 |
| **Large Businesses** | 2.8% | 3,798,680 | 4,640,171 | 4,739,924 | 4,850,005 | 4,954,749 |
| **All Small Business** | 24.6% | 33,849,269 | 41,118,077 | 42,170,135 | 43,521,328 | 44,652,017 |
| **VOSB** | 2.0% | 2,756,980 | 3,331,283 | 3,402,898 | 3,481,928 | 3,557,126 |
| **SDVOSB** | 1.2% | 1,692,681 | 2,031,218 | 2,074,885 | 2,123,072 | 2,168,923 |
| **HUBZone** | 0.9% | 1,229,438 | 1,472,747 | 1,507,302 | 1,551,140 | 1,588,203 |
| **SDB** | 1.4% | 1,982,397 | 2,387,912 | 2,445,503 | 2,518,567 | 2,580,338 |
| **WOSB** | 2.2% | 3,007,969 | 3,674,300 | 3,753,289 | 3,840,457 | 3,923,397 |

In its pricing proposal, International Auto Logistics offered "**[z]ero transition cost pricing**," and claimed it would spread capital costs over the life of the award in order to remain cost competitive with the incumbent American Auto Logistics. (emphasis in

original). After TRANSCOM's initial review of proposals, International Auto Logistics updated its price proposal in response to a notice from TRANSCOM that certain line items in the initial pricing proposal "appear to be high (unfair and unreasonable) as evaluated using the techniques set forth in FAR 15.404-1(b)(2)." International Auto Logistics' final, offered, "**Total Evaluated Price**" was $919,233,416.75. (emphasis in original).

According to the record, five offerors submitted proposals in response to the GPC III solicitation: International Auto Logistics, American Auto Logistics, [redacted], [redacted], and [redacted]. According to a TRANSCOM "**SOURCE SELECTION EVALUATION BOARD (SSEB) TEAM TRAINING**" document, a Source Selection Evaluation Board was to first conduct initial evaluations in order to establish a competitive range. (capitalization and emphasis in original). Then, initial evaluation notices would be sent to offerors and discussions would be conducted, after which the government would accept revised interim proposals. After submission of the revised interim proposals, offerors would have one more chance to submit final proposal revisions, after which the Source Selection Evaluation Board would complete its report. Following the issuance of the Source Selection Evaluation Board report, the Source Selection Advisory Council would perform a comparative analysis, if required. Thereafter, the source selection authority would make her final source selection decision.

The Source Selection Evaluation Board rated the final business, technical, and small business proposals for all five offerors as Acceptable. The Source Selection Evaluation Board also determined that the final Total Evaluated Prices for American Auto Logistics and International Auto Logistics were "fair, reasonable, and realistic." Neither of these conclusions by TRANSCOM are disputed in the case before the court.

According to the record and parties' joint submission, American Auto Logistics submitted eighteen past performance references, two for American Auto Logistics as the prime contractor, and sixteen for its proposed subcontractors. Both of American Auto Logistics' past performance references were rated as "Very Relevant." The past performance questionnaires for American Auto Logistics' references indicated "Exceptional" performance for one reference, and "Very Good to Exceptional" performance for the other. American Auto Logistics' subcontractor, The Pasha Group, submitted one past performance reference, which was also rated as "Very Relevant," and the "[p]ast performance questionnaire indicated overall Exceptional Performance" related to that effort. The government reviewed six past performance references for Matson Terminals, one of which was rated as "Very Relevant." For that reference, the "[p]ast performance questionnaire indicated overall Very Good Performance." Of the remaining fourteen references, thirteen were rated as "Somewhat Relevant," with the government indicating between satisfactory and exceptional performance for those efforts. One reference, from Transcar, reference "W564KB-12-D-0014 James D'Attlo," was rated by the government as "Not Relevant." All of American Auto Logistics' eighteen references were also determined to be "recent," meaning that they were "currently ongoing or have been performed within 3 years of proposal submission." In

coming to an overall past performance rating for American Auto Logistics, the Source Selection Evaluation Board stated the following:

> Most significant and of greatest consideration was AAL's two Very Good – Exceptional past performance references for its Very Relevant (VR) current contract providing all of the same services required (POV processing, arranging for/providing ocean and inland transportation, customer service, storage), with both CONUS and OCONUS operations, under a single long term contract of the same magnitude and scope as required in this solicitation. Also considered significant and given substantial consideration was the Very Good - Exceptional past performance of two of AAL's subcontractors on VR efforts providing all of the same services required (POV processing, arranging/providing ocean and inland transportation, customer service, and storage), with both CONUS and OCONUS operations, under a single contract of the same magnitude and scope as required in this solicitation. The Government also considered, though less significantly, the Satisfactory-Exceptional past performance on the SR [Somewhat Relevant] references, which considered together, reflect further successful performance of all of the services required by this solicitation (POV processing, arranging for/providing ocean and inland transportation, customer service, and storage) with both CONUS and OCONUS operations. Overall, the offeror's past performance for all efforts considered reflect Satisfactory – Exceptional ratings, with the performance on the VR references rated Very Good to Exceptional. The Government also considered AAL's documented Very Good past performance in Small Business Subcontracting Utilization. A Confidence Assessment Rating of Substantial Confidence was assigned as the Government has a high expectation the offeror will successfully perform the required effort.

The source selection authority agreed with the Source Selection Evaluation Board to award American Auto Logistics a "Substantial Confidence" overall past performance rating, the highest possible rating, and noted that "the Government has a high expectation AAL will successfully perform the required effort." TRANSCOM's choice to give American Auto Logistics a past performance rating of "Substantial Confidence" also is not in dispute in the above captioned case.

Regarding International Auto Logistics, as part of its initial past performance evaluation, TRANSCOM reviewed twenty-six past performance references, some submitted by International Auto Logistics, and some identified by the agency through its Past Performance Information Retrieval System. The Source Selection Evaluation Board, after conducting its initial review, identified three potential issues related to past performance. First, the Source Selection Evaluation Board noted that for one of International Auto Logistics' subcontractors, Horizon Lines, a past performance reference found by the agency had a low performance rating: "The Government considered that Horizon, one of IAL's subcontractors, has Unsatisfactory ratings on one

reference, however pending IAL's response to the EN [Evaluation Notice], this rating is of minimal concern." Additionally, TRANSCOM noted that International Auto Logistics' "evaluated performance is through its parent company, International Auto Processing (IAP). Evaluation Notice (EN IAL-0009) will be sent to verify the relationship specific to this contract between IAL and IAP." TRANSCOM also noted that Global Auto Logistics, another of intervenor's subcontractors, "shares common ownership with Trans Global Auto Logistics (TGAL) and relies on TGAL for their past performance record. Evaluation Notice (EN IAL-0010) will be sent to verify the relationship specific to this contract between GAL and TGAL."

International Auto Logistics responded to the three evaluation notices issued by TRANSCOM. In response to the evaluation notice regarding Horizon Lines, International Auto Logistics attached additional documents which it stated "shows a reenergized Horizon Lines being an ALPHA carrier meeting RDD 98.7% of the time with an ITV [In-Transit Visibility] percentage of 97.0%. This performance level continues with the supporting evidence in our proposal reflecting Horizon's 100% 90-day rolling performance rating." International Auto Logistics also stated:

> IAL noted in its vendor prequalification audits that in mid-2012 Horizon put in place new procedures and timely RDD reporting mechanisms that clearly showed exemplary performance measurements in the later time window. Horizon operationally addressed weaknesses in the USTRANSCOM-cited CPAR for break bulk cargo by initiating a procedure for monitoring and reporting Gate Out and Delivery events in 2012, the effects of which corrected the issue and improved service statistics on this cargo.

Finally, International Auto Logistics mentioned that "[a]ll Team IAL subcontractors must meet or exceed IAL performance metrics and quality standards on the GPC III contract," and that they will be closely monitored. As a result, the Source Selection Evaluation Board stated: "Offeror's revised proposal is sufficient to address the concerns of this EN. EN is closed."

In response to the evaluation notice on the relationship between International Auto Processing and International Auto Logistics, International Auto Logistics responded with a letter from Robert Miller, "President & CEO" of International Auto Processing, stating in relevant part:

> This letter confirms International Auto Processing's (IAP) firm and lasting commitment to support its wholly-owned subsidiary International Auto Logistics (IAL) to the fullest extent. IAL will have at its complete disposal IAP's robust resources, port and vehicle processing expertise, rail, and trucking networks, IT systems, quality and ISO9001 certified programs and processes, commercial best practices and techniques, Human Resources, and financial backing to meet any challenge and ensure

compliance with the requirements as defined under the GPCIII PWS [Performance Work Statement].

Many of the IAP Board and Management team such as myself, President of IAP, Vince Watson, CFO, Steve Robbins, VP Operations (and over 18 years with IAP), both IAP/IAL Board members, as well as many of our departmental leaders and team members are on-call and will be sharing their skills, knowledge, operation techniques and experience in the training process as well as being "on-call" should additional support be required. The IAP and IAL team are highly aware of the customer's need in a contract transition. IAP pledges to IAL its complete support.

International Auto Logistics also separately pointed to parts of its proposal that indicated that it would be able to take advantage of International Auto Processing's "'*robust resources, including port and vehicle processing expertise, rail and trucking networks, IT systems, quality and training processes, and commercial business best practice techniques,*'" as well as "*IAP's human resources and financial backing*." (emphasis in original). As a result of this response, the Source Selection Evaluation Board stated: "Offeror's revised proposal is sufficient to address the concerns of this EN. EN is closed."

In response to the evaluation notice on the relationship between Trans Global Auto Logistics and Global Auto Logistics, International Auto Logistics attached a letter from Trans Global Auto Logistics, stating in relevant part:

This letter confirms Trans Global Auto Logistics (TGAL) firm and lasting commitment to support its sister company Global Auto Logistics (GAL) both of which are controlled by Kay Lester to the fullest extent. GAL will have at its complete disposal TGAL's vast resources in the areas of; [sic] freight forwarding,2[nd] [sic] POV movement, NVOCC (Non-Vessel Owning Common Carrier), warehousing, trucking, global operations network, systems, operational transportation logistics policies and procedures, human resources, and financial backing to meet any challenge and insure GAL compliance with the requirements as defined under the GPCIII PWS.

Although Ms. Lester, the president and owner of both entities, did not sign the letter, Aldo Flores, who identified himself as the General Manager of Trans Global Auto Logistics, stated: "I represent I am fully authorized to confirm Kay [Lester] and her companies [sic] resources will be at full disposal toward the successful performance of responsibilities to the magnitude required under the scope of the solicitation PWS." The International Auto Logistics proposal also stated:

[A]ll of TGAL's key personnel as outlined in the proposal such as Kay Lester, Tony Lester and Joe Wetz, all with unquestioned prior GPC and similar related service as well as their supportive team members will be on

hand and on call to assist GAL. From training, to quality operational processes and procedures, Ocean and Inland Logistics and more."

In response, the Source Selection Evaluation Board stated: "Offeror's revised proposal is sufficient to address the concerns of this EN. EN is closed."

After receiving responses from International Auto Logistics as well as other offerors, the Source Selection Evaluation Board conducted its interim evaluation. TRANSCOM discussed International Auto Logistics' responses to the agency's evaluation notices:

One EN was issued to afford IAL the opportunity to respond to adverse past performance information to which IAL responded by providing a satisfactory explanation as to the adverse past performance. IAL responded by stating Horizon lines has made improvements to their performance and is currently an "ALPHA" carrier (defined as eligible for all cargo bookings, Preferred Contractor for Unit Move Cargo) and meets their RDD 98.7% of the time and has an ITV percentage of 97%. Both unsatisfactory ratings are of minimal concern since Horizon has corrected its performance and is currently performing above average. Two additional ENs were issued to verify the relationship between IAL and IAP as well as GAL and TGAL for the purposes of past performance information in IAL's proposal. IAL responded by providing information sufficient to confirm the relationships between itself and IAP as well as GAL and TGAL for the purpose of past performance information for this solicitation. Additional information was also received from IAL's past performance references during this time. After evaluation of all new information noted above, however, it was determined the overall impact was not significant enough to affect IAL's past performance rating. Therefore, IAL's past performance confidence assessment remained Satisfactory Confidence.

As part of the interim evaluation, the Source Selection Evaluation Board summarized its review of each of International Auto Logistics' past performance references in a chart in the interim evaluation report, starting with the prime contractor's past performance references. International Auto Logistics provided three past performance references, which were performed by its parent company, International Auto Processing. TRANSCOM summarized the references as follows:

| Reference or Contract No. | Description of Effort Evaluated | Performance Areas | Recent (Y/N) | Relevancy Rating | Rationale for Relevancy Rating | Performance Comments |
|---|---|---|---|---|---|---|
| MBUSA (Mercedes Benz USA) Ted Boudalis | Prime contractor receiving, inspecting, documenting, washing, providing and managing truck areas, painting and body repairs, customer service, performance reporting, and interim storage at the VPC in Brunswick, GA. | POV Processing, Storage, Customer Service | Y 1/1/07 – 12/31/12 | SR [Somewhat Relevant] | Reference provided includes customer service, short term storage, and POV processing but does not include arranging/providing ocean & inland transportation, longterm storage, or OCONUS performance. | Past Performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |

| General Motors Scott McMillan | Prime contractor receiving, inspecting, documenting, washing, providing and managing truck areas, painting and body repairs, customer service, performance reporting, and interim storage at the VPC in Brunswick, GA. | POV Processing, Storage, Customer Service | Y 10/1/07 – 12/31/17 | SR | Reference provided includes customer service, short term storage, and POV processing but does not include arranging/providing ocean & inland transportation, longterm storage, or OCONUS performance. | Past Performance questionnaire indicated overall Very Good Performance. Reference stated they would award future contract. |
| [Hyundai] Glovis America, Inc. Glenn Clift | Prime contractor providing new/finished vehicle processing and storage in the US. | POV processing, customer service, storage | Y 2010-2012 | SR | Reference provided includes customer service, storage, and POV processing but does not include arranging/providing ocean & inland transportation or OCONUS performance. | Past Performance questionnaire indicated overall Very Good Performance. Reference stated they would award future contract. |

TRANSCOM stated: "In summary, IAL's performance record includes CONUS operations and demonstrates Very Good-Exceptional performance in POV processing, storage and customer service."

TRANSCOM next examined International Auto Logistics' subcontractors' past performance references, in the order they appear in the above list of subcontractors. Regarding the subcontractor, Liberty Global Logistics, TRANSCOM summarized the three references submitted for the subcontractor as follows:

| Reference or Contract No. | Description of Effort Evaluated | Performance Areas | Recent (Y/N) | Relevancy Rating | Rationale for Relevancy Rating | Performance Comments |
|---|---|---|---|---|---|---|
| HTC711-09-D-0039 Bill Lindquist | Prime contractor providing international cargo transportation and distribution services using common contract ocean carriers offering regularly scheduled commercial liner service. | Providing/ arranging for ocean & inland transportation, customer service | Y 1/1/09 – 2/29/12 | SR | Reference provided includes providing/arranging for ocean & inland transportation, customer service, and CONUS/OCONUS performance but does not include POV processing and storage. | Past Performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |
| Uniworld Ross Shrourou | Prime contractor providing carriage of vehicles and heavy equipment via ocean transportation from US East Coast to various destinations in the Mediterranean, Red Sea, and Arabian Gulf. | Providing/ arranging for ocean transportation, customer service | Y 1/1/11 - Present | SR | Reference provided includes providing/arranging for ocean transportation, customer service, and CONUS/OCONUS performance but does not include POV processing, providing/arranging inland transportation, or storage. | Past Performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |

| HTC711-09-D-0039 Kim Crossen | Prime contractor providing international cargo transportation and distribution services using common contract ocean carriers offering regularly scheduled commercial liner service. | Providing/ arranging for ocean & inland transportation, customer service | Y 04/01/11 – 09/30/12 | SR | Reference provided includes providing/arranging for ocean & inland transportation, customer service, and CONUS/OCONUS performance but does not include POV processing and storage. | PPIRS [Past Performance Information Retrieval System] indicated Satisfactory performance. Reference stated they would award future contract. |

TRANSCOM stated: "In summary, LGL's [Liberty Global Logistics'] performance record covers CONUS and OCONUS operations and demonstrates Satisfactory-Exceptional performance in providing/arranging for inland and ocean transportation and customer service."

Next, TRANSCOM reviewed Horizon Line's past performance references, as follows:

| Reference or Contract No. | Description of Effort Evaluated | Performance Areas | Recent (Y/N) | Relevancy Rating | Rationale for Relevancy Rating | Performance Comments |
|---|---|---|---|---|---|---|
| HTC711-11-09-D-0037 Kim Crossen | Prime contractor providing international cargo transportation and distribution services using common contract ocean carriers offering regularly scheduled commercial liner service. | Providing/arranging for ocean & inland transportation | Y 1/30/09 – 9/30/12 | SR | Reference provided includes providing/arranging for ocean & inland transportation, and CONUS/OCONUS performance but does not include POV processing, storage, and customer service. | PPIRS indicated Satisfactory performance. Reference stated they would award future contract. |
| HTC711-11-D-R012 Kim Crossen | Prime contractor providing port to port and end to end ocean transportation services between CONUS and Alaska/Hawaii. | Providing/arranging for ocean & inland transportation | Y 12/1/11 – 11/30/12 | SR | Reference provided includes providing/arranging for ocean & inland transportation, and CONUS/OCONUS performance but does not include POV processing, storage, and customer service. | PPIRS indicated Satisfactory performance. Reference stated they would award future contract. |
| HTC711-11-D-W004 Kim Crossen | Prime contractor providing port to port and end to end ocean transportation services to/from Alaska/Hawaii and CONUS. | Providing/arranging for ocean & inland transportation | Y 08/01/11 – 11/30/12 | SR | Reference provided includes providing/arranging for ocean & inland transportation, and CONUS/OCONUS performance but does not include POV processing, storage, or customer service. | PPIRS indicated Unsatisfactory to Satisfactory performance. Reference stated they might or might not award future contract. |

TRANSCOM commented that "No PPQs [completed Past Performance Questionnaires] were received for Horizon," and therefore, all of Horizon Line's references came from a search of TRANSCOM's Past Performance Information Retrieval System. TRANSCOM provided some additional discussion regarding Horizon Line's "Unsatisfactory to Satisfactory performance" rating with regards to reference HTC711-11-D-W004, the third past performance reference in the above chart. The agency stated:

In the area of on-time delivery, the report noted that Horizon met the Required Delivery Date for 64 of 95 pieces moved during this period of

performance and no cargo movement was measured for Dec 2011, Feb through Jun 2012, and Sep 2012 due to incomplete submission of EDI codes. Additionally, Horizon's overall ITV percentage was 56% and the Contracting Officer stated she might or might not award to Horizon today given the choice. Horizon was given "Charlie" ratings for both areas (defined as eligible for cargo bookings at a reduced preference). Evaluation Notice (EN IAL-0008) was issued to provide IAL an opportunity to respond to Horizon's adverse past performance. IAL responded by stating Horizon lines has made improvements to their performance and is currently an "ALPHA" carrier (defined as eligible for all cargo bookings, Preferred Contractor for Unit Move Cargo) and meets their RDD 98.7% of the time and has an ITV percentage of 97%. Both unsatisfactory ratings are of minimal concern since Horizon has corrected its performance and is currently performing above average. Additionally, IAL has established performance metrics for its subcontractors which will be managed via its TRAX system to ensure on-time performance and complete in-transit visibility. In summary, Horizon's performance record covers CONUS and OCONUS operations and demonstrates Unsatisfactory - Satisfactory performance in providing/arranging for inland and ocean transportation, with an acceptable resolution to the Unsatisfactory performance.

TRANSCOM next examined Global Auto Logistics, which submitted three past performance references, all performed through Trans Global Auto Logistics. Two of the references were determined by TRANSCOM to be "Relevant," making them the highest rated International Auto Logistics references in terms of relevance. The first reference stated, "TGAL, a sub-contractor to Allied International/Sirva under their contract with the Canadian Government, is responsible for complete POV processing in Europe of both inbound and outbound Canadian Department of Defense service member POVs." The reference mentioned that, "TGAL has established multiple agencies in Geilenkirchen, Heidelberg, Hamburg, Berlin, Munich, Rome and Naples" in carrying out its assigned role. The subcontract with Allied International/Sirva was stated to be for $2 million annually, $10 million over its life cycle.

The second Global Auto Logistics reference was one in which Trans Global Auto Logistics asserted it provides "VW-Logistics with complete transportation and relocation services for their Group-employee's global moves (i.e. VW, Porsche, Audi, Skoda, Seat), to and from one of their global Plants or Regional headquarters." The reference stated that the contract is for "$650,000 annually (estimated)," and also mentioned that, "VW-Logistics provides Trans Global with allocated and sufficient space on their chartered RO/RO – vessels, to facilitate the timely shipping of our volume of Canadian Forces 1st and 2nd POV program, as well as for the U.S.-Service-Members 2nd POVs." TRANSCOM rated only two of the three references provided:

| Reference or Contract No. | Description of Effort Evaluated | Performance Areas | Recent (Y/N) | Relevancy Rating | Rationale for Relevancy Rating | Performance Comments |
|---|---|---|---|---|---|---|
| W6447-ILEA08-35 Pat Amirault | Subcontractor providing complete transportation services of POVs for service members of the Canadian Department of National Defense for shipments between Canada/US and Europe. | Providing/arranging for ocean & inland transportation, customer service, POV processing | Y 2008 - Present | R [Relevant] | Reference provided includes providing/arranging for ocean & inland transportation, customer service, POV processing, and CONUS/OCONUS performance but does not include storage. | Past performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |
| Volkswagen Logistics Andree Brinkmann | Prime contractor providing transportation and relocation services for shipment of private vehicles worldwide including additional services required locally by host nation countries. | Providing/arranging for ocean & inland transportation, customer service, POV processing | Y 2006 - Present | R | Reference provided includes providing/arranging for ocean & inland transportation, customer service, POV processing, and CONUS/OCONUS performance but does not include storage. | Past performance questionnaire indicated overall Very Good to Exceptional Performance. Reference stated they would award future contract. |

The third Global Auto Logistics reference, for the contract with Hoegh Auto Liners, referenced a $1.5 million annual effort, in which, Trans Global Auto Logistics is "[p]roviding ocean transportation services between U.S., Europe, West Africa, Middle East, and Australia." The agency did not evaluate the Global Auto Logistics reference regarding the contract with Hoegh Auto Liners. The agency indicated that when it tried to contact Hoegh Auto Liners:

> Spoke to Mr. McKown on 8/26/2013 @ 1:50PM. He explained the relationship between his company and TGAL is that TGAL buys vessel space from Hoegh Auto Liners. TGAL is not performing services for Hoegh Auto Liners, but instead is a customer providing cargo to them to be shipped. After going over the PPQ with Mr. McKown over the phone, it was determined he is not the right person to complete a PPQ on behalf of TGAL.

In the TRANSCOM source selection evaluation notes contained in the record, the government stated that "[t]he Hoegh reference is not present. Perhaps an EN would be appropriate, particularly if we'll do this consistently across the board in other instances," and that "[r]eference has been e-mailed twice and called once requesting a PPQ." The record does not contain an indication of any further attempt to contact Hoegh in order to verify Global Auto Logistics' past performance reference.

Separately, TRANSCOM in its interim evaluation report also noted the strength of Global Auto Logistics' key personnel, stating:

> TGAL's key personnel (Kay Lester, Tony Lester, and Joe Wetz) have prior experience with GPC II and similar related service and are available to GAL in performance under this contract. Additionally, GAL and TGAL are both controlled by Kay Lester. GAL will have at its disposal TGAL's vast

resources in the areas of freight forwarding, POV movement, NVOCCs, warehousing, trucking, global operations, network, systems, operational transportation logistics policies and procedures, human resources, and financial backing.

TRANSCOM concluded: "In summary, GAL's performance record covers CONUS and OCONUS operations and demonstrates Very Good-Exceptional performance in providing/arranging for inland and ocean transportation, customer service, and POV processing."

TRANSCOM next reviewed the past performance references of SDV Command Source. TRANSCOM considered the three references provided by intervenor and one reference TRANSCOM found through its own Past Performance Information Retrieval System. TRANSCOM stated in its review:

| Reference or Contract No. | Description of Effort Evaluated | Performance Areas | Recent (Y/N) | Relevancy Rating | Rationale for Relevancy Rating | Performance Comments |
|---|---|---|---|---|---|---|
| W9124J-09-D-0017 Gerard Sovie | Prime contractor providing complete in-processing Storage services for the Dept of the Army POVs. | POV processing, providing/arranging for inland transportation, customer service, and storage. | Y 7/1/09 – 6/30/12 | SR | Reference provided includes providing/arranging for inland transportation, customer service, storage, and POV processing but does not include providing/arranging for ocean transportation or OCONUS performance. | Past performance questionnaire indicated overall Very Good Performance. Reference stated they would award future contract. |
| W9124J-09-D-0017 DO Fort Carson, CO Jennifer DeGraff | Prime contractor providing complete in-processing Storage services in Colorado for the Dept of the Army POVs. | POV processing, providing/arranging for inland transportation, customer service, and storage. | Y 7/1/09 – 6/30/12 | SR | Reference provided includes providing/arranging for inland transportation, customer service, storage, and POV processing but does not include providing/arranging for ocean transportation or OCONUS performance. | Past performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |
| W9124J-09-D-0017 DO Joint Base Lewis-McChord, WA Arthur Dearen | Prime contractor providing complete in-processing Storage services in Washington for the Dept of the Army POVs. | POV processing, providing/arranging for inland transportation, customer service, and storage. | Y 7/1/09 – 6/30/12 | SR | Reference provided includes providing/arranging for inland transportation, customer service, storage, and POV processing but does not include providing/arranging for ocean transportation or OCONUS performance. | Past performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |
| W9124J-09-D-0017 Angela Arwood | Prime contractor providing complete in-processing storage services for the Dept of the Army POVs. | POV processing, providing/arranging for inland transportation, customer service, and storage. | Y | SR | Reference provided includes providing/arranging for inland transportation, customer service, storage, and POV processing but does not include providing/arranging for ocean transportation or OCONUS performance. | PPIRS indicated Very Good to Exceptional performance. Reference stated they would award future contract. |

TRANSCOM concluded: "In summary, SDV's performance record covers CONUS operations and demonstrates Very Good to Exceptional performance in

providing/arranging for inland transportation, customer service, storage, and POV processing."

TRANSCOM next evaluated Posey Transport Group. Of the three references, only one was found to be "Somewhat Relevant," with the other two determined to be "Not Relevant." For the "Somewhat Relevant" reference, TRANSCOM rated the reference as follows:

| Reference or Contract No. | Description of Effort Evaluated | Performance Areas | Recent (Y/N) | Relevancy Rating | Rationale for Relevancy Rating | Performance Comments |
|---|---|---|---|---|---|---|
| AT&T Marc Botindari | Prime contractor managing the transportation of new vehicles entering service and the transportation of used surplus vehicle relocation and specialty equipment relocation. | Providing/arranging inland transportation, customer service | Y 2009 – Present | SR | Reference provided includes providing/arranging inland transportation and customer service in US only. The reference does not include providing/arranging ocean transportation, POV processing, storage, or OCONUS performance. | Past Performance questionnaire indicated overall Exceptional Performance. Reference stated they would award future contract. |

TRANSCOM concluded that: "In summary, Posey's performance record cover [sic] CONUS operations only and demonstrates Exceptional performance in providing/arranging for inland transportation and customer service."

Of the remaining twelve past references, ten were determined to be not relevant, and two not recent. The references are summarized below by the court:

| Subcontractor | Reference or Contract No. | TRANSCOM's Description of Effort Evaluated | TRANSCOM's Rationale for Relevancy Rating |
|---|---|---|---|
| Posey Transport Group | TS00010203 Joe Adamczyk | "Subcontractor providing POV transport between VPCs and vehicle storage facilities (VSFs) at operating locations in five US western states. 2009-2010 $107,945; 2010-2011 $319,530; 2011-2012 $53,143." | "Reference provided includes providing/arranging inland transportation and customer service in the western United States only. The reference does not include providing/arranging ocean transportation, POV processing, storage, OCONUS performance, and was a low dollar value in comparison to this Solicitation." |
| Posey Transport Group | Erhard BMW John Kapousis | "Prime contractor managing the transportation of dealer to dealer vehicle trades and dealer to customer POV transportation requests in CONUS and Canada. 2010 $21,255; 2011 $14,670; 2012 $8,830; 2013 $9,900." | "Reference provided includes providing/arranging inland transportation and customer service in United States and Canada only. The reference does not include providing/arranging ocean transportation, POV processing, storage, OCONUS performance, and was a low dollar value in comparison to this Solicitation." |
| Boyle Transportation | GSA Ron Siegel | "Prime contractor moving US National Archives via inland transportation for National Archives Records Administration with security requirements in CONUS. $200,000 annually." | "Reference provided includes providing/arranging inland transportation and customer service in the United States only. The reference does not include providing/arranging ocean transportation, POV processing, storage, OCONUS performance, and was a low dollar value in comparison to this Solicitation." |
| Boyle Transportation | M&EC Mike Eisenhower | "Prime contractor moving nuclear materials, security, and/or other specified requirements in CONUS. $120,000." | "Reference provided includes providing/arranging inland transportation and customer service in the United States only. The reference does not include providing/arranging ocean transportation, POV processing, storage, OCONUS performance, and was a low dollar value in comparison to this Solicitation." |

| VPC of Fayetteville | VPC001 & RV001 Arthur Goodman | "Prime contractor providing indoor POV storage (including maintenance) for two POVs, one RV, and sold the vehicle in Hope Mills, North Carolina. Also provided shuttle service to/from airport. $2,279.46 annually; $6,838.38 life cycle." | "Reference provided includes customer service, storage, & POV processing in North Carolina only. The reference does not include providing/arranging ocean or inland transportation, OCONUS performance, and was a very low dollar value in comparison to this Solicitation. This reference was a onetime arrangement between the contractor and an individual." |
|---|---|---|---|
| VPC of Fayetteville | VPC013 & VPC190 Michelle Bandy | "Prime contractor providing indoor POV storage (including maintenance) and shipping for one POV and packing, crating, storage, and shipping of household goods in Hope Mills, North Carolina. Also provided shuttle service to/from airport. $3,085." | "Reference provided includes customer service, storage, POV processing, and arranging/providing inland transportation in North Carolina only. The reference does not include providing/arranging ocean transportation, OCONUS performance, and was a very low dollar value in comparison to this Solicitation. This reference was a onetime arrangement between the contractor and an individual." |
| VPC of Fayetteville | VPC182 Juan Villarreal | "Prime contractor providing indoor POV storage (including maintenance) and shipping for one POV in Hope Mills, North Carolina. $1,671.03." | "Reference provided includes customer service, storage, POV processing, and arranging/providing inland transportation in North Carolina only. The reference does not include providing/arranging ocean transportation, OCONUS performance, and was a very low dollar value in comparison to this Solicitation. This reference was a onetime arrangement between the contractor and an individual." |
| North American Consulting Services | GAPS Donald Asdell | "Individual who developed, established, and instituted operational and administrative processes and programs to operate vehicle processing and factory operations as the President of GAPS. $235,000 annual; $725,000 life cycle." | "Reference provided is for an individual's performance (Ruhi Guven) as a previous President of (GAPS). Information provided is not for NACS as a company." |
| North American Consulting Services | City & Port of Long Beach Frank Colonna | "Prime contractor providing port and terminal operations and logistics needs at the port of Long Beach, CA." | [Not recent] |
| North American Consulting Services | A&R Engineering Murat Sehidoglu | "Prime contractor reviewing and updating existing Quality Assurance program to reflect the industry required standards in Carson, CA." | [Not recent] |
| Lincoln Property Company | W9124J-09-D-0017 Joe Adamczyk | "Subcontractor who researched, negotiated, and acquired facilities to support the contract." | "Reference provided includes customer service in reference to acquiring facilities in CONUS only. The reference does not include providing/arranging ocean or inland transportation, OCONUS performance, POV processing, or storage." |
| Lincoln Property Company | Cascades Technologies, Inc. Alfredo Casta | "Prime contractor who identified needs and criteria to find the person office spaces in Washington, D.C. and Northern Virginia." | "Reference provided includes customer service in reference to acquiring facilities in CONUS only. The reference does not include providing/arranging ocean or inland transportation, OCONUS performance, POV processing, or storage." |

TRANSCOM remarked that Boyle Transportation's and VPC of Fayetteville's "Not Relevant" references were for too low an amount of money. North American Consulting Services' one recent reference was remarked as not relevant because it was an "individual's performance (Ruhi Guven)." Lincoln Property Company's two "Not Relevant" references were remarked as containing too little scope: "The references includes [sic] customer service for acquiring facilities in CONUS only, but do not include providing/arranging for inland or ocean transportation, POV processing, storage, or OCONUS performance."

In reaching an interim past performance confidence determination, the TRANSCOM evaluators stated:

> SUMMARY: The Government considered all of the past performance above (28 references) in establishing an overall confidence assessment rating for IAL. IAL had no VR references for the services required (CONUS and OCONUS operations, POV processing, arranging for/providing ocean and inland transportation, customer service, and storage). as they have not performed the services together in a single long term contract of the same magnitude and scope as required in this Solicitation. Most significant and of greatest consideration was the Very Good – Exceptional performance of one of IALs subcontractors on two R efforts of similar scope and magnitude of effort and complexities as this solicitation as the efforts covered CONUS and OCONUS operations, providing/arranging for inland and ocean transportation, customer service, and POV processing. Only storage was not provided under these similar efforts. The Government also considered the Satisfactory-Exceptional past performance on the SR references, which considered together, reflect successful performance of all of the services required by this solicitation (CONUS and OCONUS operations, POV processing, arranging for/providing ocean and inland transportation, customer service, and storage). The Government considered that Horizon, one of IAL's subcontractors, has Unsatisfactory ratings on one reference, however IAL satisfactorily addressed the adverse past performance and the rating is of minimal concern. The Government did not consider the ten efforts that were determined not relevant nor the two determined not recent. The offeror has no documented past performance in the area of Small Business Subcontracting Utilization, therefore performance in this area is unknown and will not be treated favorable [sic] nor unfavorably.
>
> Although IAL has no VR references as they have not performed a single contract of the same magnitude and scope as required in this Solicitation, it' s [sic] R references are considered significant as they include all required services with the exception of storage. In addition, IAL and its subcontractors combined have provided sufficient references to demonstrate successful performance in all individual performance areas as required by the solicitation. This gives the Government a reasonable expectation the offeror will successfully perform the required effort. Therefore, a Confidence Assessment Rating of Satisfactory Confidence was assigned.

(emphasis and capitalization in original). The record indicates that, after the interim evaluation discussed above was completed, "[n]o discussions were held, nor revisions made" by International Auto Logistics regarding its past performance proposal. The Source Selection Evaluation Board signed and approved its final report on October 15, 2013. In the final report, since International Auto Logistics had made no changes to its

past performance evaluation, the Source Selection Evaluation Board maintained its rating determination from the interim evaluation, and stated: International Auto Logistics' "past performance confidence assessment remained Satisfactory Confidence."

The same Source Selection Evaluation Board offered the following final evaluation for all offerors:

**Evaluation Matrix after FPR Evaluation**

| Offeror | Business Proposal | Technical Proposal | | | Past Performance | Small Business Proposal | | Total Evaluated Price |
|---|---|---|---|---|---|---|---|---|
| | | Transition Plan | Technical Approach | Cyber Security | | Small Business Subcontracting Plan | Small Business Utilization Strategy | |
| International Auto Logistics (IAL) | Acceptable | Acceptable | Acceptable | Acceptable | Satisfactory Confidence | Acceptable | Acceptable | $919,233,416.75 |
| American Auto Logistics (AAL) | Acceptable | Acceptable | Acceptable | Acceptable | Substantial Confidence | Acceptable | Acceptable | $957,535,151.41 |
| [Redacted] | Acceptable | Acceptable | Acceptable | Acceptable | Satisfactory Confidence | Acceptable | Acceptable | [Redacted] |
| [Redacted] | Acceptable | Acceptable | Acceptable | Acceptable | Satisfactory Confidence | Acceptable | Acceptable | [Redacted] |
| [Redacted] | Acceptable | Acceptable | Acceptable | Acceptable | Satisfactory Confidence | Acceptable | Acceptable | [Redacted] |

(emphasis in original). American Auto Logistics received a past performance confidence rating of "Substantial Confidence," and International Auto Logistics received a past performance rating of "Satisfactory Confidence."

The Source Selection Advisory Council submitted its report reviewing the GPC III solicitation on October 16, 2013. The Source Selection Advisory Council performed an "integrated assessment" of the various proposals, which "takes into consideration the potential tradeoffs in terms of performance confidence assessment ratings and price." The integrated assessment did not consider technical subfactors, "because the factors were rated on an Acceptable / Unacceptable basis and all offerors' proposals were rated as Acceptable." In its integrated assessment, the Source Selection Advisory Council compared International Auto Logistics directly with American Auto Logistics:

> IAL received a Satisfactory past performance confidence assessment rating, offering a lesser level of confidence in successful contract performance when compared to AAL's proposal, which received a Substantial Confidence rating. All services under this requirement for which past performance information was requested represent commercial services. The lack of a single reference encompassing all performance areas resulted in IAL being assigned a lower past performance confidence assessment rating (Satisfactory Confidence) than AAL (Substantial Confidence). However, the difference between these two ratings is mitigated to an extent by the general commercial nature of the contract. Offerors have access to the existing shipping lanes for ocean transportation using the Government's Universal Services Contract (USC)

and Regional Domestic Contracts (RDC); many of the OCONUS VPCs are Government-provided; warehousing, vehicle processing space, line-haul services, and the IT requirements are also commercially available. Although IAL's past performance was not the same scope as the solicitation or AAL's past performance, it includes the same commercial services required with the exception of performing under a single contract. Adding volume to a commercial service already being performed presents less risk than adding a new service. IAL's past performance provides the Government satisfactory confidence it has the experience that would enable IAL to expand its current commercial efforts to meet the Government's requirements. While the solicitation permits the Government to award to an offeror with a higher price where superior past performance of the higher priced offeror outweighs the cost difference, the Government will not pay a price premium that it considers disproportionate to the benefits associated with the proposed margin of service superiority. The incumbent's superior past performance, when compared to the price and past performance proposals of IAL, does not warrant awarding at the higher proposed price. Therefore, IAL's proposal represents the best overall value to the Government.

The Source Selection Advisory Council, in making its final recommendation to the source selection authority, "determined the offeror representing the best value to the Government, price and other factors considered, is IAL. Award to IAL is recommended."

The source selection authority, Gail Jorgenson, made the final selection and signed the Source Selection Decision Document on October 23, 2013. Under the "**Basis for Award**," the Source Selection Decision Document stated:

The Government utilized a variation of the Trade-off Source Selection Process in accordance with (IAW) the mandatory DOD Source Selection Procedures. Specifically, the Government conducted a Past Performance Price Tradeoff (PPT) source selection in which competing offerors' past performance history was evaluated on a basis approximately equal to cost or price considerations. Award will be made to the offeror deemed responsible IAW FAR Part 9, as supplemented, who submitted an acceptable Business Proposal, Technical Proposal, and Small Business Proposal, and is judged, based on their past performance and total evaluated price, to represent the best value to the Government. Offerors were notified that this may result in an award to a higher rated, higher priced offeror, where the decision is consistent with the evaluation factors and the Government reasonably determines that the superior past performance of the higher priced offeror outweighs the difference in price. Offerors were also notified that the Government will not pay a price premium it considers to be disproportionate to the benefits associated with the proposed margin of service superiority. Therefore, the Government will award the contract to the offeror representing the best value, all factors

considered in accordance with the solicitation. An integrated assessment of the source selection team's evaluations of price and past performance is described below.

The source selection authority decided to give all the remaining offerors, including International Auto Logistics, a "Satisfactory Confidence" past performance rating, in agreement with the recommendations from the Source Selection Evaluation Board. The source selection authority stated that "the Government has a reasonable expectation these offerors will successfully perform the required effort." The source selection authority discussed International Auto Logistics' past performance evaluation in further detail:

> The Government considered 26[11] past performance references in establishing an overall confidence assessment rating for IAL. IAL had no Very Relevant references for the services required as they have not performed the required services together in a single long-term contract of the same magnitude and scope as the current requirement. Although IAL has no Very Relevant references, its Relevant references are considered significant as they include all required services with the exception of storage. Most significant and of greatest consideration was the Very Good – Exceptional performance of IAL's subcontractors on two Relevant efforts of similar scope and magnitude of effort and complexity as this solicitation, which included CONUS and OCONUS operations, providing/arranging for inland and ocean transportation, customer service, and POV processing, representing all performance areas noted in the solicitation except for long-term storage. The Government also considered the Satisfactory-Exceptional past performance on the Somewhat Relevant references, which considered together, reflect successful performance of all of the services required by this solicitation, including long-term storage. The offeror has no documented past performance in the area of Small Business Subcontracting Utilization, therefore performance in this area is unknown and was treated neither favorable [sic] nor unfavorably. Because IAL and its subcontractors combined have provided numerous references to demonstrate successful performance in individual performance areas as required by the solicitation, the Government has a reasonable expectation the offeror will successfully perform the required effort; therefore, a Confidence Assessment Rating of Satisfactory Confidence was assigned.

---

[11] Although the source selection authority stated in the Source Selection Decision Document that the government had reviewed twenty-six references for International Auto Logistics, the Source Selection Evaluation Board stated that it reviewed twenty-eight past performance references. A joint comparative chart submitted by the parties also indicates that the government reviewed twenty-eight past performance references for International Auto Logistics.

In discussing International Auto Logistics' "**Integrated Assessment**" (emphasis in original), the source selection authority stated:

All services under this requirement for which past performance information was requested (POV processing, arranging for or providing ocean transportation, arranging for or providing inland transportation, customer service, and storage) represent commercial services, despite the difficulty for offerors other than the incumbent to produce a single, comprehensive past performance reference including essentially the same scope and magnitude of effort and complexities requested in the solicitation. While the lack of a single reference encompassing all performance areas resulted in a lower past performance confidence assessment rating, the value between Satisfactory Confidence and Substantial Confidence ratings regarding actual contract performance is reduced to an extent by the general commercial nature of the contract and the prevalence of the required services in the commercial marketplace. This includes access to existing shipping lanes for ocean transportation, including the use of the Government's Universal Services Contract (USC) and Regional Domestic Contracts (RDC); the Government-provided vehicle processing center facilities in many of the OCONUS locations; the availability of commercial warehousing and vehicle processing center space, availability of commercial line-haul services to and from the major POV processing centers, and the basic, commercial-based IT requirements. The Government also notes IAL's past performance score reflected the scope of its past performance. IAL did not present past performance of the same scope as the Government requirement or AAL's past performance. However, while the scope was not the same, the Government notes IAL's past performance includes largely the same commercial services conducted by AAL (with the exception of performing under a single contract) and includes services IAL demonstrated it has and currently performs in the commercial marketplace. Adding volume to a commercial service already being performed presents less risk than adding a new service. IAL's past performance provides the Government satisfactory confidence that it has the experience that would enable IAL to expand current commercial efforts to meet the Government requirements.

While the Government may award to a higher rated, higher priced offeror, where it determines that the superior past performance of the higher priced offeror outweighs the associated price premium, the aforementioned commercial qualities of the requirements impact the extent to which the Government is willing to trade-off increased cost for higher-rated past performance. IAL's TEP is the lowest submitted by any

offer and is $38,301,734.66[12] below the next lowest offer. While the solicitation permits the Government to award to an offeror with a higher price where superior past performance of the higher priced offeror outweighs the cost difference, the Government will not pay a price premium that it considers disproportionate to the benefits associated with the proposed margin of service superiority. The incumbent's superior past performance, when compared to the price and past performance proposals of IAL, does not warrant awarding at the higher proposed price. Therefore, IAL's proposal represents the best overall value to the Government. Additional rationale for this tradeoff are detailed in the next section.

The source selection authority, within American Auto Logistics' "**Integrated Assessment**" (emphasis in original), also elaborated further as to why the government had concluded that International Auto Logistics was a better candidate for the GPC III award:

AAL was the only offeror to receive a Very Relevant past performance rating on any reference submitted, because only AAL submitted evidence of providing all of the same services as the current requirement, with essentially the same scope and magnitude of effort and complexities, under a single contract. This is due to AAL and its subcontractors' unique position of having successfully provided these services for the past 13 years. As a result, AAL received a Substantial Confidence past performance rating. AAL's proposed price is $38,301,734.66 higher than the lowest priced offeror. While the solicitation permits the Government to award to an offeror with a higher price, where superior past performance of the higher priced offeror outweighs the cost difference, the Government will not pay a price premium that it considers disproportionate to the benefits associated with the proposed margin of service superiority. In the present case, AAL's higher past performance does not outweigh the $38,301,734.66 price premium. A distinguishing difference in the past performance rating of AAL and IAL is that AAL's performance occurred under a single contract, and was of the same scope and magnitude as the solicited requirement. On the other hand, IAL demonstrated performance of similar or the same tasks [sic] under separate contracts, and was not the same scope and magnitude of the solicited requirement. In other words, both proposals demonstrated successful performance of essentially the same commercial services, but only AAL's performance was under a single contract with similar scope. In order to award to AAL, the Government would be required to trade-off a $38,301,734.66 price premium for award to an offeror whose past performance score is higher

---

[12] In a footnote, the source selection authority stated: "All figures represent the price differences in the TEPs as evaluated. Actual difference in cost to the Government is dependent on POV shipping and storage volume during contract performance."

because it performed the same recent and relevant commercial services under a single contract versus multiple contracts. Under the current Global POV Contract, AAL performs the work of a third-party logistics provider and is responsible for dividing and managing work between its subcontractors. The experience of providing logistics services for the same work (of greater scope) under a single contract versus multiple commercial contracts (of lesser scope), for purposes of actual contract performance, is not significant enough to justify the higher price. Awarding to AAL, with a $38,301,734.66 higher price would represent a price premium disproportionate to the benefits associated with the proposed margin of service superiority. As detailed above, the primary margin of service superiority represented in AAL's higher past performance score is not in specific performance areas, but rather contract integration, which in the current commercial marketplace is not worth the $38,301,734.66 price premium. Therefore, AAL does not represent the best value to the Government.

In making its "**SOURCE SELECTION DECISION**" (emphasis in original), the source selection authority maintained that:

> In accordance with the solicitation, which indicated that past performance would be evaluated on a basis approximately equal to price, I have determined that the additional cost of $38,301,734.66 is not proportionate to the benefit associated with the higher past performance rating which was based on the fact that AAL had successfully performed the current effort for the services required under this solicitation under a single contract.

The source selection authority concluded that "[i]t is, therefore, my decision that the proposal submitted by IAL represents the best value to the Government." Contract HTC711-14-D-R025 was awarded to International Auto Logistics, LLC on October 24, 2013.

American Auto Logistics filed a post-award bid protest at the GAO on November 1, 2013. In its protest to the GAO, American Auto Logistics argued that: (1) TRANSCOM's "evaluation of IAL's proposal under the Technical factor was unreasonable because IAL's technical approach could not have effectively demonstrated its ability to comply with the PWS requirements . . . ;" (2) "IAL's past performance rating was unwarranted given its extremely limited and largely irrelevant experience in providing the required range of services of similar scope, magnitude of effort, and complexity;" (3) "TRANSCOM's price realism assessment of IAL's proposal was inadequate because specific elements of IAL's lower pricing cannot reflect a clear understanding of the requirements . . . ;" (4) "TRANSCOM failed to conduct a reasonable performance/price tradeoff in making its source selection decision, and effectively and improperly converted the specified best value tradeoff criteria to a lowest-priced, technically-acceptable award scheme;" and (5) that TRANSCOM

improperly evaluated International Auto Logistics' technical proposal, because TRANSCOM "failed to recognize that IAL poses an unacceptable security risk due to its ties to the Unification Church . . . which has made various investments in North Korea (Pyonghwa Motors Co., KumGangSan International Group and Botongkang Hotel and Golf Course in Pyongyang) and have extensive economic ties to the North Korean and Chinese governments." In a footnote, American Auto Logistics claimed that "IAP is owned by Panda Motors, Inc.(also [sic] known and doing business as Panda Development Company (China)), which is in turn owned and controlled by the Unification Church."

TRANSCOM filed its agency report on November 26, 2013. In its response to the agency report filed at the GAO, American Auto Logistics dropped its first and third claims, regarding TRANSCOM's evaluation of International Auto Logistics' "technical approach" and TRANSCOM's price realism analysis. American Auto Logistics maintained, and elaborated on, its claim that TRANSCOM's past performance assessment was flawed, and explained that International Auto Logistics' two "Relevant" references for Global Auto Logistics were actually not relevant. Protestor alleged first that the references were invalid because they came from a sister organization, Trans Global Auto Logistics Europe,[13] not Global Auto Logistics itself. American Auto Logistics also alleged at the GAO that "[e]ven assuming it was appropriate to consider the past performance of TGAL-E [Trans Global Auto Logistics Europe], neither the Allied Contract nor the Volkswagen Contract warranted a "Relevant" rating under the RFP's definitions." (footnote omitted). American Auto Logistics also maintained that TRANSCOM "gave credit to TGAL's key personnel in assigning it Relevant ratings - even though the RFP's evaluation criteria do not allow for past performance credit with respect to key personnel." Finally, American Auto Logistics maintained that Global Auto Logistics' past performance references could not be significant, as, allegedly, "GAL was proposed to perform no more than $3-4 million per year of the contract's scope, equating to less than two percent of the total contract value," and therefore was a minor subcontractor. American Auto Logistics also questioned the source selection authority's

---

[13] This is the first instance in the record in which "Trans Global Auto Logistics Europe" is mentioned as a separate entity from Trans Global Auto Logistics. Earlier, in its proposal, International Auto Logistics appears to have referred to the entity as its "European branch" and "European offices." According to an exhibit filed by protestor during the GAO protest, protestor claimed that "[t]he most recent (and only) list of shareholders available from the corporate registry is dated February 2, 2007, lists the following four entities and individuals as each owning 25% of Trans Global Logistics Europe:"

- Trans Global Logistics Inc. Texas (25%)
- Frank Hollmann (25%)
- MIRASCON Versicherungsmakler GmbH, Koln (25%)
- Joachim Wetz (25%)

(footnote omitted).

conclusion regarding the other "Somewhat Relevant" references in the International Auto Logistics proposal, focusing in particular on the references regarding the solicitation of "POV Processing Services," "Inland Transportation Services," and "Ocean Transportation Services." (emphasis in original). Protestor contended at the GAO that International Auto Logistics, due to its alleged lack of experience, could give "at best a 'low expectation,' that IAL will successfully perform the GPC III requirements."

In its response to the TRANSCOM agency report, American Auto Logistics also maintained that, "[i]n view of the numerous flaws in TRANSCOM's evaluation of IAL's past performance proposal, therefore," "TRANSCOM's past performance/price tradeoff and source selection decision were necessarily flawed and unreasonable." American Auto Logistics contended that "the SSA's integrated assessment explicitly discounted the differences in the AAL and IAL past performance ratings from the outset based merely on the 'nature of the contract.'" According to American Auto Logistics, "[q]uite simply, the SSA did not have the authority to reduce the difference between a Substantial Confidence rating and Satisfactory Confidence rating in the context of making the award decision based on the commercial nature of the contract." (emphasis in original). In addition, American Auto Logistics maintained that "**IAL's Significant Ties To North Korea, China And The Unification Church Are Very Real And Pose Security Risks**," and attached to its comments a report by Stroz Friedberg LLC, detailing International Auto Processing's alleged ties to the Unification Church, North Korea, and China. (emphasis in original).

International Auto Logistics intervened in the protest at the GAO. International Auto Logistics submitted comments to the agency report and also provided an affidavit from Kay Lester of Global Auto Logistics, to explain the relationship between Global Auto Logistics, Trans Global Auto Logistics, and Trans Global Auto Logistics Europe. The affidavit stated in relevant part:

> I [Kay Lester] am the President and owner of Trans Global Auto Logistics, Inc., ("TGAL"), a Woman-Owned Small Business ("WOSB"), a position I have held since 2002. . . . I am also the President and owner of Global Auto Logistics, LLC ("GAL"), a WOSB, a position I have held since GAL was formed in early 2013 for the purpose of participating on support contracts with the U.S. Government. My duties for these companies consist of overseeing and managing day-to-day and overall operations.
>
> . . .
>
> Trans Global Logistics Europe ("TGALE"), GmbH, is a subsidiary of TGAL, TGALE was formed in 2005 to provide TGAL's customer base with a variety of support throughout Europe, including port handling, customs clearance services, general freight handling, trucking / inland transportation and logistics support throughout Europe. I am a principal of TGALE. I have been intimately involved with TGALE since its formation. After forming TGALE, I opened the European office, made all hiring

decisions, conducted all training, and negotiated all inland agency, port services, and inland transportation service agreements. Having fully developed the infrastructure, I continue to manage all day-to-day operations with my partner Joachim Wetz. TGALE will make all of its resources and assets available to GAL and TGAL in the performance of the GPC III contracting effort, particularly in light of TGAL's anticipated contractual role in performing the aforementioned services in and throughout Europe.

International Auto Logistics also provided an affidavit from Mr. Wetz, which stated in relevant part:

Trans Global Logistics Europe GmbH ("TGALE"), is a subsidiary of TGAL. I am the General Manager of Trans Global Logistics Europe GmbH ("TGALE") and manage day-to-day operations with my business partner Sandra K. Lester. TGALE was formed in 2005 to provide TGAL's customer base general freight trucking and transportation, inland transportation, and logistics support through Europe. TGALE will make all of its resources and assets available to GAL and TGAL in performance of the GPC III contracting effort, particularly in light of TGAL's anticipated contractual role in performing the aforementioned services in and throughout Europe.

The GAO denied American Auto Logistics' protest, on January 30, 2014. Regarding protestor's past performance claim, the GAO stated that "[t]he evaluation of past performance, including the agency's determination of the relevance and scope of an offeror's performance history to be considered, is within the sound discretion of the contracting agency." Regarding American Auto Logistics' claim that Global Auto Logistics' past performance references were performed allegedly by Trans Global Auto Logistics Europe, the GAO stated: "It is well settled that an agency may rely on the performance of a parent or sister company where, as here, resources and key personnel are anticipated to be relied on during performance." (citing Serco, Inc., B-406683, 2012 WL 3298132 (Comp. Gen. Aug. 3, 2012), and Ecompex, Inc., B-292865.4, 2004 WL 1675519 (Comp. Gen. June 18, 2004)). The GAO further stated that "IAL emphasized that GAL and its sister company [Trans Global Auto Logistics] shared common ownership and that the sister company's president and owner, European managing partner, and key personnel would be supporting GAL in its performance of this contract." (footnote omitted). The GAO also explained that, "[a]lthough the protester maintains that the European 'affiliate' is a separate and distinct entity from the sister company, the protester's own evidence shows that the 'affiliate' was formed to support and serve the customer base of the sister company." In addition, the GAO found no issue with the agency's consideration of Global Auto Logistics' past performance references,

even though the references did not perform all of the work required here under one contract, and even though GAL is expected to perform only a

relatively small portion of the work on the contract. The RFP did not require that each reference have experience performing all of the required work, or all of the work under one contract.

The GAO also addressed American Auto Logistics' "attempts to diminish the relevancy of several of the somewhat relevant contracts the agency considered in evaluating IAL's performance," stating that:

The protester again bases its complaint on the fact that none of the referenced contracts involved performing all of the requirements of the RFP under a single contract. . . . We have reviewed each of the challenged references and find that the record supports the agency's relevancy determination as well as the agency's conclusion that, collectively, all of the references provided the agency with satisfactory confidence that IAL would successfully perform the contract.

Regarding American Auto Logistics' claim that the performance price tradeoff was unreasonable, the GAO stated:

At the heart of the protester's complaints is its belief that the agency is not justified in selecting a lower priced contractor given the protester's superior record of performance. As noted above, the agency disagreed. . . . As the agency explains, the services procured here were commercial services that are available in the commercial marketplace. Thus, the IAL team's performance under separate smaller contracts, in the agency's eyes, was relevant to demonstrating satisfactory performance, and AAL's superior performance did not warrant the added cost in the commercial marketplace.

(footnote omitted). The GAO added, "[i]n sum, we find unobjectionable the agency's conclusion that, although the protester had a superior record of performance, that superiority was not worth a price premium of $38 million." Finally, the GAO addressed the claim regarding the Unification Church, North Korea, and China in a footnote, stating that "[t]he agency responds that it is not aware of any connection between IAL and North Korea, China, or the Unification Life Church. Further, the agency notes that protester acknowledges that IAL submitted an acceptable information assurance and cybersecurity plan," and that the agency had not violated any laws or regulations in this regard. (internal citations omitted). The GAO concluded that the "protester's allegations regarding IAL's possible relationships do not provide a basis for our Office to sustain its protest."

Protestor filed suit in this court on February 5, 2014, alleging that "TRANSCOM's past performance evaluation methodology was unreasonable and contrary to the criteria in the RFP. According to the protestor, TRANSCOM failed to evaluate each past performance reference provided by IAL and its subcontractors to determine its similarity in terms of scope, magnitude of effort and complexities to the GPC III solicitation

requirements." Protestor maintains, as it did at the GAO, that "[t]he two Relevant ratings assigned to the contract references provided for subcontractor GAL/TGAL were improper and inconsistent with the RFP's criteria . . . ." Moreover, protestor argues in this court that TRANSCOM "also failed to properly apply the RFP relevancy criteria when evaluating the past performance references for IAP and several of IAL's other named subcontractors."

Protestor also argues:

TRANSCOM's source selection decision was also substantially flawed, and contrary to the RFP and applicable law, because it diminished the value of AAL's Substantial Confidence rating, as compared to IAL's Satisfactory Confidence rating, on the basis that certain of the service elements of the GPC III requirement are available in the commercial marketplace, that IAL had demonstrated that is [sic] has and currently performs all of the GPC III service elements in the commercial marketplace, and that "adding volume to a commercial service already being performed presents less risk than adding a new service."

Although not presented in the complaint, in a hearing before this court, protestor raised a third protest ground, that International Auto Logistics has subcontracted with an allegedly "fairly notoriously debarred company," under the name Agility International or Agility Defense and Government Services. Protestor subsequently elaborated on its third ground in writing, stating that "International Auto Logistics, LLC intends to subcontract with, or otherwise use the services of, an Agility business unit that is currently on the excluded parties list in the System for Award Management for purposes of performing certain portions of the GPC III contract at issue in this protest." Defendant maintains, in a February 19, 2014 status report, that "Agility is not listed as a subcontractor in International Auto Logistics' proposal for the contract at issue," and that, "as of February 18, 2014, Agility is not listed as suspended or debarred in the System for Award Management and is eligible to receive Government contracts." Nonetheless, protestor contends that defendant did not perform sufficient research on the issue, because there are "hundreds of Agility-affiliated companies that have been suspended from contracting with the U.S. Government," and that although intervenor's counsel claimed that they "knew nothing about what any unspecified Agility entity was 'doing or why it is doing it,'" intervenor's counsel "also represent[s] the two Agility companies that challenged their suspensions before the U.S. District Court for the Northern District of Alabama." (footnote omitted).

Protestor sought "injunctive and declaratory relief prohibiting TRANSCOM and IAL from proceeding with performance of the GPC III Contract awarded to IAL," and submitted motions for both a temporary restraining order and preliminary injunction regarding the GPC III contract. Protestor also sought a finding that the source selection decision was "arbitrary and capricious, an abuse of discretion, and contrary to the RFP's criteria and applicable law," and requested an order from the court "requiring TRANSCOM to conduct a new evaluation of IAL's past performance proposal and make

a new source selection decision in strict accordance with the RFP and applicable law." The parties and the court agreed to proceed on an expedited schedule for the above captioned case. The court issued an oral decision indicating to the parties no injunction was forthcoming. As noted above, this opinion reduces to writing the oral decision previously issued to the parties.

## DISCUSSION

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(a)(1) (2012). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract.'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009))); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); see also Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires 'allegational prejudice,' as contrasted to prejudice on the merits . . . ."); Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

Protestor, American Auto Logistics, maintains that it has standing as an interested party under 28 U.S.C. § 1491(b)(1), since "Plaintiff's proposal received the highest possible past performance rating," "had the second-lowest evaluated price," and was acceptable in all other evaluation areas. Neither defendant nor intervenor challenge protestor's standing. Given protestor's position as the second-lowest offeror in terms of price and the only offeror with a "Substantial Confidence" past performance rating, the court agrees that protestor had a substantial chance of winning the solicitation at issue in the above captioned case if it is able to succeed on the merits of the protest.

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2013), which governs motions for judgment on the administrative record, the court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1356–57)); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1329 (citing to Scanwell Laboratories, Inc. v. Shaffer for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319. The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys.

Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244) (emphasis in original); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2012);[14] see

---

[14] The language of 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

also <u>Orion Tech., Inc. v. United States</u>, 704 F.3d 1344, 1347 (Fed. Cir. 2013); <u>COMINT Sys. Corp. v. United States</u>, 700 F.3d 1377, 1381 (Fed. Cir. 2012); <u>Savantage Fin. Servs. Inc., v. United States</u>, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d 1352, 1358 (2009); <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332); <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>Eco Tour Adventures, Inc. v. United States</u>, 114 Fed. Cl. at 22; <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. 334, 340 (2012). "'In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Turner Constr. Co. v. United States</u>, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2011); <u>see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d 901, 907 (Fed. Cir. 2013); <u>McVey Co. v. United States</u>, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); <u>PlanetSpace, Inc. v. United States</u>, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1358)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically has addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A). <u>See COMINT Systems Corp. v. United States</u>, 700 F.3d at 1381 ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))); <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of Title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (citations omitted)); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d at 1350 ("Among the various APA

---

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A), and citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); SKF USA Inc. v. United States, 630 F.3d 1365, 1374 (Fed. Cir. 2011); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d at 1342 ("The agency must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform a meaningful review . . . ."); WHR Grp., Inc. v. United States, 115 Fed. Cl. 386, 398 (2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013) (applying the standard in a bid protest dispute); Linc Gov't Servs., LLC v. United States, 108 Fed. Cl. 473, 489 (2012) (same). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995–96 (Fed. Cir. 1996); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340; Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523 (2011). The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc.

v. United States, 645 F.3d at 1387; Sierra Nev. Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

Furthermore, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 694–96. Recognizing the two-step analysis of bid protest cases, the United States Court of Appeals for the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057;

Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir.

1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)));
Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); Davis Boat
Works, Inc. v. United States, 111 Fed. Cl. at 349; HP Enter. Servs., LLC v. United
States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States,
101 Fed. Cl. 765, 780 (2011).

> As stated by the United States Supreme Court:
>
> Section 706(2)(A) requires a finding that the actual choice made was not
> "arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law." To make this finding the court must consider
> whether the decision was based on a consideration of the relevant factors
> and whether there has been a clear error of judgment. Although this
> inquiry into the facts is to be searching and careful, the ultimate standard
> of review is a narrow one. The court is not empowered to substitute its
> judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on
other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v.
Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,
Inc., 419 U.S. at 285; Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d at 1309 (In
discussing the "arbitrary, capricious, and abuse of discretion otherwise not in
accordance with the law" standard, the Federal Circuit stated that "the ultimate standard
of review is a narrow one. The court is not empowered to substitute its judgment for that
of the agency." (quotation omitted)); In re Sang Su Lee, 277 F.3d at 1342; Advanced
Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious
standard applicable here is highly deferential. This standard requires a reviewing court
to sustain an agency action evincing rational reasoning and consideration of relevant
factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at
285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993);
BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The
court 'is not empowered to substitute its judgment for that of the agency,' and it must
uphold an agency's decision against a challenge if the 'contracting agency provided a
coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton
Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755 (2004); Axiom Res. Mgmt., Inc. v.
United States, 564 F.3d at 1381) (internal citations omitted)), appeal withdrawn, 559 F.
App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed.
Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); Gulf
Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004); ManTech Telecomms. & Info.
Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir.
2002).

> According to the United States Court of Appeals for the Federal Circuit:
>
> Effective contracting demands broad discretion. Burroughs Corp. v. United
> States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United

States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) (The Department of Labor, "as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Kingdomware Techs., Inc. v. United States, 107 Cl. 226, 231 (2012) ("'Federal procurement entities have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation."'" (quoting K-Lak Corp. v. United States, 98 Fed. Cl. 1, 8 (2011) (quoting Tyler Constr. Grp. v. United States, 570 F.3d at 1334))).

Similarly, the Federal Circuit further has indicated that:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))); Cohen Fin. Servs., Inc. v. United States, 112 Fed. Cl. 153, 162 (2013); McVey Co., Inc. v. United States, 111 Fed. Cl. at 402.

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl.

643, 650 (2008) ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."), appeal dismissed, 356 F. App'x 390 (Fed. Cir. 2009); Textron, Inc. v. United States, 74 Fed. Cl. 277, 286 (2008), appeal denied, 222 F. App'x 974–96, (Fed. Cir. 2007) (in which the court considered technical ranking decisions as "'minutiae of the procurement process'" not to be second guessed by a court (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))). This is because "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 717 (2011); Unisys Corp. v. United States, 89 Fed. Cl. 126, 142 (2009) (holding that an agency's "exercise of such technical judgment and expertise . . . . is entitled to the greatest possible deference under E.W. Bliss"). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct. See WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (internal citations omitted))); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations.").

The amount of discretion afforded the contracting officer is greater in some circumstances as compared to others. For example, in a negotiated procurement, contracting officers are generally afforded greater decision making discretion, in comparison to their role in sealed bid procurements. See Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("The protestor's burden is greater in negotiated procurement, as here, than in other types of bid protests because '"the contracting officer is entrusted with a relatively high degree of discretion."'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (quoting Burroughs Corp. v. United States, 223 Ct. Cl. 53, 64, 617 F.2d 590, 598 (1980)))); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." (citations omitted)); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002) ("Moreover, in a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations."), reh'g en banc denied (Fed. Cir.), cert. denied, 540 U.S. 937 (2003).

The United States Court of Appeals for the Federal Circuit has explained that procurement officials have an even greater degree of discretion when it comes to best-value determinations, as compared to deciding on price alone. See Galen Med.

Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); Optimization Consulting, Inc. v. United States, 115 Fed. Cl. 78, 89 (2013); Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28; E.W. Bliss Co. v. United States, 77 F.3d at 449; Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Am. Tel. & Tel.

Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

Although it is not bound by GAO decisions, the court typically gives respect and consideration to GAO decisions. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests.")); Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. at 230 n.2; Orion Tech., Inc. v. United States, 102 Fed. Cl. 218, 229 n.17 (2011) ("While the decisions of the Comptroller General and the boards of contract appeals are not binding on the Court of Federal Claims, their analyses may be instructive."), aff'd, 704 F.3d 1344 (Fed. Cir. 2013). Decisions of the GAO are treated as expert opinions, which the court should "prudently consider." Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003), aff'd in part, rev'd in part sub nom. Cherokee Nation of Okla. v. Leavitt, 543 U.S. 631 (2005); see also Glenn Def. Marine (Asia) PTE Ltd. v. United States, 97 Fed. Cl. 568, 577 (2011), dismissed, 459 F. App'x 906 (Fed. Cir. 2011); Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 412 (2009) ("'Although not binding on this court, GAO opinions are properly used for information and guidance, given the GAO's experience and expertise.'" (quoting Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 213, 232 (2008))); Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 746 (2008); Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 623 (2005).

Protestor argues that the decision by TRANSCOM to award the GPC III contract to International Auto Logistics was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with applicable law," citing to 28 U.S.C. § 1491(b)(4). Protestor alleges three protest grounds in support: First, protestor challenges TRANSCOM's award of a "Satisfactory Confidence" past performance rating to International Auto Logistics. Second, protestor challenges TRANSCOM's decision, under its integrated assessment and performance price tradeoff, to award the contract to the lower-priced International Auto Logistics, despite protestor's higher past performance rating of "Substantial Confidence." Third, protestor challenges the award to International Auto Logistics as in violation of federal procurement laws, because International Auto Logistics is allegedly proposing to use a suspended or debarred contractor for contract performance.

Given the complexity of the facts presented before the court, utilizing a joint submission submitted by the parties, the court has prepared three charts comparing International Auto Logistics' past performance references with those of American Auto Logistics:

| Comparative Chart – TRANSCOM's Past Performance Evaluation of International Auto Logistics | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Recency | Relevancy | OCONUS (Outside the Continental United States) | CONUS (Continental United States) | POV Processing | Arranging for or Providing Ocean Transportation | Arranging for or Providing Inland Transportation | Customer Services | Storage | Past Performance Reference Evaluation by TRANSCOM |
| Prime Contractor | International Auto Logistics/ International Auto Processing | (a) MBUSA Ted Boudalis | Y | Somewhat Relevant | | √ | √ | | | √ | √ | Exceptional Performance |
| | | (b) General Motors Scott McMillan | Y | Somewhat Relevant | | √ | √ | | | √ | √ | Very Good Performance |
| | | (c) Glovis America, Inc. Glenn Clift | Y | Somewhat Relevant | | √ | | | | √ | √ | Very Good Performance |
| Subcontractors | Liberty Global Logistics | (a) HTC711-09-D-0039 Bill Lindquist | Y | Somewhat Relevant | √ | √ | | √ | √ | √ | | Exceptional Performance |
| | | (b) Uniworld Ross Shrourou | Y | Somewhat Relevant | √ | √ | | √ | | | | Exceptional Performance |
| | | (c) HTC711-09-D-0039 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | √ | | Satisfactory Performance |
| | Horizon Lines | (a) HTC711-11-09-D-0037 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |
| | | (b) HTC711- 11-DR012 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |
| | | (c) HTC711- 11-DW004 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Unsatisfactory to Satisfactory Performance |
| | Global Auto Logistics/ Trans Global Auto Logistics | (a) Allied Contract W6447-ILEA08-35 | Y | Relevant | √ | √ | √ | | √ | √ | | Exceptional Performance |
| | | (b) Volkswagen Logistics Andree Brinkmann | Y | Relevant | √ | √ | √ | √ | √ | √ | | Very Good to Exceptional Performance |
| | SDV Command Source | (a) W9124J- 09-D-0017 Gerard Sovie | Y | Somewhat Relevant | | √ | | | √ | √ | √ | Very Good Performance |
| | | (b) W9124J-09-D-0017 DO Fort Carson | Y | Somewhat Relevant | | √ | √ | | √ | √ | √ | Exceptional Performance |
| | | (c) W9124J- 09-D-0017 DO Joint Base | Y | Somewhat Relevant | | √ | √ | | √ | √ | | Exceptional Performance |
| | | (d) W9124J-09-D-0017 Angela Arwood | Y | Somewhat Relevant | | √ | √ | | √ | √ | √ | Very Good to Exceptional Performance |
| | Posey Transport Group | (a) AT&T Marc Botindari | Y | Somewhat Relevant | | √ | | | √ | √ | | Exceptional Performance |
| | | (b) TS00010203 Joe Adamczyk | Y | Not Relevant | | | | | | | | |
| | | (c) Erhard BMW John Kapousis | Y | Not Relevant | | | | | | | | |
| | Boyle Transport- ation | (a) GSA Ron Siegel | Y | Not Relevant | | | | | | | | |
| | | (b) M&EC Mike Eisenhower | Y | Not Relevant | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **VPC of Fayetteville** | **(a)  Arthur Goodman** | Y | Not Relevant | | | | | | |
| | | **(b)  Michelle Bandy** | Y | Not Relevant | | | | | | |
| | | **(c)  Juan Villarreal** | Y | Not Relevant | | | | | | |
| | **North American Consulting & Services Company** | **(a)  GAPS Donald Asdell** | Y | Not Relevant | | | | | | |
| | | **(b)  City & Port of Long Beach** | N | - | | | | | | |
| | | **(c)  A&R Engineering** | N | - | | | | | | |
| | **Lincoln Properties** | **(a)  W9124J-09-D-0017 Joe Adamczyk** | Y | Not Relevant | | | | | | |
| | | **(b)  Cascades Technologies** | Y | Not Relevant | | | | | | |

| | | | Recency | Relevancy | OCONUS (Outside the Continental United States) | CONUS (Continental United States) | POV Processing | Arranging for or Providing Ocean Transportation | Arranging for or Providing Inland Transportation | Customer Services | Storage | Past Performance Reference Evaluation by TRANSCOM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Comparative Chart – TRANSCOM's Past Performance Evaluation of American Auto Logistics** | | | | | | | | | | | | |
| **Prime Contractor** | American Auto Logistics | (a) DAMT01-03-D-0184 Willice Doyle | Y | Very Relevant | √ | √ | √ | √ | √ | √ | √ | Exceptional Performance |
| | | (b) DAMT01-03-D-0184 Krissy Schneider | Y | Very Relevant | √ | √ | √ | √ | √ | √ | √ | Very Good to Exceptional Performance |
| **Subcontractors** | American Roll-on Roll-off Carrier | (a) HTC711-12-DW004 Bill Lindquist | Y | Somewhat Relevant | √ | √ | | √ | √ | √ | | Exceptional Performance |
| | | (b) HTC711-09-D-0029 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |
| | American Logistics Network | (a) DAMT01-03-D-0184 Willice Doyle | Y | Somewhat Relevant | | √ | √ | | √ | √ | √ | Exceptional Performance |
| | AP Logistics | (a) DAMT01-03-D-0184 Willice Doyle | Y | Somewhat Relevant | √ | | √ | √ | | √ | | Very Good Performance |
| | Matson | (a) DAMT01-03-D-0184 Willice Doyle | Y | Very Relevant | √ | √ | √ | √ | √ | √ | √ | Very Good Performance |
| | | (b) HTC711-12-DW014 Bill Lindquist | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Exceptional Performance |
| | | (c) HTC711-11-DW005-0014 Bill Lindquist | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Exceptional Performance |
| | | (d) HTC711-11-DR013 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |
| | | (e) HTC711-11-DW005 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | | | | Satisfactory Performance |
| | | (f) HTC711-09-D-0041 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |
| | Transcar | (a) DAMT01-03-D-0184 Willice Doyle | Y | Somewhat Relevant | √ | | √ | √ | √ | √ | | Exceptional Performance |
| | | (b) W564KB-12-D-0014 James D'Attlo | Y | Not Relevant | | | | | | | | |
| | The Pasha Group | (a) DAMT01-03-D-0184 Willice Doyle | Y | Very Relevant | √ | √ | √ | √ | √ | √ | √ | Exceptional Performance |
| | Pasha Hawaii Transport Lines | (a) HTC711-11-DW007 Bill Lindquist | Y | Somewhat Relevant | √ | √ | | √ | √ | √ | | Exceptional Performance |
| | | (b) HTC711-11-DW007 Kim Crossen | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |
| | | (c) HTC711-11-DR016 Suzanne Mudd-Yarber | Y | Somewhat Relevant | √ | √ | | √ | √ | | | Satisfactory Performance |

| Summary Comparative Chart - TRANSCOM Evaluation | | | | | |
|---|---|---|---|---|---|
| | Number of Past Performance References | | | | |
| | Very Relevant | Relevant | Somewhat Relevant | Not Relevant | Not Recent |
| **INTERNATIONAL AUTO LOGISTICS** | | | | | |
| International Auto Logistics/International Auto Processing | | | 3 | | |
| Liberty Global Logistics | | | 3 | | |
| Horizon Lines | | | 3 | | |
| Global Auto Logistics/ Trans Global Auto Logistics | | 2 | | | |
| SDV Command Source | | | 4 | | |
| Posey Transport Group | | | 1 | 2 | |
| Boyle Transportation | | | | 2 | |
| VPC of Fayetteville | | | | 3 | |
| North American Consulting & Services Company | | | | 1 | 2 |
| Lincoln Properties | | | | 2 | |
| **TOTAL (28)** | | **2** | **14** | **10** | **2** |
| | | | | | |
| **AMERICAN AUTO LOGISTICS** | | | | | |
| American Auto Logistics | 2 | | | | |
| American Roll-on Roll-off Carrier | | | 2 | | |
| American Logistics Network | | | 1 | | |
| AP Logistics | | | 1 | | |
| Matson | 1 | | 5 | | |
| Transcar | | | 1 | 1 | |
| The Pasha Group | 1 | | | | |
| Pasha Hawaii Transport Lines | | | 3 | | |
| **TOTAL (18)** | **4** | | **13** | **1** | |

Past Performance Evaluation

In response to protestor's challenges of the agency's past performance evaluations, defendant responds that when evaluating past performance in a negotiated procurement, this court maintains a highly deferential standard, such that, in order to prevail, protestor must demonstrate "'by a preponderance of the evidence that the [source selection authority decision] lacked *any* rational basis,'" quoting Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 117 (2003), appeal dismissed, 89 F. App'x 741 (Fed. Cir. 2004). (emphasis and modification in original). Previously, a Judge of the United States Court of Federal Claims explained, "[i]n the bid protest context, the assignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'" Todd Constr., L.P. v. United States, 88 Fed. Cl. 235, 247 (2009) (quoting Clean Venture, Inc., B-284176, 2000 WL 253581, at *3 (Comp. Gen. Mar. 6, 2000)), aff'd, 656 F.3d 1306 (Fed. Cir. 2011); see also Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 785 (It is a "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference.'" (quoting Al Andalus Gen. Contracts Co. v. United States, 86 Fed. Cl. 252, 264 (2009) (citing Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 293 (2007)))); SP Sys., Inc. v. United States, 86 Fed. Cl. 1, 23 (2009) (A "past performance evaluation 'will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'" (quoting Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. at 637)). "'When the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, "the greatest deference possible is given to the agency."'" FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 396 (2011) (quoting Univ. Research Co. v. United States, 65 Fed. Cl. 500, 505 (2005) (quoting Gulf Grp., Inc. v. United States, 61 Fed. Cl. at 351)); see also Plasan N. Am., Inc. v. United States, 109 Fed. Cl. 561, 572, appeal dismissed (Fed. Cir. 2013); Fort Carson Support Servs. v. United States, 71 Fed. Cl. 571, 598 (2006) ("Evaluation of past performance is 'within the discretion of the contracting agency and will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'" (quoting Consol. Eng'g Servs. v. United States, 64 Fed. Cl. at 637)). Likewise, the Court in Seaborn Health Care, Inc. v. United States, wrote:

A similar deferential standard applies when the Court is reviewing an agency's assessment of past performance evaluations. Commissioning Solutions Global, LLC v. United States, 97 Fed. Cl. 1, 9 (2011) ("[I]n cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a 'triple whammy of deference.'") (quoting Gulf Grp., Inc. v. United States, 61 Fed. Cl. 338, 351 (2004))); see also Blackwater Lodge & Training Center Inc. v. United States], 86 Fed. Cl. 488, 493 (2009) ("mere disagreement" with past performance evaluations is insufficient to disturb agency's decision).

Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. 42, 48 (2011). Continuing, the
court stated:

> In evaluating an offeror's past performance, FAR 15.305(a)(2) affords
> agencies considerable discretion in deciding what data is most relevant.
> PlanetSpace Inc. v. United States, 92 Fed. Cl. 520, 539 (2010). "Thus,
> when evaluating an offeror's past performance, the [contracting officer]
> 'may give unequal weight,' or no weight at all, 'to different contracts when
> [the contracting officer] views one as more relevant than another.'" Linc
> Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 718 (2010) (quoting
> SDS Int'l, Inc. v. United States, 48 Fed. Cl. 759, 769 (2001)).

Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. at 51 (modifications in
original); see also Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 787.
"The court must especially defer to the agency's technical evaluations, past
performance ratings, and other 'minutiae of the procurement process . . . which involve
discretionary determinations of procurement officials.'" J.C.N. Constr., Inc. v. United
States, 107 Fed. Cl. 503, 510 (2012) (quoting E.W. Bliss Co. v. United States, 77 F.3d
at 449), subsequent determination, 2013 WL 593479 (Fed. Cl. Feb. 15, 2013). This
court has determined that, in a negotiated performance, a protestor must overcome a
"triple whammy of deference by demonstrating by a preponderance of the evidence that
the SSA lacked *any* rational basis" to assign a given past performance rating.
Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 117 (emphasis in original); see
also CGS Adm'rs, LLC v. United States, 110 Fed. Cl. 431, 450 (2013) (stating that "past
performance evaluations in this type of procurement are accorded a 'triple whammy of
deference'" (quoting Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 117)),
appeal dismissed, 89 Fed. App'x 741 (Fed. Cir. 2004); Plasan N. Am., Inc. v. United
States, 109 Fed. Cl. at 572; Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 243
(2011). Nonetheless, although highly deferential, the court's review of an agency's past
performance evaluation is neither an automatic endorsement of the agency's actions
nor tolerant of observable mistakes. Moreover, each past performance evaluation is
reviewed on a fact-specific basis.

Protestor challenges TRANSCOM's rating of Global Auto Logistics' two past
performance ratings as "Relevant." Protestor contends that it is not Global Auto
Logistics that performed the efforts discussed in the references, but rather Trans Global
Auto Logistics Europe, which protestor alleges is a "separate legal entity with different
ownership." Protestor maintains that "an agency may only attribute to the offeror the
past performance of an affiliate where the proposal demonstrates that the resources of
the affiliate will be provided or relied upon for contract performance such that the
affiliate will have meaningful involvement in contract performance," citing in support
Femme Comp, Inc. v. United States, 83 Fed. Cl. at 747. Protestor claims that "neither
TRANSCOM nor Intervenor has disputed the plain fact that Trans Global-Europe is a
separate legal entity from, and not just a branch office of, Trans Global, and it is
nowhere identified in Intervenor's proposal," by name. Protestor notes that the

"Intervenor's proposal does not even reference Trans Global-Europe, let alone commit Trans Global-Europe's unidentified workforce, facilities or other resources to the performance of any part of the GPC III Contract." Protestor further contends that "the vague references to having a European branch office cannot be reasonably construed as referring specifically to Trans Global Logistics Europe because there are no less than six different European 'partners' named on the website of Trans Global Auto Logistics."[15] Therefore, according to protestor, TRANSCOM had no basis on which to conclude that Trans Global Auto Logistics Europe was "an entity having involvement with Intervenor's team or future contract performance." Protestor also cites to Health Net Federal Services, LLC, B-401652.3, 2009 WL 3843162 (Comp. Gen. Nov. 4, 2009), in which the protestor alleges the GAO held that an "agency improperly considered the past performance of corporate affiliates where the proposal provided no insight regarding which specific entities had performed the contracts referenced in the past performance proposal." Protestor also cites to IAP World Services, Inc.; EMCOR Government Services, Inc., B-407917.2, 2013 WL 3817472 (Comp. Gen. July 10, 2013), and Perini/Jones, Joint Venture, B-285906, 2000 WL 33741037 (Comp. Gen. Nov. 1, 2000), for the proposition that a mere statement by a subsidiary's parent cannot bind the subsidiary to perform on a contract.

In response, defendant argues that, "[t]he awardee's proposal plainly identified Global Auto Logistics with its sister company, Trans Global Auto Logistics, as a subcontractor," and that the two companies "had entered into a teaming agreement." Defendant admits that "[p]erhaps at the outset the awardee could have stated more clearly the relationship between Global Auto Logistics and Trans Global Auto Logistics," but that, in any event, International Auto Logistics' responses to the evaluation notices made clear that Trans Global Auto Logistics has a "firm and lasting commitment to support its sister company Global Auto Logistics," and that Global Auto Logistics "will have at its complete disposal TGAL's vast resources." Defendant further maintains that the third entity, Trans Global Auto Logistics Europe, also "figures prominently in the awardee's proposal," through references to Trans Global Auto Logistics' European branch offices. Defendant further notes that, in the International Auto Logistics proposal, "[t]he awardee identified Mr. Joachim 'Joe' Wetz as both General Manager of Trans Global Auto Logistics and Vice President of its European operations." Defendant argues that, therefore, it was "not unreasonable for the evaluators to conclude that Trans Global Auto Logistics Europe is simply the European branch of Trans Global Auto Logistics repeatedly referenced in the awardee's proposal." Additionally, defendant points out that at the GAO, International Auto Logistics provided affidavits from Ms. Lester and Mr. Wetz affirming that "Trans Global Auto Logistics Europe is a 'subsidiary' of Trans Global Auto Logistics," with all of its resources made available to both Global Auto Logistics and Trans Global Auto Logistics. Defendant maintains that these

---

[15] Protestor notes that "Trans Global's website identifies six different European 'Partners,' including: Trans Global-Europe in Germany; TransGlobal Logistics UK in the United Kingdom; Amphion Global Logistics in Greece; International Transport Co SRL in Italy; B&B Expedite BV in The Netherlands; and Complete Marine Freight in Spain." (emphasis in original).

commitments, made in the intervenor's proposal, in the evaluation notice responses, and at the GAO, were sufficient to allow TRANSCOM to consider Trans Global Auto Logistics Europe's past performance references when evaluating intervenor's proposal.

Defendant relies on the GAO decision in the above captioned protest, as well as the GAO decision in IAP World Services, Inc.; EMCOR Government Services, 2013 WL 3817472, for the proposition that, when assessing a past performance reference, "'[t]he relevant consideration is whether the resources of the parent or affiliated company—*its workforce, management, facilities, or other resources*—will be provided *or* relied upon for contract performance such that the parent or affiliate will have *meaningful involvement in contract performance*.'" (quoting id. at *6) (emphasis in original). Defendant adds that, in IAP World Services, Inc.; EMCOR Government Services, the GAO wrote: "'[I]t is appropriate to consider an affiliate's performance record where the affiliate will be involved in the contract effort *or where it shares management with the offeror*,'" but also noted that "'it is inappropriate to consider an affiliate's record where that record does not bear on the likelihood of successful performance by the offeror.'" (quoting id.) (emphasis in original). Defendant also quotes from Femme Comp Inc. v. United States, 83 Fed. Cl. at 747, for the proposition that an affiliated company's past experience can be attributed when the proposal demonstrates that the "'resources of the parent or affiliated company will affect the performance of the offeror.'"

Intervenor agrees with defendant's arguments, and adds, once again, citing Femme Comp, 83 Fed. Cl. 704, that "the procuring agency need not explicitly make a determination on the relationship where there is no reason to question it," (citing id. at 746), and "'[t]he fact that the [affiliated] corporations were not expressly listed as subcontractors is immaterial; there is no requirement that an offeror must designate its affiliated corporations as subcontractors in order to officially commit their resources to the performance of a contract.'" (quoting id. at 747) (modification in original). Intervenor further contends that "[a] company is not required to team with its affiliates where the affiliate's assets and resources will be made available during contract performance," again citing to Femme Comp for support. Intervenor supports defendant's position that, based on the record, "International's proposal clearly demonstrated both: (1) Global Auto Logistics'/Trans Global Auto Logistics' affiliation with Trans Global Logistics Europe; and (2) Global Auto Logistics'/Trans Global Auto Logistics' intent to use Trans Global Logistics Europe in contract performance." The intervenor also notes, "Global Auto Logistics/Trans Global Auto Logistics did not distinguish between the U.S. and European affiliates."

Evaluations of past performance are governed by FAR 15.305 (2013), which instructs that agency personnel, "should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition." FAR 15.305(2)(iii). As a Judge of this court held in Femme Comp, "'[a]n agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the

performance of the offeror.'" <u>Femme Comp Inc. v. United States</u>, 83 Fed. Cl. at 747 (quoting <u>Hot Shot Express, Inc.</u>, B-290482, 2002 WL 1831022, at *2 (Comp. Gen. Aug. 2, 2002)); <u>see</u> <u>also</u> <u>Linc Gov't Servs., LLC v. United States</u>, 96 Fed. Cl. at 722. The GAO has also explained in <u>Hot Shot Express</u> that where

> no provision in the solicitation precludes offerors from relying on the resources of their corporate parent or affiliated companies in performing the contract, and an offeror represents in its proposal that resources of a related company will be committed to the contract, the agency properly may consider those resources in evaluating the proposal.

<u>Hot Shot Express, Inc.</u>, 2002 WL 1831022, at *2 (citing <u>Physician Corp. of Am.</u>, B-270698, 1996 WL 191140 (Comp. Gen. Apr. 10, 1996)). In <u>PlanetSpace, Inc. v. United States</u>, the rationale behind allowing the source selection authority discretion in choosing whether or not to evaluate the affiliate or parent was explained as follows:

> At the outset, it is important to note that what does or does not constitute "relevant" past performance falls within the SSA's [source selection authority's] considered discretion. <u>See</u> FAR 15.305(a)(2)(ii) ("The [SSA] shall determine the relevance of similar past performance information."). . . The Office of Federal Procurement Policy's ("OFPP") guidance to agencies is in accord, encouraging agencies to consider the past performance of key management personnel and subcontractors to "reduce [ ] the chance of needing to neither reward nor penalize an offeror with no other relevant past performance information" under FAR 15.305(a)(2)(iv). <u>Best Practices for Collecting and Using Current and Past Performance Information</u>, ch. 3 (Office of Fed. Procurement Policy, et al. 2000) (internal quotation marks omitted).

<u>PlanetSpace, Inc. v. United States</u>, 92 Fed. Cl. at 539.

In the above captioned protest, International Auto Logistics gave sufficient information in its proposal and later responses to the evaluation notices to allow TRANSCOM to reasonably conclude that Trans Global Auto Logistics would be working with Global Auto Logistics to perform the GPC III contract, if the contract were to be awarded to the intervenor. When listing subcontractors in its proposal, International Auto Logistics mentioned the two companies together, as "Trans Global Auto Logistics/Global Auto Logistics." In its description of the subcontractor, International Auto Logistics made clear that Global Auto Logistics and Trans Global Auto Logistics "share[] common ownership" and that Global Auto Logistics "was formed as a special purpose company, with the goal of participating in bidding and obtaining support contracts with the U.S. Government. GAL relies on TGAL and its principals for its past performance." Therefore, it was reasonable for TRANSCOM to conclude that both companies proposed were to be involved as subcontractors in the GPC III contract performance, even if other parts of the proposal named only Global Auto Logistics as the subcontractor. In addition, in response to an evaluation notice from TRANSCOM,

International Auto Logistics attached a letter from Trans Global Auto Logistics, stating, in relevant part:

> This letter confirms Trans Global Auto Logistics (TGAL) firm and lasting commitment to support its sister company Global Auto Logistics (GAL) both of which are controlled by Kay Lester to the fullest extent. GAL will have at its complete disposal TGAL's vast resources in the areas of; freight forwarding,2[nd] [sic] POV movement, NVOCC (Non-Vessel Owning Common Carrier), warehousing, trucking, global operations network, systems, operational transportation logistics policies and procedures, human resources, and financial backing to meet any challenge and insure GAL compliance with the requirements as defined under the GPCIII PWS.

This letter further supports the agency's determination that Trans Global Auto Logistics would have "meaningful involvement" in Global Auto Logistics' proposed contract performance, see Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 722, and demonstrates "that the resources of the parent or affiliated company will affect the performance of the offeror." See Femme Comp Inc. v. United States, 83 Fed. Cl. at 747 (internal quotation omitted).

International Auto Logistics' proposal does not explicitly mention Trans Global Auto Logistics Europe, although the proposal does state that Trans Global Auto Logistics has "European offices," and that Mr. Wetz, one of the key personnel committed to the GPC III effort is General Manager and Vice President of the "Transglobal Auto Shipping European Branch." The first time Trans Global Auto Logistics Europe is mentioned as a separate entity from Trans Global Auto Logistics in the record is in protestor's comments to the agency report during the GAO protest. At the GAO, International Auto Logistics also submitted an affidavit by Ms. Lester stating:

> Trans Global Logistics Europe ("TGALE"), GmbH, is a subsidiary of TGAL. TGALE was formed in 2005 to provide TGAL's customer base with a variety of support throughout Europe, including port handling, customs clearance services, general freight handling, trucking/ inland transportation and logistics support throughout Europe. I am a principal of TGALE. I have been intimately involved with TGALE since its formation. . . . Having fully developed the infrastructure, I continue to manage all day-to-day operations with my partner Joachim Wetz. TGALE will make all of its resources and assets available to GAL and TGAL in the performance of the GPC III contracting effort, particularly in light of TGAL's anticipated contractual role in performing the aforementioned services in and throughout Europe.

In addition, International Auto Logistics submitted an affidavit from Mr. Wetz, stating:

> Trans Global Logistics Europe GmbH ("TGALE") is a subsidiary of TGAL. I am the General Manager of Trans Global Logistics Europe GmbH

("TGALE") and manage day-to-day operations with my business partner Sandra K. Lester. TGALE was formed in 2005 to provide TGAL's customer base general freight trucking and transportation, inland transportation, and logistics support through Europe. TGALE will make all of its resources and assets available to GAL and TGAL in performance of the GPC III contracting effort, particularly in light of TGAL's anticipated contractual role in performing the aforementioned services in and throughout Europe.

Protestor argues that intervenor's affidavits at the GAO represent "*post hoc* rationalizations" that are "inappropriate to overcome the APA standard of review." The parties' submissions to the GAO, however, may be considered by this court. See 31 U.S.C. § 3556 (2012) (In any action in front of the United States Court of Federal Claims, "the reports required by sections 3553 (b)(2) [the agency's report to the GAO in a bid protest] and 3554 (e)(1) [the United States Comptroller General's report to Congress in instances where an agency does not submit to recommendations from the GAO] of this title with respect to such procurement or proposed procurement and any decision or recommendation of the Comptroller General under this subchapter with respect to such procurement or proposed procurement shall be considered to be part of the agency record subject to review."); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911 n.8 ("All of the materials submitted to the GAO are part of the administrative record before the Court of Federal Claims. 31 U.S.C. § 3556. In a case involving a post-award conflict of interest investigation and analysis, this court noted that courts 'reviewing bid protests routinely consider . . . evidence developed in response to a bid protest.'" (quoting Turner Constr. Co. v. United States, 645 F.3d at 1386)) (modifications in original).

In the protest currently before the court, although the affidavits submitted to the GAO further clarify the agency's and intervenor's arguments, there was, in fact, sufficient information available to the agency at the time of award included in the proposal and in the intervenor's responses to the evaluation notices, such that the agency's consideration of Trans Global Auto Logistics' European affiliate or branch office's past performance was not arbitrary or capricious. Protestor argues that Trans Global Auto Logistics Europe is a separate entity and therefore its resources cannot automatically be committed to the GPC III effort. Protestor states that, "[t]he most recent (and only) list of shareholders available from the corporate registry in Germany reflects that as of 2007 TGLE was owned 25% each by TGAL, MIRASCON Versicherungsmakler GmbH, Mr. Frank Hollmann, and Mr. Joachim Wetz," indicating that Ms. Lester (through Trans Global Auto Logistics) and Mr. Wetz together own fifty percent of Trans Global Auto Logistics Europe. Protestor contends that "this 'common management'" is insufficient, because "a subsidiary corporation is defined as 'a corporation in which a parent corporation has a controlling share.'" (quoting Black's Law Dictionary 394 (9th ed. 2009)). According to the solicitation, "Subsidiary means an entity in which more than 50 percent of the entity is owned-- (1) Directly by a parent corporation; or (2) Through another subsidiary of a parent corporation." Whether or not Trans Global Auto Logistics Europe is a "subsidiary" of Trans Global Auto Logistics

does not affect TRANSCOM's analysis, however. The past performance of affiliates also can be attributed to intervenor's proposal if their resources are committed to the contract. See Femme Comp Inc. v. United States, 83 Fed. Cl. at 747; IAP World Servs., Inc.; EMCOR Gov't Servs., 2013 WL 3817472, at *6. Trans Global Auto Logistics Europe is an affiliate of Trans Global Auto Logistics. See FAR 2.101 ("Affiliates means associated business concerns or individuals if, directly or indirectly-- (1) Either one controls or can control the other; or (2) A third party controls or can control both."). Ms. Lester and Mr. Wetz represented at the GAO that they run the "day-to-day" operations of Trans Global Auto Logistics Europe, and protestor's filing indicates that the two own fifty percent of the entity. Additionally, at the GAO, protestor described Mr. Wetz as Trans Global Auto Logistics Europe's "sole director," therefore having control of management. Furthermore, "there is no requirement that an offeror must designate its affiliated corporations as subcontractors in order to officially commit their resources to the performance of a contract." Femme Comp Inc. v. United States, 83 Fed. Cl. at 747. Instead, the FAR indicates that the source selection authority "should take into account . . . subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition." FAR 15.305(a)(2)(iii). Based on the intervenor's proposal, it was reasonable for the source selection authority to find that Global Auto Logistics' European resources would be committed to the contract if awarded to the intervenor, and, therefore, to consider Trans Global Auto Logistics Europe's past performance references. Moreover, Ms. Lester's and Mr. Wetz's representation as fifty percent of Trans Global Auto Logistics Europe's shareholders, and Mr. Wetz as the European entity's sole director, reasonably indicates that Trans Global Auto Logistics Europe's resources would be committed to the intervenor's GPC III effort, if International Auto Logistics was awarded the contract.

Protestor attempts to rely on Femme Comp Inc. v. United States to argue that International Auto Logistics' decision not to mention the legal entity's name, Trans Global Auto Logistics Europe, is a reason not to consider it's past performance references. The Femme Comp court, however, allowed a subsidiary's past performance to be considered even though the exact relationship with the contractor was not specifically described in the proposal. The Femme Comp court stated the "[a]lthough Systems Research's [the awardee's] proposal refers repeatedly to Galaxy, Touchstone, and Spectrum, none of the three corporations were identified as subcontractors that were committed to perform under an awarded contract." Femme Comp Inc. v. United States, 83 Fed. Cl. at 721, 745 (internal citations omitted). The Femme Comp court, relying on the GAO's viewpoint from Hot Shot Express, Inc., 2002 WL 1831022, nonetheless recognized that:

> [T]he Army could have reasonably concluded that Systems Research's proposal demonstrated that the resources of Spectrum and Touchstone would affect Systems Research's performance on the contract. Both corporations are included in the narrative portion of Systems Research's proposal in such a way as to suggest that they would play a role in Systems Research's contract performance. The fact that the corporations were not expressly listed as subcontractors is immaterial; there is no

requirement that an offeror must designate its affiliated corporations as subcontractors in order to officially commit their resources to the performance of a contract.

Femme Comp Inc. v. United States, 83 Fed. Cl. at 747. Additionally, the Femme Comp court stated:

> Systems Research's response that all of Galaxy's employees were its own employees strongly implies that Galaxy was Systems Research's subsidiary corporation. As such, the Army could have reasonably concluded that Systems Research's proposal demonstrated that Galaxy's resources would affect Systems Research's performance on the contract. Accordingly, the Army properly considered Galaxy's experience and past performance when evaluating Systems Research's proposal.

Id. International Auto Logistics' proposal stated that Trans Global Auto Logistics would use European branch offices, and discussed its resources available in Europe. Although International Auto Logistics did not specifically identify that the European branch which would be involved in contract performance was, by name, Trans Global Auto Logistics Europe, the government was not arbitrary and capricious when it concluded that Trans Global Auto Logistics Europe's experience and resources were relevant to the intervenor's past performance evaluation for the GPC III contract.

Protestor's reliance on the GAO decisions it cites also is unavailing. Protestor contends that Health Net provides that agencies cannot consider the past performance of "corporate affiliates where the proposal provided no insight regarding which specific entities had performed the contracts referenced in the past performance proposal." In Health Net, the GAO was not concerned with a lack of clarity as to the corporate relationship, but instead whether the entities involved in the past performance reference would actually perform as part of an awarded contract. The GAO opinion stated:

> Given the repeated use of the general reference to "Aetna" throughout AGHP's [Aetna Government Health Plans, LLC's, the awardee's] proposal, the PAG (performance assessment group) did not know the specific roles, if any, the various Aetna entities would have in performance of the T–3 effort. Nor did the PAG have any insight regarding which specific Aetna entities had performed the contracts referenced in AGHP's past performance proposal; therefore, the PAG could not know what role, if any, the entities that had performed the prior contracts would have in performance of AGHP's T–3 contract. Given this lack of information, TMA's [the Department of Defense TRICARE Management Activity's] reliance on past performance by "Aetna" in its assessment of AGHP effectively attributed to AGHP the past performance of other Aetna corporate entities based on the mere fact of their corporate affiliation. Absent some more definitive indications of what entities performed what contracts and what roles they would have in performing the T–3 effort,

there was no basis for TMA to consider, let alone give credit in the evaluation for, the "generic" Aetna past performance submitted with its proposal.

Health Net Fed. Servs., LLC, 2009 WL 3843162, at *12. As opposed to offering the unnamed Aetna affiliates as in the Health Net case, Trans Global Auto Logistics specifically offered the experience of its "European offices," over which it had significant ownership and management control. Moreover, International Auto Logistics emphasized Mr. Wetz's role in GPC III performance, as the "Vice President of European Operations" for Trans Global Auto Logistics.

The GAO decision in IAP World Services, Inc.; EMCOR Government Services, 2013 WL 3817472, also is distinguishable from protest currently before the court. In IAP World Services, Inc.; EMCOR Government Services, the GAO faulted the agency for providing past performance references from entities that may not actually participate in the contract. See IAP World Servs., Inc.; EMCOR Government Services, 2013 WL 3817472, at *7. The GAO stated: "We disagree with the Navy that it could attribute to J & A [World Service, LLC] the experience and past performance of separate corporate affiliates that were not proposed to perform any work or to otherwise provide resources under the contract." Id. The same was true in Perini/Jones, Joint Venture, in which the GAO sustained a protest, in part, because the awardee's past performance rating came from an affiliate and the GAO found "nothing in BRS's proposal that purports to offer the workforce, management, facilities or other resources of KBR for purposes of performing the contract." See Perini/Jones, Joint Venture, 2000 WL 33741037, at *5–6. With respect to International Auto Logistics' proposal, TRANSCOM gave past performance credit to an entity that was reasonably seen by the source selection authority as intending to perform on the contract, based on the International Auto Logistics proposal, even if the entity was not named in the proposal by its full name, Trans Global Auto Logistics Europe, but instead referred to as Trans Global Auto Logistics' "European offices." As opposed to the GAO cases offered above, there is sufficient evidence in the record that International Auto Logistics "purports to offer the workforce, management, facilities or other resources" of Trans Global Auto Logistics Europe towards the performance of the contract, as was verified in the affidavits submitted by the intervenor to the GAO. See id. at *5.

An agency "may attribute the experience or past performance of a parent or affiliated company," if the offeror merely, in the proposal or otherwise, "'demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror.'" Femme Comp Inc. v. United States, 83 Fed. Cl. at 747 (quoting Hot Shot Express, Inc., 2002 WL 1831022, at *2). As the protestor acknowledges in discussing its allegations with respect to [redacted] and [redacted], an individual contractor or subcontractor may be composed of hundreds of legal entities, and it would create a heavy burden to require every individual entity that is to be involved in a proposed contract to independently certify its involvement, and an equally heavy burden on the agency to verify each entity. Instead, as long as the proposal or evaluation notice makes it clear "that the resources of the parent or affiliated company will affect the

performance of the offeror," the past performance references of the parent or affiliate can be acknowledged. See id. In the International Auto Logistics proposal, Global Auto Logistics made specific mention of its facilities and resources in Europe, which it proposed to use to operate the European vehicle processing centers it would become responsible for under the contract, if awarded. Therefore, the source selection authority had a reasonable basis upon which to consider the past performance of Trans Global Auto Logistics Europe, and the agency's decision to do so was not arbitrary or capricious.

In passing, protestor, in the facts section of its motion for judgment on the administrative record, asserts that "Intervenor's proposal did not include International Auto Processing as a subcontractor," and, therefore, implies, without further addressing the argument, that TRANSCOM improperly allowed International Auto Logistics to rely on the past performance references of its parent organization, International Auto Processing, in its past performance proposal. As discussed above, however, "'[a]n agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror.'" Femme Comp Inc. v. United States, 83 Fed. Cl. at 747 (quoting Hot Shot Express, Inc., 2002 WL 1831022, at *2). In its proposal, International Auto Logistics made clear that the resources of International Auto Processing will be committed to intervenor's GPC III performance. The proposal stated: "IAL has at its disposal, complete access to IAP's [International Auto Processing's] robust resources, including port and vehicle processing expertise, rail and trucking networks, IT systems, quality and training processes, and commercial business best practice techniques." In addition, TRANSCOM issued an evaluation notice after its initial review of intervenor's proposal, asking intervenor to "confirm that International Auto Logistics (IAL) will have full access to the resources of International Auto Processing (IAP) . . . ." In response, intervenor provided an August 14, 2013 letter from Mr. Miller, President and Chief Executive Officer of International Auto Processing, stating: "This letter confirms International Auto Processing's (IAP) firm and lasting commitment to support its wholly-owned subsidiary International Auto Logistics (IAL) to the fullest extent," and provided further details on the relationship between the two companies. Therefore, TRANSCOM was not arbitrary and capricious in determining that this was sufficient to confirm International Auto Processing's commitment of resources to GPC III performance, or in considering the parent company's past performance references.

Next, protestor argues that Global Auto Logistics' past performance references should not have been counted at all, because, International Auto Logistics does not specify how much each subcontractor would earn on the contract, and, according to protestor, "Global [Auto Logistics] was proposed to perform no more than $3–4 million per year of the contract's scope, equating to less than two percent of the annual contract value."[16] Protestor contends that "[t]he RFP provided that: 'Past performance

---

[16] Protestor estimates in its submission to the court that the proposal indicated that International Auto Logistics is assigning 2.2% of total contracted dollars to WOSB or

regarding predecessor companies or principal subcontractors that will perform major or critical aspects of this requirement will be weighted the same (equally as important) as the past performance information for the offeror.'" (emphasis in original). Protestor alleges that TRANSCOM made no effort to determine whether any subcontractor, in particular, Global Auto Logistics, was a "principal" subcontractor performing "major" or "critical" aspects of the contract, yet TRANSCOM decided that Global Auto Logistics' "two Relevant references were '[m]ost significant and of greatest consideration.'" According to protestor, International Auto Logistics was improperly awarded a "Satisfactory Confidence" past performance rating. In support, protestor again cites to Health Net Federal Services, LLC, 2009 WL 3843162, which protestor alleges is an example of a case in which the GAO sustained a protest of a contractor's past performance rating when the "subcontractor's role was limited to a relatively small portion of the contract."

In response, defendant contends that "[t]he solicitation [for the GPC III contract] did not define 'principal subcontractor' or 'major' or 'critical' aspects of the requirement." Therefore, according to defendant, the solicitation allows for past performance references of subcontractors that will "perform major or critical 'aspects,' not a major or critical 'percentage,' of the solicitation's requirements." Defendant argues that "[t]he awardee proposed Global Auto Logistics/Trans Global Auto Logistics to operate vehicle processing centers (VPC) and vehicle storage facilities (VSF), provide over-the-road (OTR) transport inside and outside the contiguous U.S. (CONUS and OCONUS), and perform customs clearance work. These services are not ancillary. They are the performance work statement's core requirements." (internal citations omitted). Defendant also disputes protestor's allegation that Global Auto Logistics is proposed to earn only $3-4 million per year, stating that "Global Auto Logistics/Trans Global Auto Logistics will operate nearly all of the awardee's vehicle processing centers in Europe," and that those vehicle processing centers "are worth significantly more than $3-4 million." Defendant also separately estimates in its motion for judgment on the administrative record that "Global Auto Logistics/Trans Global Auto Logistics will operate under the contract at roughly $8.8 million for the first full year of contract performance," and that the facilities Global Auto Logistics will operate can generate up to $14 million a year, "depending upon the volume of vehicle inspections and processing." Protestor, in response, notes that defendant's calculation "is based on the firm-fixed prices that TRANSCOM will pay Intervenor," (emphasis in original), and that intervenor would take out a percentage, reducing what the subcontractor would actually earn. Intervenor supports and repeats defendant's arguments, and adds that: "Not only is the evaluation scheme American attempts to inject not in the Solicitation, but to apply it would result in a 'competition' that only American could win and therefore violate the purpose of the Competition in Contracting Act."

As an initial matter, protestor has not provided sufficient evidence that Global Auto Logistics is projected to earn only $3–4 million per year on the contract. It is

---

women-owned small business, equal to approximately $3–4 million a year, and that Global Auto Logistics is a woman-owned small business.

correct that International Auto Logistics advertises Global Auto Logistics in its proposal as a "woman-owned small business," and states in a separate chart within the proposal that women-owned small businesses are anticipated to receive between $3–4 million of the overall contract per year. At the same time, however, Global Auto Logistics is slated in the proposal to operate five contractor owned and operated vehicle processing centers internationally, two vehicle storage facilities within the United States, and twelve government owned but contractor operated vehicle processing centers in Europe. Except for the one chart protestor points to, the calculations extrapolated from the solicitation, although only projections, suggest that Global Auto Logistics and its affiliates would earn, or at least generate as revenue for International Auto Logistics, more than the $3–4 million from the GPC III contract if awarded. In addition, even assuming the validity of protestor's factual assertions, defendant's analysis suggests that Global Auto Logistics' individual earnings, as a subcontractor, may reflect only a small portion of what the intervenor will earn from TRANSCOM due to Global Auto Logistics' services under the GPC III contract.  Even if Global Auto Logistics were to take in only $3–4 million a year, its references would still be permissible given the critical role Global Auto Logistics is anticipated to play in contract performance.[17]

---

[17] Protestor also projects that another of intervenor's subcontractors, SDV Command Source, is only going to earn "approximately $1.6-2.1 million" per year on the contract if awarded, "which equates to approximately 1.2 percent of the total annual contract value." Protestor alleges that, therefore, "TRANSCOM should not have considered SDV Command's past performance at all because it is not proposed as a 'principal subcontractor.'" Protestor reaches this projection, as it does with respect to Global Auto Logistics, by relying on the intervenor's proposal's indication that International Auto Logistics is assigning 1.2% of all subcontracting dollars to "SDVOSB [Service-Disabled Veteran-Owned Small Business]," and noting that SDV Command Source fits that category in the proposal. Defendant does not attempt to project SDV Command Source's earning potential off the GPC III contract if awarded, but, instead states that "the awardee has proposed SDV Command Source to operate vehicle processing centers in Georgia, Missouri, and Puerto Rico and a vehicle storage facility in South Carolina. As noted above, plaintiff's restrictive definition of 'principal subcontractor' is not found in the solicitation." (internal citation omitted). SDV Command Source is slated in the proposal to operate three vehicle processing centers and one vehicle storage site. According to intervenor's proposal, the revenue generated from just the three vehicle processing centers alone will be more than what protestor alleges SDV Command Source will earn on the contract per year. In addition, even if protestor's analysis of SDV Command Source's earnings under the contract is correct, as is discussed more below, TRANSCOM still was not arbitrary and capricious in categorizing SDV Command Source as a "major subcontractor." Moreover, since SDV Command Source's references were rated as "Somewhat Relevant" to the GPC III solicitation, it appears from the record the references were not given as much weight as Global Auto Logistics' two "Relevant" references. As noted by the source selection authority in her decision document, the two "Relevant" Global Auto Logistics references were treated as "[m]ost significant and of greatest consideration" in determining intervenor's overall past performance confidence rating.

The parties' arguments conflate what is really a two-part analysis. Part one is whether a reference can be considered. Part two is how much weight should be given a particular reference. The solicitation states:

> The offeror shall submit no more than three past performance references for **each** major subcontractor, public or private, for which each subcontractor has performed services within the previous three calendar years similar in nature to the services described in this solicitation.

(emphasis in original). Therefore, as a threshold matter, for a subcontractor's past performance references to be considered by TRANSCOM in the first place, the subcontractor must be a "major subcontractor." "The interpretation of a solicitation, as that of contract provisions generally, is a question of law which courts review *de novo.*" CBY Design Builders v. United States, 105 Fed. Cl. at 327 (citing NVT Techs., Inc. v. United States, 370 F.3d at 1159, and Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1353). Determining the ambiguity of a solicitation is likewise a question of law. NVT Techs., Inc. v. United States, 370 F.3d 1159 (citing Interwest Constr. v. Brown, 29 F.3d 611, 614 (Fed. Cir. 1994)). "In determining whether rival interpretations of a solicitation are reasonable, the court must 'begin with the plain language of the document.'" Furniture by Thurston v. United States, 103 Fed. Cl. 505, 512 (2012) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003))). Furthermore, "[w]hen interpreting a solicitation, the [solicitation] must be considered as a whole and interpreted in 'a manner that harmonizes and gives reasonable meaning to all of its provisions.'" CBY Design Builders v. United States, 105 Fed. Cl. at 327 (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353, and NVT Techs., Inc. v. United States, 370 F.3d at 1159); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. at 277.

When the terms of a solicitation are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. See CBY Design Builders v. United States, 105 Fed. Cl. at 327 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1353); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 131 S. Ct. 997 (2011); Teg–Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." (quoting Coast Fed. Bank, FSB v. United States, 323 F.3d at 1038)); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning— extrinsic evidence is inadmissible to interpret them."). "A solicitation term is ambiguous if 'more than one meaning is reasonably consistent with [its] language.'" Furniture by Thurston v. United States, 103 Fed. Cl. at 511 (quoting Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 997) (modification in original). The United States Court of Appeals for the Federal Circuit has stated that, "[t]o show an ambiguity [in contract language,] it is

not enough that the parties differ in their respective interpretations of a contract term." NVT Techs., Inc. v. United States, 370 F.3d at 1159. In order to demonstrate ambiguity, the interpretations offered by both parties must "'fall within a "zone of reasonableness."'" Id. (quoting Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (1999) (citations omitted)); see also Ace Constructors, Inc. v. United States, 499 F.3d 1357, 1361 (Fed. Cir. 2007) ("[I]n interpreting a solicitation, '[it] is ambiguous only if its language is susceptible to more than one reasonable interpretation. . . . If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.'" (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353)).

The parties have different interpretations of the meaning of "major," as applied to the word "subcontractor." Although protestor admits in its filings that "[t]he term 'major subcontractor' was not defined by the RFP," protestor argues "major" has a dollar component to it, and, therefore, only large-dollar subcontractors' past performance references should have been considered by TRANSCOM; yet, protestor does not suggest what dollar value would be large enough. Defendant and intervenor both assert that "major" should be interpreted broadly, to include "aspects" of a subcontractor's participation, such as the types of responsibilities the parties are proposed to undertake. Looking at the solicitation as a whole, the court agrees that a broader interpretation of "major subcontractor" is appropriate. Although protestor is asking the court to take a more restrictive, price-based view of the term "major," there is no indication in the solicitation that price alone was meant to determine what constitutes a "major subcontractor." Instead, as intervenor points out, "[r]ather than requiring the Agency to measure past performance in specific percentages and dollar values, the Solicitation required it to perform a qualitative analysis of each offeror's past performance and assign a rating."

The term "major subcontractor" does not appear to be defined in the FAR, and is assigned a variety of meanings in a variety of solicitations, sometimes involving money, sometimes not. See, e.g., Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. 723, 728 (2011) ("The assessment was conducted by analyzing 'the quality, relevancy[,] and recency' of the offeror's and its major subcontractors' past performances in the government contract arena. The Solicitation specifically identified as significant to its analysis past contracts greater than $100,000 for the provision of services similar to those to be provided pursuant to the T4 Program." (internal citation omitted; modification in original)); Femme Comp Inc. v. United States, 83 Fed. Cl. at 711 (the solicitation defining major subcontractor as "a subcontractor that [was] anticipated to perform 20% of the total contract earned revenue," "must have been responsible for, or performed, two or more of the functional areas listed in the Performance Work Statement, and must have had at least nine months of experience on the contract . . . ." (internal quotations omitted; modification in original)); Info. Tech. & Applications Corp. v. United States, 51 Fed. Cl. 340, 352 (2001) ("While the Comptroller General in Oceanometrics [1998 WL 309917 (Comp. Gen. June 9, 1998)] does not define what constitutes a 'major or critical aspect' of a contract, it is the court's view that the percentage of the work proposed to be performed is one consideration and not the dispositive factor in determining whether the proposed effort of the subcontractor is a major or critical aspect of the work."), aff'd,

316 F.3d 1312 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Landoll Corp., B-291381, 2002 WL 32056925, at *5 (Comp. Gen. Dec. 23, 2002) (The GAO accepted "the evaluators' belief that the subcontractor would be 'responsible for critical design functions,' and that although WASP [Watkins Aircraft Support Products, Inc.] stated that the subcontractor's work expressed as a percentage of total project dollars would be very small, the subcontractor's role 'would in fact be vital to WASP's success or failure in the UMT [universal munitions trailer] effort.'" (internal citations omitted)).

Accordingly, the term "major subcontractor" has been defined in a variety of ways specific to the context of the particular procurement at issue. Although the solicitation at issue before the court does not offer a definition of the term "major subcontractor," the following words do appear in the solicitation: "Past performance regarding predecessor companies or principal subcontractors that will perform major or critical aspects of this requirement will be weighted the same (equally as important) as the past performance information for the offeror." This language seems to suggest that the term "major" refers to an "aspect" of the work to be provided, not just a price or dollar value calculation. The fact that Global Auto Logistics, pursuant to the International Auto Logistics proposal, will be responsible for the operation of five contractor owned and operated vehicle processing centers internationally, two vehicle storage facilities within the United States, and twelve government owned, but contractor operated vehicle processing centers in Europe, provides a rational basis by which the source selection could have considered Global Auto Logistics a "major subcontractor," vital to the success or failure of the International Auto Logistics effort. See Landoll Corp., 2002 WL 32056925, at *5. On the other hand, protestor's view that "major" must refer predominantly to price appears unsupported by a review of the solicitation.

Apart from whether or not Global Auto Logistics' past performance references should have been evaluated in the first instance, protestor also opposes the weight that these references were given. The solicitation stated: "Past performance regarding predecessor companies or principal subcontractors that will perform major or critical aspects of this requirement will be weighted the same (equally as important) as the past performance information for the offeror." In the Source Selection Decision Document, the source selection authority further stated:

Although IAL has no Very Relevant references, its Relevant references are considered significant as they include all required services with the exception of storage. Most significant and of greatest consideration was the Very Good – Exceptional performance of IAL's subcontractors on two Relevant efforts of similar scope and magnitude of effort and complexity as this solicitation, which included CONUS and OCONUS operations, providing/arranging for inland and ocean transportation, customer service, and POV processing, representing all performance areas noted in the solicitation except for long-term storage. The Government also considered the Satisfactory-Exceptional past performance on the Somewhat Relevant references, which considered together, reflect successful performance of all of the services required by this solicitation, including long-term storage.

Protestor argues that the source selection authority gave more weight to Global Auto Logistics' past performance references than to International Auto Logistics' other "Somewhat Relevant" references, which was in violation of the solicitation's requirements. The court does not dispute protestor's contention that the source selection authority found Global Auto Logistics' past performance references "[m]ost significant and of greatest consideration," but does not agree that TRANSCOM was in violation of the requirements of the solicitation.

TRANSCOM reasonably awarded International Auto Logistics a "Satisfactory Confidence" rating, based, in part, on the two Global Auto Logistics "Relevant" past performance references, both indicating "Very Good to Exceptional" performance on the efforts discussed in the references, along with the intervenor's remaining fourteen "Somewhat Relevant" past performance references. As stated by the United States Court of Appeals for the Federal Circuit, "[a]t the outset, it is important to note that what does or does not constitute 'relevant' past performance falls within the [Source Selection Authority's] considered discretion." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911 (quoting PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 539 (modification in original). "Further, the FAR entrusts the critical determination of 'what does or does not constitute "relevant" past performance to the SSA's considered discretion.'" Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 718 (quoting PlanetSpace v. United States, 92 Fed. Cl. at 539 (citing FAR 15.305(a)(2)(ii))). "'[D]etermining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'" Todd Constr., L.P. v. United States, 88 Fed. Cl. at 247 (quoting Clean Venture, Inc., 2000 WL 253581, at *3); Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. at 48; Commissioning Solutions Global, LLC, B-401553, 2009 WL 3634337, at *3 (Comp. Gen. Oct. 6, 2009) ("[T]he contracting agency has the discretion to determine the relevance and scope of the performance history to be considered, and our Office will not question the agency's judgment unless it is unreasonable or inconsistent with the terms of the solicitation or applicable procurement statutes and regulations."). Moreover, in general, "'"when evaluating an offeror's past performance, the [Source Selection Authority] may give unequal weight, or no weight at all, to different contracts when the [Source Selection Authority] views one as more relevant than another."'" Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911 (quoting Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 718 (quoting SDS Int'l, Inc. v. United States, 48 Fed. Cl. at 769)) (modification in original); see also E.W. Bliss Co. v. United States, 77 F.3d at 449; Plasan N. Am., Inc. v. United States, 109 Fed. Cl. at 573 ("'[A]n agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract.'" (quoting Forestry Surveys & Data v. United States, 44 Fed. Cl. 493, 499 (1999)); Tech Sys., Inc. v. United States, 98 Fed. Cl. at 259; Univ. Research Co., LLC v. United States, 65 Fed. Cl. at 507 ("An agency could, of course, choose to give greater weight to contracts it found to be more relevant than others . . . ."). The court also notes that its review is "'"only to ensure that it [the evaluation] was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors'

past performance is primarily a matter within the contracting agency's discretion."'" Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 784 (quoting Todd Constr., L.P. v. United States, 88 Fed. Cl. at 247 (quoting Clean Venture Inc., 2000 WL 253581, at *3). The solicitation states that "[t]he relevancy of each contract reference will be considered in the overall confidence assessment rating for the offeror." The solicitation further states that "[i]n evaluating past performance, the Government will give greater consideration to information on those contracts deemed most relevant to the effort described in this RFP." The source selection authority, therefore, was able to rely on Global Auto Logistics' references even more than those of the prime contractor's references, given the "Somewhat Relevant" rating for the prime contractor and the "Relevant" rating for Global Auto Logistics.

The protestor contends that TRANSCOM's decision to give weight to Global Auto Logistics' "Relevant" references despite the subcontractor's allegedly small size disagrees with the GAO's opinion in Health Net Federal Services, LLC, 2009 WL 3843162. Protester asserts that, in Health Net, the GAO found that even if "the past performance of a subcontractor was relevant," "the subcontractor's past performance could not rationally justify the offeror's rating because the subcontractor's role was limited to a relatively small portion of the contract." Protestor appears to argue that even though two of Global Auto Logistics' past performance references received a rating of "Relevant," because Global Auto Logistics was proposed to perform an allegedly small portion of the overall contract, the source selection authority should not have found both references "[m]ost significant and of greatest consideration" when determining International Auto Logistics' overall past performance confidence rating. Health Net Federal Services, LLC, however, is distinguishable from the above captioned case. The GAO, in Health Net, stated:

> Moreover, we conclude that the agency's consideration of the relevant past performance of AGHP's [Aetna Government Health Plans, LLC's, the awardee's] subcontractor, WPS [Wisconsin Physicians Services], could not have reasonably justified AGHP's past performance rating. To the extent WPS had "relevant" and "exceptional" past performance, WPS's role in performance was limited to [Deleted] of the many T–3 functional requirements, [Deleted]. This left AGHP, as the prime contractor, responsible for all other T–3 requirements, including [Deleted]. Thus, while AGHP, through WPS, demonstrated relevant experience for [Deleted] under the RFP, a significant portion of the contract was to be in the hands of AGHP, which had only "somewhat relevant" experience.

Id. at *14 (redactions in original). The GAO's decision in Health Net does not contradict this court's consistently-held view that "'an agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract.'" Plasan N. Am., Inc. v. United States, 109 Fed. Cl. at 573 (quoting Forestry Surveys & Data v. United States, 44 Fed. Cl. at 499); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 718; SDS Int'l, Inc. v. United States, 48 Fed.

Cl. at 769. Indeed, the solicitation at issue in Health Net indicated, just like in the GPC III solicitation, that the greatest weight was to be given to references and information "'determined to be the most relevant and significant.'" Id. (internal citation omitted).

What seemed to trouble the GAO in Health Net were fact-specific issues such as the Department of Defense's decision to give Aetna the highest past performance rating possible, based primarily or solely on Aetna's reference of very small size. Id. The GAO stated: "In sum, based on the fact that AGHP's past performance submitted for evaluation was with respect to contracts that were small fractions of the size of the T–3 effort, TMA's decision to assign AGHP the highest past performance rating of 'High Confidence' is not supported by the record." Id. at *16. The GAO, after completing its review, found that none of the past performance references provided by Aetna were more than "Somewhat Relevant," and the GAO was concerned by the poor quality of Aetna's references, all of which were of a small size:

> Whether it was reasonable to consider some of the contracts even "somewhat" relevant given that their beneficiary populations were a small fraction of the size of the beneficiary population covered by the T–3 contract is itself questionable. At a minimum, absent some further support in the record, it was not reasonable to give AGHP the highest past performance rating in reliance on the "exceptional" performance ratings associated with the prior contracts of such smaller size.

Id. at *14. Moreover, in the Health Net solicitation, size played an important factor in determining a past performance reference's relevance: "According to the SSEG [Source Selection Evaluation Guide], '[r]elevance would increase as the size of the historical efforts increase.'" Health Net Fed. Servs., LLC, 2009 WL 3843162, at *4 (internal citation omitted). In the above captioned case, as discussed in detail below, although TRANSCOM gave considerable weight to the past performance references from Global Auto Logistics, the agency also considered fourteen other Somewhat Relevant references, some of which were for very large dollar denomination contracts. Furthermore, the solicitation in the current case did not indicate that size was of the same critical importance as in the Health Net case. In addition, TRANSCOM only awarded International Auto Logistics an overall past performance rating of "Satisfactory Confidence," which is not the highest confidence rating available. TRANSCOM's overall past performance rating decision, therefore, appears more reasonable than the Department of Defense's rating decision in Health Net.

Protestor next argues that even if Global Auto Logistics' references could be considered and given the weight they were given by the source selection authority, she incorrectly rated the two Global Auto Logistics past performance references "Relevant." Protestor points to the solicitation's definition of a "Relevant" past performance rating, which stated: "'[p]resent/past performance effort that involves similar scope and magnitude of effort and complexities this solicitation requires.'" Protestor contends that "[t]his definition includes three conjunctive parts: 'similar scope' and 'similar magnitude' and 'similar complexity,'" (emphasis in original), yet when rating two of Global Auto

Logistics' past performance references, according to protestor, "TRANSCOM only considered similarities in the respective performance areas of the contracts (*i.e.*, the scope of work) and did not give any consideration to the low dollar values and comparatively low levels of complexity." Protestor alleges:

> The record reflects that the past performance evaluation was a mechanical process by which the evaluators simply identified whether each contract reference included the following service elements: CONUS performance, OCONUS performance, vehicle processing, arranging for ocean transportation, providing ocean transportation, arranging for inland transportation, providing inland transportation, customer service and storage.

According to protestor, "[i]f all but one of these elements were identified by the evaluators, then the reference received a rating of Relevant," regardless of similarity in magnitude or similarity in complexity.

Defendant responds that protestor's reading of the solicitation is too narrow, and claims that "plaintiff's suggested reading of the solicitation criteria would effectively transform the solicitation into a sole-source procurement." Defendant argues that, "the evaluators were free to take a more holistic approach." According to defendant, "[t]his Court and the Federal Circuit have consistently and recently held that the determination of whether a contract is relevant in a past performance evaluation is within the agency's discretion." Defendant asks the court not to focus on the price of the past performance references, because first, "most important, the solicitation did not commit the agency to a dollar-value threshold for scope, magnitude of effort, or complexity," second, because the contract is being performed with a number of subcontractors, and third, because "the services are readily available in the commercial marketplace, even if on a smaller scale than plaintiff's current operation." Intervenor supports the defendant's position, and, quoting from the solicitation, indicates that the solicitation defined "'relevancy,'" not according to a "specific percentage of work at a specific minimum dollar value," but as

> "based on, but not limited to, the similarities between a given past performance effort and this solicitation in terms of the following for CONUS and/or OCONUS operations: POV processing, arranging for or providing ocean transportation, arranging for or providing inland transportation, customer service, and storage."

In addition to the solicitation defining a past performance reference to be "Relevant" when the "[p]resent/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires," the solicitation stated:

> Relevancy in regard to scope and magnitude of effort and complexity will be assessed based on, but not limited to, the similarities between a given past performance effort and this solicitation in terms of the following for CONUS and/or OCONUS operations: POV processing, arranging for or

providing ocean transportation, arranging for or providing inland transportation, customer service, and storage.

The solicitation also indicates: "In assigning an overall confidence assessment for each offeror, the Government will consider at a minimum: POV processing, arranging for or providing ocean transportation, arranging for or providing inland transportation, customer service, storage, overall performance on small business utilization," but did not mention price. The broad definitions of "Relevant" allowed the agency flexibility to determine relevance. The solicitation allowed the agency to make its relevancy determination, "based on, but not limited to, the similarities between a given past performance effort and this solicitation" in the five areas of "POV processing, arranging for or providing ocean transportation, arranging for or providing inland transportation, customer service, and storage." The parties created and submitted a joint, comparative chart, which suggested that a reference was credited as "Very Relevant," "Somewhat Relevant," or "Not Relevant," based in part on how many of the five areas of work the past performance reference covered, as well as two additional evaluation parameters: whether the past performance reference covered work inside the continental United States, and outside the continental United States. It appears from a review of the joint submission that a past performance reference was in part credited as "Very Relevant" if it covered all seven evaluative parameters, "Relevant" if it covered six of seven evaluative parameters, and "Somewhat Relevant" if it included activity in three to five of seven evaluative parameters, although the record indicates that, overall, the agency took a more nuanced approach than indicated by the parties' summary charts. The agency did not have to make a relevancy determination based solely or even primarily on price or size. See J.C.N. Constr., Inc. v. United States, 107 Fed. Cl. at 515; Tech Sys., Inc. v. United States, 98 Fed. Cl. at 259 (noting that while the agency "could make contract size dispositive for relevance, there is no external requirement that it do so"); see also TestVonics Inc., B-406700.3, 2012 WL 6098422, at *4 (Comp. Gen. Dec. 4, 2012) ("In light of the fact that the contract called for the manufacture of units having virtually all of the technical characteristics of the units to be furnished under the contract to be awarded . . . the fact that the contract being evaluated was for the manufacture of fewer units during a shorter period of time does not provide a basis for our Office to find the agency's conclusion unreasonable," in assigning the reference contract a rating of "relevant.").

Global Auto Logistics' first past performance reference was Trans Global Auto Logistics' contract with Allied International/Sirva, for the processing of personally-owned vehicles for the Canadian defense forces in Europe (Allied contract). TRANSCOM's rationale for Global Auto Logistics' rating of "Relevant" was: "Reference provided includes providing/arranging for ocean & inland transportation, customer service, POV processing, and CONUS/OCONUS performance but does not include storage." Protestor claims, however, that "TRANSCOM's evaluators incorrectly identified the scope of work under the Allied Contract. It did not include all of the service elements except storage. Specifically, Intervenor's proposal explained that the Allied Contract was limited to 'vehicle' processing in Europe of both inbound and outbound Canadian Department of Defense service member [privately-owned vehicles]," and did not cover

performance in the continental United States. (emphasis and modification in original). Additionally, protestor argues that while "Intervenor's proposal claims the work under the Allied Contract included <u>arranging</u> ocean transportation as part of the POV processing, there is no indication that the Allied Contract included <u>providing</u> ocean transportation." (emphasis in original). Defendant responds that both continental United States and outside of continental United States experience was not needed, and similarly, both providing for and arranging for ocean transport was not required, for a rating of "Relevant" under TRANSCOM's rating scheme. Additionally, defendant claims that the Allied contract past performance questionnaire indicated that the effort "included CONUS operations."

The past performance questionnaire regarding the Allied International contract was filled out by Pat Amirault from "Sirva Inc / Allied Internatiuonal [sic]." Initially, protestor contends that the past performance questionnaire is unreliable as a source by which to determine what performance areas a past performance reference covered, because "the evaluation record makes clear that the questionnaires were completed by commercial customers that did not understand them." The record before the court is insufficient to agree with protestor's conclusion. It is unlikely that, for example, Pat Amirault would have mistaken whether or not Trans Global Auto Logistics worked within the continental United States on the Allied International contract. Nor can one conclude from the record that Pat Amirault simply checked all the boxes "**Exceptional**" without looking at the questions, especially since for the questions regarding storage, Mr. Amirault responded "N/A" instead of giving a rating. (emphasis in original). Although International Auto Logistics' proposal did not explicitly indicate that any of the work for the Allied contract was performed within the continental United States, the proposal stated that Trans Global Auto Logistics was handling "[c]omplete transportation services" for the Canadian defense forces. The questionnaire for the reference included, under "[l]ocation (countries) where service was performed under this contract," "USA." Additionally, where the questionnaire indicated, "[c]ontractor was capable of coordinating CONUS inland shipments between multiple origins and destinations on an ongoing basis within required delivery dates," Mr. Amirault checked the box marked "**Exceptional**." (emphasis in original). The record, therefore, provides evidence that supports the agency's decision to credit the reference with work in the continental United States.

The protestor also contends that intervenor only arranged for, but did not provide, ocean transport. The solicitation only asked for past performance experience related to "arranging for <u>or</u> providing ocean transportation," however, and did not require both. (emphasis added). From a review of the agency past performance evaluations, the agency appears to have grouped together "providing/arranging" when reviewing the ocean transportation evaluation parameter. The agency, therefore, was not unreasonable or inconsistent when it decided to attribute this reference with "providing/arranging for" ocean transportation, even if Trans Global Auto Logistics only had arranged for ocean transportation under the contract.

Protestor also questions Global Auto Logistics' second "Relevant" past performance reference, the Volkswagen Logistics contract, as being arbitrarily rated. TRANSCOM's rationale for the rating of "Relevant" for this contract was the same as for the Allied International contract: "Reference provided includes providing/arranging for ocean & inland transportation, customer service, POV processing, and CONUS/OCONUS performance but does not include storage." Regarding the Volkswagen Logistics contract, protestor claims that there were no continental United States operations under this contract, and that there was no ocean transportation at all under the contract, but that, "TRANSCOM has given past performance credit for providing and arranging ocean transportation for the second of these services even though Trans Global-Europe is merely a customer of VW-Logistics on that part of the contract." Protestor also argues that the Volkswagen Logistics contract was too small to be "Relevant" because it only was for $650,000.00 a year, and that TRANSCOM was inconsistent to allow this reference to be rated "Relevant" but to downgrade other offerors' past performance reference which were of similar value.[18]

As with the Allied International contract, the past performance questionnaire for the Volkswagen Logistics contract indicates that operations inside the continental United States were part of the contract. The questionnaire mentioned "USA" as a "'[l]ocation (countries) where service was performed under this contract." Under the question, "[c]ontractor was capable of coordinating CONUS inland shipments between multiple origins and destinations on an ongoing basis within required delivery dates," the Volkswagen Logistics respondent checked the box marked "**Very Good**." (emphasis in original). This is sufficient to support TRANSCOM's decision to attribute continental United States performance to this reference.

The protestor contends that Trans Global Auto Logistics did not arrange or provide for ocean transport under the Volkswagen Logistics contract. Although Trans Global Auto Logistics is also moving Volkswagen privately-owned vehicles under a contract, Trans Global Auto Logistics separately, or in conjunction, also appears to have arranged for ocean transportation with Volkswagen Logistics of other privately-owned vehicles. The Volkswagen response to the past performance questionnaire stated: "Trans Global provides an outstanding service to VW-Group, as well as being a valuable customer to VW-Logistics, as a forwarder booking and shipping POVs on VW-Logistics chartered vessels." This indicates that Trans Global Auto Logistics still does the work of arranging for ocean shipping, even if it is with "VW-Logistics chartered vessels." As the agency remarked in its agency response to protestor's GAO protest, "[t]he Volkswagen vessel is no different than any other ocean vessel, it just happens TGAL [Trans Global Auto Logistics] also has a contract to move Volkswagen POVs, and

---

[18] In particular, protestor points to TRANSCOM's evaluation of a "$300,000 - $500,000" reference for TranLogistics, LLC, a subcontractor to the American Presidential Lines proposal, regarding which TRANSCOM stated: "References were considered SR [Somewhat Relevant] because they covered all 5 performance areas. However, they were not considered R [Relevant] because of their low dollar value."

also uses space on these chartered vessels to move POVs of U.S. and Canadian Service members as well."

Although there is no evidence that TRANSCOM felt price was a key determining factor as to whether or not a subcontractor was a "major subcontractor," TRANSCOM did generally downgrade a past performance reference if the references reflected an amount of revenue that was low, although this was most often in conjunction with another issue, such as the reference also covering experience in a small number of performance areas relevant to the GPC III contract. For example, TRANSCOM rated the past performance references of another International Auto Logistics subcontractor, VPC of Fayetteville, as "Not Relevant" in part because the references, for less than $4,000.00 each, were "very low dollar value in comparison to this Solicitation," and only covered a limited number of performance areas. TRANSCOM also rated as "Not Relevant" another reference from an International Auto Logistics subcontractor, Posey Transport Group, which was worth up to $319,530.00 in one year, in part as being "a low dollar value in comparison to this Solicitation," but also because the reference covered only a few performance areas:

> Reference provided includes providing/arranging inland transportation and customer service in the western United States only. The reference does not include providing/arranging ocean transportation, POV processing, storage, OCONUS performance, and was a low dollar value in comparison to this Solicitation.

Based on a review of the record, only for a single subcontractor, TranLogistics, LLC, a subcontractor to another offeror, American Presidential Lines, did TRANSCOM make the statement that revenue was the reason for a reference's rating downgrade: "All 3 references [of TranLogistics] are rated 'SR' [Somewhat Relevant] and are low dollar ($300,000 - $500,000) and involve automobiles. . . . References were considered SR [Somewhat Relevant] because they covered all 5 performance areas. However, they were not considered R [Relevant] because of their low dollar value." Upon review, the record indicates that TRANSCOM uniformly decided that "references in the $300,000-$500,000 range" would typically receive a rating of "Somewhat Relevant," unless the reference also covered very few performance areas. The record does not clarify whether this limit was per year or over the life cycle of the contract. Regardless, the Volkswagen contract, for $650,000.00 per year, would have been outside the range in which TRANSCOM considered a past performance reference to be of "low dollar value."[19]

---

[19] The court notes that one of protestor's eighteen past performance reference is a reference for Transcar, GmbH (reference W564KB-12-D-0014). TRANSCOM, in its review of the reference, indicated that the reference was for a "low dollar value" of $356,878.24. Protestor's proposal additionally indicated that the annual revenue of the reference was €269,477.00, with the lifecycle earnings only reaching €274,902.00. Protestor's Transcar reference, also, according to TRANSCOM's review, only covered two performance areas.

TRANSCOM, in its interim evaluation of Global Auto Logistics' past performance references, gave recognition to Global Auto Logistics' key personnel, stating: "TGAL's key personnel (Kay Lester, Tony Lester, and Joe Wetz) have prior experience with GPC II and similar related service and are available to GAL in performance under this contract." Protestor, however, objects to TRANSCOM's consideration of key personnel, arguing that "the solicitation did not provide that past performance evaluation credit would be given for the experience of 'key personnel,' and there is nothing in the solicitation that required resumes to be submitted." The FAR, however, specifically suggests that agencies should consider "key personnel who have relevant experience" when making past performance decisions. See FAR 15.305(2)(iii). In the past, Judges of this court have held: "Given that procurement officials are usually 'given great discretion in determining what references to review in evaluating past performance,' the SSA's consideration of the experience of intervenor's key personnel does not appear improper." SDS Int'l v. United States, 48 Fed. Cl. at 771 (quoting Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 567 (2000)); see also Supreme Foodservice GmbH v. United States, 112 Fed. Cl. at 431; PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 539 (discussing evaluation of "key personnel" under the FAR). Moreover, there is nothing in the solicitation that prohibited the consideration of key personnel by the agency when evaluating past performance.

Protestor next questions TRANSCOM's decision to rate another fourteen International Auto Logistics past performance references as "Somewhat Relevant," and claims that "the Source Selection Authority also reached an erroneous conclusion that the various Intervenor references that were assigned Somewhat Relevant ratings, when 'considered together . . . reflect successful performance of all of the services[20] required by this solicitation, including long-term storage.'" (modification in original). Protestor contends that in three "performance areas" the source selection authority "naively" concluded that International Auto Logistics could complete the assigned tasks based on the strength of intervenor's past performance references. According to the protestor, these performance areas were "_Vehicle Processing Services_," "_Inland Transportation Services_," and "_Ocean Transportation Services_." (emphasis in original) For each performance area, protestor attempts to show, not necessarily that the individual past performance references were incorrectly rated, but instead, that, in total, the intervenor's references covering a given performance area were not sufficient for TRANSCOM to rationally conclude that there is "a reasonable expectation" that intervenor could perform on the contract.

Defendant did not respond to protestor's allegations individually, but argues generally:

> Plaintiff's argument is an exaggeration and once again reflects its efforts to essentially transform the solicitation into a sole source award to the incumbent. The evaluators recognized that these "somewhat relevant" past performance efforts were not the "same" as the solicitation's

---

[20] These "services" are also referred to as "performance areas" elsewhere in the record.

requirements, but the record demonstrates the awardee's "somewhat relevant" past efforts involved *some* of the scope and magnitude of effort and complexities the solicitation requires.

(emphasis in original). Defendant also maintains that: "Plaintiff's mere disagreement is not enough, however, to overturn the agency's decision." Intervenor adds that "American [Auto Logistics] insists (incorrectly) that the terms 'relevant' and 'somewhat relevant' require the Agency to determine relevancy solely on the basis of a comparison of dollar values and percentage of Solicitation requirements the contractor performed, while ignoring key differences between 'very relevant' work and work that is only 'relevant' or 'somewhat relevant.'"

The core of protestor's argument is that the agency erred in its technical analysis of whether or not the intervenor's past performance references, in total, allowed for a "reasonable expectation that the offeror will successfully perform the required effort." Protestor repeatedly asserts that the intervenor's technical attributes are insufficient and that TRANSCOM was arbitrary and capricious in its evaluation. For example, related to vehicle processing services, protestor claims that International Auto Logistics "does not operate a vehicle processing center that is comparable to the privately-owned vehicle processing requirements in the Performance Work Statement Sections 1.3.3, 1.3.4 and 1.3.7, and its outdoor lot is certainly not comparable to the Performance Work Statement Section 1.3.6 requirements (providing secure indoor facility and monthly maintenance requirements)." Initially, the court notes that protestor is arguing about intervenor's technical proposal, attempting to dispute the agency's conclusion that intervenor's "[p]roposal clearly meets the minimum requirements of the solicitation," as identified in the performance work statement. Intervenor's technical proposal has not been challenged by protestor. To the extent protestor is arguing that the agency's past performance determination was improper because the agency's technical determination regarding a particular past performance reference was incorrect, determinations on such technical matters deserve deference from the court, and the court should not easily overturn an agency's reasoned conclusion. It is not the court's role to determine whether the evaluations were perfect or even as good as they could be, or, in its opinion, the best technical solution to the problem the agency is trying to solve, as long as the requirements of the solicitation are met. "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d at 648 (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." (citation omitted)). "[D]isagreement with evaluations, 'no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.'" Tech Sys., Inc. v. United States, 98 Fed. Cl. at 243 (quoting Banknote Corp. of Am. v. United States, 56 Fed. Cl. at 384).

Regarding the intervenor's fourteen "Somewhat Relevant" references, to determine if the references provided a rational basis for TRANSCOM's overall past performance rating decision, the agency in the Source Selection Evaluation Board report concluded that, even discounting Global Auto Logistics' two "Relevant" references: "the Satisfactory-Exceptional past performance on the SR [Somewhat Relevant] references, which considered together, reflect successful performance of all of the services required by this solicitation (CONUS and OCONUS operations, POV processing, arranging for/providing ocean and inland transportation, customer service, and storage)." The source selection authority also stated in the Source Selection Decision Document: "Because IAL and its subcontractors combined have provided numerous references to demonstrate successful performance in individual performance areas as required by the solicitation, the Government has a reasonable expectation the offeror will successfully perform the required effort; therefore, a Confidence Assessment Rating of Satisfactory Confidence was assigned." Protestor takes issue with this assessment, with respect to three performance areas: vehicle processing, ocean transportation, and inland transportation.

TRANSCOM credited under the performance area "*Vehicle Processing Services*" all three of International Auto Logistics' "Somewhat Relevant" past performance references and all four of SDV Command Source's "Somewhat Relevant" references, not including Global Auto Logistics' two "Relevant" references. (emphasis in original). Protestor contends, however, that, under the GPC III contract, International Auto Logistics will be responsible for six vehicle processing centers, but that its references "reflect no experience in the operation of a processing center that involves individualized handling and processing of hundreds of vehicles per week dropped off or picked up by service members, a process that is far more personalized and complicated than that used by International Auto Processing for its commercial customers at the Brunswick, GA facility." Therefore, according to protestor, "[b]ased on an accurate interpretation of the relevancy ratings requiring an assessment of scope and magnitude of effort and complexity of each reference as compared to the RFP requirements, International Auto Processing's past performance warranted no better than a Not Relevant rating." (emphasis in original). International Auto Logistics' proposal, and related past performance questionnaire responses, emphasized that the central activity of intervenor's references was the processing of vehicles. Regarding intervenor's first reference, the "MBUSA [Mercedes Benz USA]" contract, intervenor stated in its proposal that it "unloads, inspects, and processes POVs for outgoing ocean vessels," and handles "over 200,000 POVs annually," bringing in at least $2,893,562.00 in 2012.[21] The past performance questionnaire filled out by International Auto Logistics and sent to Mercedes Benz USA listed under the "Brief Description of Work Performed," "[r]eceive, inspect, document, wash, provide and manage truck areas, paint and body

---

[21] In intervenor's proposal, intervenor stated that it earned $8.1 million on the Mercedes Benz USA contract in 2012, and $9.9 million in 2013. In the past performance questionnaire, however, International Auto Logistics stated that the value of the contract in 2012 was only $2,893,562.00, with no information on 2013 values.

repairs, customer service, performance reporting." (emphasis in original). Regarding intervenor's second reference, for a "General Motors" contract, according to its proposal, intervenor "coordinates inland truck transportation, unloads vehicles, performs in/out processing," as well as "inspect[s] each vehicle for damage upon arrival." The proposal indicates that the contract is for $800,000.00 annually. Although the past performance questionnaire in the record does not contain a description of the work performed, Scott McMillan, the respondent to the questionnaire for "General Motors," stated that "IAP provides port processing services out of Brunswick, Georgia. Although one of our smaller providers (approximately 19K units annually), they do a very good job processing our vehicles."

Regarding intervenor's third reference, a contract with Hyundai Glovis America, intervenor states in its proposal that "IAP receives POVs from vessels, performs in/out processing," "inspect[s] each vehicle for damage upon arrival," and installs accessories and customizes vehicles. The proposal further notes that "Glovis and its customers, Hyundai and Kia, have been so pleased with the level of quality service provided by IAP that Hyundai has allowed IAP to process its vehicles for over 25 years. In 2012, these manufacturers shipped over 170,000 vehicles through IAP facilities." The contract is for approximately $13 million a year, according to both intervenor's proposal and the past performance questionnaire. The questionnaire respondent, Glenn Clift, President and CEO of Glovis America, stated that "IAP is a member of GLOVIS America's 2012 Club Elite Program in recognition of their ability to meet or exceed performance standards in Automotive Port Processing."

Protestor argues that "International Auto Processing does not operate a vehicle processing center that is comparable to the privately-owned vehicle processing requirements in the Performance Work Statement Sections 1.3.3, 1.3.4 and 1.3.7, and its outdoor lot is certainly not comparable to the Performance Work Statement Section 1.3.6 requirements (providing secure indoor facility and monthly maintenance requirements)." Protestor's contention that intervenor's facilities do not meet the requirements of the performance work statement is directed at TRANSCOM's rating of intervenor's technical proposal; Subfactor 2 – Technical Approach, as Acceptable, which means that the "[p]roposal clearly meets the minimum requirements of the solicitation." Before this court, protestor has not challenged the determination that intervenor's technical proposal was rated as "Acceptable." Moreover, the GPC III solicitation does not require that intervenor's past performance references had to match the GPC III solicitation's particular performance work statement requirements.

Intervenor's past performance references as the prime contractor are supplemented by SDV Command Source's past performance references, which include vehicle processing. Protestor never challenges the validity of the references themselves, but instead contends that "the value of SDV Command's total performance under the GPC III Contract (operating three of the 19 contractor-owned and operated facilities and one of seven storage facilities) is only estimated by Intervenor to be 1.2% of the annual contract dollars." According to protestor, TRANSCOM, therefore, should not have considered SDV Command's past performance at all because it is not

proposed as a 'principal subcontractor.'" As discussed above, however, the court has reason to be skeptical of protestor's calculation of how much any one of intervenor's subcontractors will earn. That SDV Command Source will operate three vehicle processing centers and one vehicle storage facility provides a reasonable basis upon which TRANSCOM could consider the subcontractor a "major subcontractor," and consider its past performance references. One of SDV Command Source's four past performance references was for a $55,356,885.16 life-cycle contract for the United States Army Installation Management Command, in which SDV Command Source, according to the past performance questionnaire, "[e]stablished and operated six (6) Vehicle Processing Centers (VPCs) and eight (8) Vehicle Storage Facilities (VSFs)." (emphasis in original). SDV Command Source was given a "**Very Good**" rating by the respondent from the United States Army in response to the questionnaire statement indicating: "Contractor provided vehicle inspection and corresponding documentation of vehicle condition prior to acceptance and upon delivery, including pre-existing and newly incurred damage." (emphasis in original). Another of SDV Command Source's references was for a $7,522,453.04 life-cycle contract with the United States Army at Fort Carson, in which the company, according to the past performance questionnaire, "[e]stablish[ed] and operate[d] Vehicle Processing Centers (VPCs) and either collocated or separate Vehicle Storage Facilities (VSFs)." (emphasis in original). The respondent to the past performance questionnaire from Fort Carson marked "**Exceptional**" in response to both statements on the questionnaire regarding privately-owned vehicle processing: "Contractor provided management/coordination to receive and schedule POV shipments between multiple destinations within delivery dates required;" and "[c]ontractor provided vehicle inspection and corresponding documentation of vehicle condition prior to acceptance and upon delivery, including pre-existing and newly incurred damage." (emphasis in original). SDV Command Source also presented a third past performance reference, for a $16,673,677.91 contract with the United States Joint Base Lewis, in which SDV Command Source established and operated vehicle processing centers and performed other vehicle processing services, including maintenance and inspections. The questionnaire respondent representing Joint Base Lewis marked "**Exceptional**" in response to the two statements in the questionnaire related to privately-owned vehicle processing.[22] (emphasis in original).

There are imperfections in intervenor's, and its subcontractor's, past performance references. In all of International Auto Logistics' three past performance questionnaires, the respondents marked "**Unknown**" in response to the two statements related to

---

[22] As discussed below, TRANSCOM, using its Past Performance Information Retrieval System, identified and considered a fourth reference the agency determined also covered processing of personally-owned vehicles. TRANSCOM stated that the reference was for a contract in which SDV Command Source was a "[p]rime contractor providing complete inprocessing storage services for the Dept of the Army POVs," and that the reference indicated "Very Good to Exceptional performance." The record, however, does not contain other information as to the reference, such as the specific work involved or size of the contract.

"**Privately-Owned Vehicle (POV) Processing**."[23] (emphasis in original). In SDV Command Source's past performance questionnaire related to the approximately $55 million United States Army life-cycle contract, the respondent indicated in its comments that the focus of the contract was not about vehicle processing, but, instead, noted that: "SDV's contract with IMCOM was for long-term POV storage only. However, SDV did dray POVs to/from SDV' [sic] vehicle processing centers and SDV storage locations." These inconsistencies, however, are far from fatal to TRANSCOM's determination. As noted above, the court accords significant discretion to agencies in past performance determinations, especially those in which the determinations are highly technical in nature. See Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911; Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; Tech Sys., Inc. v. United States, 98 Fed. Cl. at 243; L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. at 650 ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."); Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. at 395; see also E.W. Bliss Co. v. United States, 77 F.3d at 449 (noting that protestor's arguments "deal with the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials that a court will not second guess"). The agency only need demonstrated "rational reasoning and consideration of relevant factors." See Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 (quotations omitted); Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 117. The record supports TRANSCOM's decision that International Auto Logistics' and SDV Command Source's references were sufficient in "scope and magnitude of effort and complexity" as to warrant a "Somewhat Relevant" past performance rating. These references, when considered together, offered a rational basis for TRANSCOM to conclude that there is a "reasonable expectation that the offeror will successfully perform the required" processing of personally-owned vehicles under the GPC III program.

Under "*Ocean Transportation Services*," TRANSCOM considered the "Somewhat Relevant" past performance references of two of intervenor's subcontractors, Liberty Global Logistics, and Horizon Lines, apart from Global Auto Logistics' two "Relevant" references. (emphasis in original). Protestor does not contend that Liberty Global Logistics' or Horizon Lines' references are irrelevant to ocean transportation, and admits that "ocean container shipping is Horizon's line of business." The protestor states, "[t]he issue here is not whether those contracts encompassed similar performance areas." Instead, protestor takes issue with "the vast difference in 'scope' and 'complexity,' including whether Liberty and Horizon have sufficient assets to meet the GPC III requirement to transport more than 4,000 privately-owned vehicles per month within the applicable Required Delivery Date time frames." Protestor claims that "Liberty has only two roll-on/roll-off vessels, which is significantly fewer than the five to eight roll-on/roll-off vessels that Plaintiff will use under its negotiated agreements with its sister company," and that "Horizon only operates container ships." Protestor argues without support that

---

[23] "**Unknown**" is defined in the questionnaire as: "No record of past performance or the record is inconclusive." (emphasis in original).

container ships are worse and more expensive for transporting cars, because they hold fewer vehicles, and that Horizon Lines' fifteen owned or leased container ships would be unable to make up the transport capability of protestor's roll-on/roll-off carriers, which can carry "thousands of cars." Protestor contends that "[b]ased at least in part on questionable 'market research' that it may be possible to transport six vehicles in a container, TRANSCOM did not question whether the Liberty and Horizon assets would be sufficient to meet the GPC III requirements."

Once again, protestor is attempting to dispute the agency's conclusion that intervenor's "[p]roposal clearly meets the minimum requirements of the solicitation." As noted above, protestor's technical proposal has not been challenged by protestor. Based on the record before the court, there is no reason to conclude that the resources intervenor has committed to the project would be insufficient to meet the GCP III program requirements. Moreover, the performance work statement allows for "arranging for" ocean transportation, and does not require that it all be provided in-house. To the extent protestor argues that intervenor's past performance references are insufficient to warrant an overall past performance rating of "Satisfactory Confidence," protestor has not persuaded the court. Liberty Global Logistics' first past performance reference was for a TRANSCOM Surface Deployment and Distribution Command contract shipping military vehicles and other cargo around the world using "U.S. Flag roll-on/roll-off" vessels.[24] This contract, according to the proposal and past performance questionnaire, was for approximately $50 million annually, equal to almost half of what International Auto Logistics proposed charging for all transportation services for the first complete year of GPC III performance, i.e. $116,525,049.85. TRANSCOM rated Liberty Global Logistics as "**Exceptional**" in response to all the statements in the questionnaire related to ocean transportation. (emphasis in original). This reference provides a rational basis by which TRANSCOM could conclude that there is a "reasonable expectation that the offeror will successfully perform" the ocean shipping effort required by the GPC III statement of work. See Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69; Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 117. Moreover, TRANSCOM also considered, and gave credit to, intervenor for another Liberty Global Logistics past performance reference, for a shipping contract with Uniworld International, Inc. worth $5.5 million annually. In the past performance questionnaire, Liberty Global Logistics was rated between "**Satisfactory**" and "**Exceptional**" in regards to ocean transportation services provided under the contract. (emphasis in original).

From the record, it appears that the TRANSCOM source selection authority did not consider the third past performance reference intervenor submitted on behalf of Liberty Global Logistics, for a contract with the Ford automotive company for $25 million a year. Nor was the one past performance reference intervenor provided for Horizon Lines, for a $2.9 billion contract with TRANSCOM, in which "Horizon currently provides transport of light vehicles in support of USTRANSCOM solicitation Regional Domestic

---

[24] This TRANSCOM contract was for the delivery of military vehicles under the "USC-6" program, apparently separate from the GPC III contract for the delivery of personally-owned vehicles at issue in the above captioned case.

Contract – 05 (RDC-05) in the Alaska and Hawaii markets," considered. Neither reference appeared in the agency's initial or interim past performance evaluations, although, in front of the GAO, the agency loosely referred to these references: "Both carriers also provided extensive past performance in the area of shipping and handling POVs." TRANSCOM's correspondence documentation indicated that, on July 18, 2013, "[t]he past performance team decided there was sufficient information to assign a rating without this PPQ, so the request for Mr. Carpenter to complete a PPQ was retracted. However, he was told if he would like to submit on LGL's [Liberty Global Logistics'] behalf he could." TRANSCOM's correspondence documentation also indicated that "Mr. Carpenter responded via e-mail on 7/29/2013 at 1:57PM stating his legal counsel will not allow him to complete the questionnaire." The record before the court indicates that "[n]o PPQs were received for Horizon."

TRANSCOM, however, gathered an additional past performance reference for Liberty Global Logistics, and three past performance references for Horizon Lines, using the agency's Past Performance Information Retrieval System. As stated in the agency's interim past performance evaluation, the Liberty Global Logistics reference TRANSCOM collected, and one of the three Horizon Line references, were for contracts "providing international cargo transportation and distribution services using common contract ocean carriers offering regularly scheduled commercial liner service." Horizon Lines' remaining two references were stated to be for contracts "providing port to port and end to end ocean transportation services" between Alaska, Hawaii, and the continental United States. Three of the four references indicated "Satisfactory" performance, although the last Horizon Lines reference indicated "Unsatisfactory to Satisfactory performance." Horizon Lines' performance concerns were resolved through intervenor's response to an evaluation notice, which indicated, in part, a "reenergized Horizon Lines being an ALPHA carrier meeting RDD 98.7% of the time with an ITV [In-Transit Visibility] percentage of 97.0%. This performance level continues with the supporting evidence in our proposal reflecting Horizon's 100% 90-day rolling performance rating."

Under "*Inland Transportation Services*," the third performance area for which protestor alleges intervenor's past performance record is lacking, TRANSCOM credited intervenor with two "Somewhat Relevant" references from Liberty Global Logistics, three Somewhat Relevant references from Horizon Lines, four "Somewhat Relevant" references from SDV Command Source, and one "Somewhat Relevant" reference from Posey Transport Group, apart from the two "Relevant" references from Global Auto Logistics. (emphasis in original). Protestor's argument does not discuss the references from Liberty Global Logistics, Horizon Lines, and SDV Command Source, considers the past performance references of those subcontractors intervenor stated provided "OTR [over-the-road]" transportation services in a summary chart on page fifty-two of intervenor's proposal. A review of the record, however, indicates that TRANSCOM considered the past performance references from all four subcontractors as arranging for or providing inland transportation services. The sole subcontractor with a "Somewhat Relevant" reference related to inland transportation services, according to protestor, is Posey Transport Group. Protestor claims that "[i]t was simply unreasonable for the Agency to conclude there is a reasonable expectation of successful performance of the

vast CONUS and OCONUS inland transportation requirements based on one subcontractor's experience on a single contract performing trucking transportation services for new vehicles only in the United States."

It was appropriate for TRANSCOM to credit the past performance of Liberty Global Logistics, Horizon Lines, and SDV Command Source towards inland transportation. Although the chart on page fifty-two of intervenor's proposal provided a more summary and less detailed overview, the text of intervenor's proposal described Liberty Global Logistics as providing transportation "between U.S. and international destinations via truck, air, sea and rail. LGL provides a wide array of point-to-point logistics and transportation services to meet common and unique shipping needs." Intervenor also described Liberty Global Logistics as providing "door-to-door movements for the Department of Defense." TRANSCOM attributed inland transportation to Liberty Global Logistics' past performance reference for the $50 million contract with the Surface Deployment and Distribution Command. Intervenor's proposal indicated that Liberty Global Logistics conducted "**Inland Transport**" for this contract, including a "surface move" of military vehicles. (emphasis in original). The respondent for the past performance questionnaire for this reference rated Liberty Global Logistics as "**Exceptional**" in response to all the statements under the category of inland transportation. (emphasis in original).

It also was appropriate for TRANSCOM to credit the past performance of SDV Command Source towards inland transportation. Regarding SDV Command Source's contract with the United States Army Installation Management Command, worth $55,356,885.16 over its life cycle, intervenor's proposal stated:

> SDV's POV Storage contract involved arranging for inland transport of POV vehicles. For these activities, we coordinated carrier scheduling and movement of vehicles in-processed at each of the VPCs and designated POV storage sites. We also coordinated carrier scheduling and movement of vehicles from VSFs to designated VPCs upon return of a service member. In general, we coordinated transport with carriers, conducted a joint inspection with the carrier (using the DOD Form 788) and oversaw all vehicle loading and dispatch.

The respondent to the past performance questionnaire for this reference marked "**Unknown**" in response to the statements on inland transportation, but commented later on in the questionnaire that: "Answered 1B and section 2 [inland transportation] as unknown because SDV's contract with IMCOM was for long-term POV storage only. However, SDV did dray POVs to/from SDV' [sic] vehicle processing centers and SDV storage locations. SDV always did a very good job of coordinating movements of POVs to and from storage." (emphasis in original). Intervenor also indicated in its proposal that SDV Command Source arranged for inland transportation as part of the Fort Carson and Joint Base Lewis contracts, worth approximately $7.5 million and $16 million life-cycle respectively. For the Fort Carson reference, the respondent to the past performance questionnaire marked "**Exceptional**" in response to three of five of the

statements in the questionnaire on inland transportation. (emphasis in original), although the respondent to the past performance questionnaire for the Joint Base Lewis contract commented "NOT APPLICABLE" in response to the same statements in the questionnaire.

In addition to the references from Liberty Global Logistics and SDV Command Source, TRANSCOM did consider one reference from Posey Transport Group, which it considered to be "Somewhat Relevant" to the solicitation's requirements, a contract to transport vehicles for AT&T. Intervenor stated in its proposal that Posey Transport Group operates as a "vehicle transport operation servicing the entire continental United States and Canada." According to the past performance questionnaire, under this contract, Posey Transport Group "[m]anaged the transportation of new vehicles entering service from sedans and service trucks/vans to bucket trucks. Also managed the transportation of used surplus vehicle relocation and specialty equipment relocation." According to the intervenor's proposal and related past performance questionnaire, the contract was worth $3,516,452.00 in 2012. The respondent for AT&T rated Posey as "**Exceptional**" in response to four out of the five questionnaire statements under the topic of inland transportation. (emphasis in original).

The references from Liberty Global Logistics, SDV Command Source, and Posey Transport Group discussed above, in total, provide a rational basis for the agency's "reasonable expectation that the offeror will successfully perform the required" inland transportation effort for the GPC III program.[25]  The record does not support protestor's contention that the agency "lacked *any* rational basis" for its actions, Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 117 (emphasis in original), or was otherwise "'unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'" Fort Carson Support Servs. v. United States, 71 Fed. Cl. at 598 (quoting Consol. Eng'g Servs. v. United States, 64 Fed. Cl. at 637).[26]

Protestor's analysis also improperly assumes that Global Auto Logistics' three past performance references should be disregarded. Global Auto Logistics' past performance references, according to TRANSCOM, covered "providing/arranging for ocean & inland transportation, customer service, POV processing, and CONUS/OCONUS performance but does not include storage." Within the three

---

[25] In addition to the above, one past performance reference from Liberty Global Logistics, three past performance references from Horizon Lines, and one past performance reference from SDV Command Source, all of which originated from the agency's Past Performance Information Retrieval System, were indicated by TRANSCOM to cover inland transportation. Protestor does not challenge their validity.

[26] The GAO's analysis of the same challenged determinations was in line with the court's analysis. The GAO stated, "[w]e have reviewed each of the challenged references, and find that the record supports the agency's relevancy determination as well as the agency's conclusion that, collectively, all of the references provided the agency with satisfactory confidence that IAL would successfully perform the contract."

"performance areas" at issue, the references provided by the intervenor for Global Auto Logistics serve to further buttress the other "Somewhat Relevant" references provided by the intervenor, and further substantiate TRANSCOM's "reasonable expectation that the offeror will successfully perform the required effort." The court also notes that the solicitation did not require that the awardee have, at the moment of award, all of the resources required to perform the GPC III contract. As the agency correctly stated in front of the GAO, "[w]hat Protester fails to understand is the solicitation did not require offerors to demonstrate ownership of 'a national and international fleet of car carriers,' or currently employ 'the necessary pool of drivers.'  Rather the solicitation called for experience in 'arranging for or providing inland transportation.'" (internal citations omitted).

In sum, based on the record before the court, the source selection authority, Ms. Jorgenson, reached her decision to award a rating of "Satisfactory Confidence" to International Auto Logistics based on a thorough review of the offeror's past performance references as a whole, not on any one reference. The source selection authority noted that, "IAL and its subcontractors combined have provided numerous references to demonstrate successful performance in individual performance areas as required by the solicitation." In addition, the agency's overall review of the offerors' past performance proposals was thorough. The agency made multiple charts to compare the different references, conducted three stages of review, followed up on issues in between the different stages of review with evaluation notices, developed a record of its correspondence with the offerors, and discussed at length the rationale behind each offeror's final, overall past performance rating. After this review, the agency concluded that the intervenor had a "reasonable expectation" of success in the GPC III effort. The evidence before the court does not support protestor's assertion that intervenor would have only a low expectation, or no expectation of successful contract performance. Even if the court were to believe that a particular lower confidence rating might have been a better determination, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quotations omitted). The solicitation at issue in this case leaves significant discretion to the source selection authority to define the evaluation terms, as well as to assess what falls within "POV processing," "arranging for or providing ocean transportation," and "arranging for or providing inland transportation." After review of the extensive record, the court finds that the agency's individual ratings of "Somewhat Relevant," assigned to International Auto Logistics' fourteen past performance references, have a reasonable basis in the record before the court, and that the intervenor deserves a "Satisfactory Confidence" overall past performance rating. A review of the record offers a rational basis for the agency's determination that there is a "reasonable expectation that the offeror will successfully perform" the GPC III contract.

Integrated Assessment & Performance Price Tradeoff

Protestor also contends that, even if TRANSCOM was reasonable in giving International Auto Logistics an overall "Satisfactory Confidence" past performance rating, "the integrated assessment itself is unreasonable and contrary to the RFP." According to the solicitation, the agency's "integrated assessment" was to reflect the agency's overall review of an offeror's proposal, and was to be conducted after ratings were given for each of the five individual business, technical, past performance, small business utilization, and price evaluation factors. The source selection authority's integrated assessment focused primarily on how the various offerors' performance and price proposals compared between offerors, an evaluation described in the solicitation as the "Performance Price Tradeoff." According to the Source Selection Decision Document, "[t]he integrated assessment takes into consideration the potential tradeoffs in terms of performance confidence assessment ratings and price. Ratings for technical subfactors are not factored into this confidence assessment rating because the factors were rated on an Acceptable/Unacceptable basis and all offerors' proposals were rated as Acceptable." The solicitation provided guidance for the offerors on how the performance price tradeoff was to be conducted:

> This is a competitive best value source selection. The Government will conduct a Performance Price Tradeoff (PPT) source selection in which competing offerors' past performance history will be evaluated on a basis approximately equal to cost or price considerations. Award will be made to the offeror who is deemed responsible IAW [in accordance with] FAR Part 9, who submits an acceptable business proposal, technical proposal, and small business proposal, and is judged, based on their past performance and total evaluated price, to represent the best value to the Government. . . . However, the Government will not pay a price premium that it considers to be disproportionate to the benefits associated with the proposed margin of service superiority.

Protestor takes issue with how TRANSCOM conducted the performance price tradeoff between International Auto Logistics and American Auto Logistics, alleging that the agency abandoned "the RFP's criteria that made price equal to past performance," in the tradeoff, and, instead, "decided that 'the value between Satisfactory Confidence and Substantial Confidence ratings regarding actual contract performance is reduced to an extent by the general commercial nature of the contract and the prevalence of the required services in the commercial marketplace.'" According to protestor, "[t]here is no statutory or regulatory authority to support the Source Selection Authority's reliance on the commercial nature of the contract to diminish—if not eliminate—the role that past performance was supposed to play in the source selection process." Protestor notes that "[t]here are countless items that would clearly meet the FAR definition of a 'commercial item,' but that does not mean they are easy to manufacture." Protestor also claims that the source selection authority impermissibly, and inconsistent with the solicitation's evaluation criteria, "concluded that 'the primary margin of service

superiority represented in AAL's [Protestor's] higher past performance score is not in specific performance areas, but rather contract integration.'" (modification in original). Protestor, in addition, claims that the source selection authority failed to consider that the price differential between the two offers may not be as large as indicated, because, "although the contract is fixed price, the resulting award will be an Indefinite-Delivery/Indefinite Quantity contract, wherein minor differences in prices could fluctuate depending on ordered quantities."

Defendant responds that the source selection authority was correct to consider the "commercial nature" of the contract, as well as to conclude that the protestor's "margin of service superiority" was in contract integration, and that there is limited "risk inherent in selecting the awardee instead of the incumbent." Defendant asserts the FAR encouraged the agency to "consider 'the relative differences between proposals, their strengths, weaknesses and risks . . . .'" (quoting Halter Marine, Inc. v. United States, 56 Fed. Cl. 144, 170 (2003)). Defendant further contends that the source selection authority "did not ignore the smaller magnitude of the awardee's past performance efforts, nor the risks inherent in choosing a contractor with a lower past performance rating, but reasoned the awardee could successfully scale up its operation because of the common, commercial nature of the services." According to defendant:

> [P]laintiff's argument ignores the salient point that neither statute, nor regulation, nor the solicitation prohibits the source selection authority from taking into account the prevalence of the solicited services in the commercial market in her analysis of the risk . . . . Here the source selection authority did precisely what she was supposed to do—exercise business judgment and balance risk to make an informed tradeoff decision.

Intervenor adds that "[t]he Court must afford the Source Selection Authority who exercises independent judgment tremendous discretion in deciding which offeror represents the best value to the government," citing FAR 15.308 (2013).

FAR 15.308 instructs source selection authorities as follows:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

FAR 15.308. The requirements of FAR 15.308 have been described as follows:

> First, the regulation requires the agency to make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford. See, e.g., TRW, Inc. [v. Unisys Corp.], at 1327; Dismas Charities, Inc., 61 Fed. Cl. [191, 203 (2004)]. Doing this, the decisional law demonstrates, obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price. Second, in performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors. FAR § 15.308 ("the documentation need not quantify the tradeoffs that led to the decision"); Widnall v. B3H Corp., 75 F.3d 1577, 1580 (Fed. Cir. 1996). But, this is not to say that the magnitude of the price differential between the two offers is irrelevant—logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase. See Beneco Enters., Inc., 2000 C.P.D. ¶ 69, 1999 WL 1713451, at *5 (1999). To conclude otherwise, threatens to "minimize[ ] the potential impact of price" and, in particular, to make "a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium." Coastal Sci. and Eng'g, Inc., 89–2 C.P.D. ¶ 436, 1989 WL 237564, at *2 (1989); see also Lockheed Missiles & Space Co., 4 F.3d at 959–60. Finally—and many cases turn on this point—the agency is compelled by the FAR to document its reasons for choosing the higher-priced offer. Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. Indeed, apart from the regulations, generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions. See Johnson Controls World Servs., 2002 WL 1162912, at *6; Satellite Servs., Inc., 2001 C.P.D. ¶ 30, at *9–11; Si–Nor, Inc., 2000 C.P.D. ¶ 159, 1999 WL 33210196, at *3 (1999).

Serco Inc. v. United States, 81 Fed. Cl. at 496–97; see also Croman Corp. v. United States, 106 Fed. Cl. 198, 220 (2012) (citing to the framework discussed in Serco), aff'd, 724 F.3d 1357 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2013). A Judge of this court has stated that, under FAR 15.308, "[w]hen assessing differences between proposals, the SSA should take into consideration not only the proposals' adjectival ratings but also information on advantages and disadvantages of the proposals. 'Looking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality.'" Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (quoting Femme Comp Inc. v. United States, 83 Fed. Cl. at 758); see also AM Gen., LLC v. United States, 115 Fed. Cl. 653, 699 (2014) ("This court has also recognized the limitation of a bare evaluation rating, and the need,

in certain circumstances, to go beyond the evaluation rating to understand the value provided by the proposal.").

A protestor bears a significant burden to demonstrate error in a source selection authority's best-value trade-off analysis, because, as discussed above, procurement officials have a very high degree of discretion when it comes to best value determinations. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government." (quotation omitted)); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355; Optimization Consulting, Inc. v. United States, 115 Fed. Cl. at 89; Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. at 110 ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382.

Courts allow agencies such a high degree of discretion in best value determinations because it is necessarily a subjective process. The determination of which offer represents the "overall best value to the government" involves layers of decision-making and judgment calls regarding which proposals offer the overall highest technical merit, and what technical advantages are worth a higher price. Any decision to contract is "inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for." Sperry Flight Sys. Div. v. United States, 212 Ct. Cl. at 339, 548 F.2d at 921; see also Comprehensive Health Servs., Inc. v. United States, 70 Fed. Cl. 700, 721 (2006).

At multiple points in the Source Selection Decision Document, the source selection authority discussed, and compared, the past performance and price offerings submitted by International Auto Logistics and American Auto Logistics. In the section evaluating International Auto Logistics' proposal, under a subsection titled "**Integrated Assessment**," (emphasis in original), the source selection authority stated:

> IAL did not present past performance of the same scope as the Government requirement or AAL's past performance. However, while the scope was not the same, the Government notes IAL's past performance includes largely the same commercial services conducted by AAL (with the exception of performing under a single contract) and includes services IAL demonstrated it has and currently performs in the commercial marketplace. Adding volume to a commercial service already being performed presents less risk than adding a new service. IAL's past performance provides the Government satisfactory confidence that it has the experience that would enable IAL to expand current commercial efforts to meet the Government requirements.

> While the Government may award to a higher rated, higher priced offeror, where it determines that the superior past performance of the higher priced offeror outweighs the associated price premium, the aforementioned commercial qualities of the requirements impact the extent to which the Government is willing to trade-off increased cost for higher-rated past performance. IAL's TEP [Total Evaluated Price] is the lowest submitted by any offeror and is $38,301,734.66 below the next lowest offer. While the solicitation permits the Government to award to an offeror with a higher price where superior past performance of the higher priced offeror outweighs the cost difference, the Government will not pay a price premium that it considers disproportionate to the benefits associated with the proposed margin of service superiority. The incumbent's superior past performance, when compared to the price and past performance proposals of IAL, does not warrant awarding at the higher proposed price. Therefore, IAL's proposal represents the best overall value to the Government. Additional rationale for this tradeoff are detailed in the next section.

The source selection authority continued the comparison when reviewing American Auto Logistics' proposal. The source selection authority stated:

> While the solicitation permits the Government to award to an offeror with a higher price, where superior past performance of the higher priced offeror outweighs the cost difference, the Government will not pay a price premium that it considers disproportionate to the benefits associated with the proposed margin of service superiority. In the present case, AAL's higher past performance does not outweigh the $38,301,734.66 price premium. A distinguishing difference in the past performance rating of AAL and IAL is that AAL's performance occurred under a single contract, and was of the same scope and magnitude as the solicited requirement. On the other hand, IAL demonstrated performance of similar or the same tasks [sic] under separate contracts, and was not the same scope and magnitude of the solicited requirement. In other words, both proposals demonstrated successful performance of essentially the same commercial services, but only AAL's performance was under a single contract with similar scope. In order to award to AAL, the Government would be required to trade-off a $38,301,734.66 price premium for award to an offeror whose past performance score is higher because it performed the same recent and relevant commercial services under a single contract versus multiple contracts. Under the current Global POV Contract, AAL performs the work of a third-party logistics provider and is responsible for dividing and managing work between its subcontractors. The experience of providing logistics services for the same work (of greater scope) under a single contract versus multiple commercial contracts (of lesser scope), for purposes of actual contract performance, is not significant enough to justify the higher price. Awarding to AAL, with a $38,301,734.66 higher

price would represent a price premium disproportionate to the benefits associated with the proposed margin of service superiority. As detailed above, the primary margin of service superiority represented in AAL's higher past performance score is not in specific performance areas, but rather contract integration, which in the current commercial marketplace is not worth the $38,301,734.66 price premium. Therefore, AAL does not represent the best value to the Government.

In making its "**SOURCE SELECTION DECISION**," (emphasis and capitalization in original), the source selection authority maintained:

> In accordance with the solicitation, which indicated that past performance would be evaluated on a basis approximately equal to price, I have determined that the additional cost of $38,301,734.66 is not proportionate to the benefit associated with the higher past performance rating which was based on the fact that AAL had successfully performed the current effort for the services required under this solicitation under a single contract.

Underpinning TRANSCOM's performance price tradeoff and integrated assessment, and the source selection authority's ultimate conclusion, is the agency's conclusion that the services to be performed under the GPC III effort are "commercial item[s]." See FAR 12.101(b). In her source selection decision, the source selection authority stated that, "[a]dding volume to a commercial service already being performed presents less risk than adding a new service," and that "the aforementioned commercial qualities of the requirements impact the extent to which the Government is willing to trade-off increased cost for higher-rated past performance." Moreover, the solicitation was structured as a commercial item acquisition. The solicitation incorporated by reference "Contract Terms and Conditions--Commercial Items" pursuant to FAR 12.301 (2013) and 52.212-4 (2013). Solicitations for commercial items are governed under FAR Part 12, which sets forth streamlined procedures and special evaluation requirements. See FAR 12.000 (2013) ("This part prescribes policies and procedures unique to the acquisition of commercial items. It implements the Federal Government's preference for the acquisition of commercial items contained in Title VIII of the Federal Acquisition Streamlining Act of 1994 (Public Law 103-355) by establishing acquisition policies more closely resembling those of the commercial marketplace and encouraging the acquisition of commercial items and components."); FAR 12.203 (2013) ("The contracting officer may use the streamlined procedure for soliciting offers for commercial items prescribed in 12.603."); FAR 12.602 (2013) ("When evaluation factors are used, the contracting officer may insert a provision substantially the same as the provision at 52.212-2, Evaluation--Commercial Items, in solicitations for commercial items . . . ."); Streamlined Solicitation for Commercial Items, FAR 12.603 (2013) ("When a written solicitation will be issued, the contracting officer may use the following procedure to reduce the time required to solicit and award contracts for the acquisition of commercial items. This procedure combines the synopsis required by 5.203 and the issuance of the solicitation into a single document."). The different, streamlined

procedures for the acquisition of commercial items give agency personnel discretion in what they can refer to in coming to a past performance determination. See Use of Past Performance, FAR 12.206 (2013) ("Contracting officers should consider past performance data from a wide variety of sources both inside and outside the Federal Government in accordance with the policies and procedures contained in subpart 9.1, section 13.106 [for simplified acquisitions], or subpart 15.3 [for negotiated acquisitions], as applicable."). Although protestor alleges in its brief that defendant erred in "Overemphasizing the Commercial Nature of the GPC III Service Elements," (capitalization in original; emphasis removed), protestor does not directly challenge TRANSCOM's decision to determine that the GPC III solicitation was a "commercial item" acquisition under the FAR.

Defendant conducted a market research survey, as is suggested in the FAR and in the Defense Federal Acquisitions Regulations Supplement (DFARS), FAR Part 200 et seq., regarding whether personally-owned vehicle processing and transport are commercial items. See FAR 12.202 (2013) ("Market research (see 10.001) is an essential element of building an effective strategy for the acquisition of commercial items and establishes the foundation for the agency description of need (see part 11), the solicitation, and resulting contract."); DFARS 212.102 (2013) ("(a)(i) When using FAR part 12 procedures for acquisitions exceeding $1 million in value . . . the contracting officer shall-- (A) Determine in writing that the acquisition meets the commercial item definition in FAR 2.101 or meets the criteria at FAR 12.102(g)(1); (B) Include the written determination in the contract file . . . ."); see also FAR 10.001 (2013) ("Agencies must . . . [c]onduct market research appropriate to the circumstances . . . ."); FAR 10.002 (2013) (discussing procedures for market research). Defendant stated in its May 18, 2012 market research report:

> The work associated with the GPC II contract was determined a "commercial item" under the Federal Acquisition Regulation (FAR) at subpart 2.101. FAR subpart 2.101 defines a service as a commercial item when it is "a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions." The GPC II was awarded following FAR Part 12 (Acquisition of Commercial Items) procedures. The GPC III requirement is the continuation of the work performed under the GPC II contract and it too is determined a commercial item. This determination agrees with the market survey where four (4) of the five (5) [80%] of the RFI [request for information] respondents agreed that the services associated with this effort are commercial. These RFI respondents provide the transportation and/or storage of vehicles as a service commonly offered to the general public, in substantial quantities, and at competitive market prices.
>
> The incumbent contractor's response states that the services sought under the GPC III requirement are not commercial. The basis for its

response is that the incumbent does not offer the same services commercially. The incumbent's interpretation, however, does not preclude the services from being "commercial" under the FAR definition. As noted above, 80% of the companies which responded to the RFI concluded that the services were commercial (See, Attachment 1). Because the services fall within the definition in FAR 2.101 and it is very probable the needs of the Government can be met through the commercial market, it has been determined that this requirement is "commercial." (See, FAR 2.101 and DFARS 212.102).

(brackets in original).

Under FAR 2.101(b)(6), a "commercial item" includes:

Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions.

FAR 2.101(b)(6). Pursuant to the FAR, "[c]atalog price means a price included in a catalog, price list, schedule, or other form that is regularly maintained by the manufacturer or vendor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public." FAR 2.101(b)(6)(i). Under the same regulation, "[m]arket prices means current prices that are established in the course of ordinary trade between buyers and sellers free to bargain and that can be substantiated through competition or from sources independent of the offerors." FAR 2.101(b)(6)(ii). According to the TRANSCOM May 18, 2012 market research report, the agency concluded that the GPC III effort was commercial in nature because, "four (4) of the five (5) [80%] of the RFI respondents agreed that the services associated with this effort are commercial," and, also, "[t]he GPC III requirement is the continuation of the work performed under the GPC II contract and it too is determined a commercial item." (first brackets in original). Defendant's market research report covered five companies. See Advanced Am. Constr., Inc. v. United States, 111 Fed. Cl. 205, 226 (2013) ("[T]he agency enjoys substantial discretion in determining how much and what type of market research is 'appropriate to the circumstances' for the purpose of '[d]etermin[ing] if sources capable of satisfying the agency's requirements exist.'" (quoting FAR 10.001(a))); Assessment and Training Solutions Consulting Corp. v. United States, 92 Fed. Cl. 722, 725, 731 (2010) ("The court agrees with defendant that the Contracting Officer had discretion under the relevant regulations to conduct market research 'appropriate to the circumstances.' The regulations note that the extent of the market research will vary depending on a number of factors and direct agencies not to request 'more than the minimum information necessary' when conducting market research." (quoting FAR 10.001(b), 10.002(b) (internal citations omitted)). In Assessment and Training Solutions Consulting Corp. v. United States, a Judge of this court upheld a

small business market research report that only garnered nine responses, only four of which were from small businesses. See generally id.

Specifically regarding the GPC III contract, the respondents to the market survey generally offered support to the agency's determination that a commercial item designation was appropriate. In general, the respondents' comments to the agency support the agency's determination. For example, [redacted], one of the market research respondents, stated that "[t]he specific services included within the scope of this bid are of a type and quantity transacted in the commercial marketplace. Vehicle handling, storage, transportation and repair work are all services performed and achieved under commercial terms and conditions." Another respondent to the market survey, [redacted], commented that "storage and transporting of vehicles is a service that is offered, sold and available to the general public by specific companies and independent contractors on a commercial basis." In addition, according to the agency, the prior GPC II contract was operated under the terms of a commercial item contract, with no indication in the record of any issues arising as a result. The statements of the industry respondents, and the agency's prior experience with the GPC II contract, offer a reasonable basis in the record for the agency to have concluded that the GPC III scope of services are, as the FAR states, "offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions." See FAR 2.101(b); Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1335 (2011) ("These agency views are reasonable. They are consistent with the Act. The length of time the agencies have held them suggests that they reflect careful consideration, not '*post hoc* rationalizatio[n].' Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 50, 103 S. Ct. 2856, 77 L.Ed.2d 443 (1983). And they consequently add force to our conclusion." (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); Amer. Airlines, Inc. v. United States, 551 F.3d 1294, 1302 (Fed. Cir. 2008) ("The government is correct that the reasonableness of an agency interpretation is supported when it has been consistent over time." (citing as an example Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993))), reh'g granted, 319 F. App'x 914 (Fed. Cir. 2009); see also Bevevino v. United States, 99 Fed. Cl. 461, 471 (2011) (the court "noting the broad deference afforded an agency's interpretation of its own regulation, especially where that interpretation has been consistent over time" (citing Gose v. United States Postal Serv., 451 F.3d 831, 837 (Fed. Cir.), reh'g denied (Fed. Cir. 2006))).

After the May 18, 2012 market research report was published, additional responses from industry were sought through an October 25, 2012 request for information e-mail, proposing the question "Vehicle Processing Centers Network (VPC). Is there a commercial alternative to the VPC network?" One of intervenor's subcontractors in its GPC III proposal, Boyle Transportation, indicated that, "[t]here isn't a commercial network that can handle the volume and seasonality of the GPC. Most commercial systems handle only a few cars a day, at most, and certainly doesn't [sic] have the storage capability to handle this contract." SDV Command Source, another of intervenor's subcontractors, stated that "[m]ixing this program with a commercial

program could and most likely would reduce the extremely high level of service." Intervenor's parent company, International Auto Processing, also noted that "currently 99 % of all revenue generated at the current VPC network is generated from the GPC making it virtually an exclusive network. . . . Most commercial alternatives would not have the excess space or acreage needed handle [sic] the GPC, negating most of or all cost advantage." International Auto Processing, however, stated, in that same response, that "[t]here are potentially multiple commercial networks that might work." [Redacted], another respondent, stated in response to the same question that "there is the option of using a completely commercial solution for this requirement." Also in the record is a comment from [redacted] that: "We think there is a lot of merit in exploring existing commercial infrastructure as an alternative to contractors setting up and maintaining separate VPC's outside of a commercial structure." In sum, the agency's conclusion that the contract was for a commercial item under FAR 2.101 was reasonable based on the record before the agency. See Weeks Marine, Inc. v. United States, 575 F.3d at 1371; Assessment and Training Solutions Consulting Corp. v. United States, 92 Fed. Cl. at 725, 731.

Given that the GPC III effort was considered a commercial item transaction under the FAR, this court reviews the agency's performance price tradeoff to see if it was arbitrary and capricious, and if it relied on factors that were not intended to be considered in the solicitation. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43. Although the solicitation specified that past performance would be weighed "approximately equal to cost or price considerations," the solicitation did not specify further how the government would come to a final, "best value," "Performance Price Tradeoff" determination. The solicitation's rather broad language left the source selection authority discretion to consider factors that would affect the performance price tradeoff, including her "business judgment[s]" under FAR 15.308. See FAR 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs."). Such business determinations, as stated in the Source Selection Decision Document, can include whether or not the "commercial nature" of the contract reduces the risk of poor performance, and whether "[a]dding volume to a commercial service already being performed presents less risk than adding a new service."

The record indicates that the source selection authority and the Source Selection Advisory Council considered the impact of the commercial nature of the services provided on International Auto Logistics' ability to perform the GPC III contract. The Source Selection Advisory Council stated:

> However, the difference between these two ratings is mitigated to an extent by the general commercial nature of the contract. Offerors have access to the existing shipping lanes for ocean transportation using the Government's Universal Services Contract (USC) and Regional Domestic Contracts (RDC); many of the OCONUS VPCs are Government-provided; warehousing, vehicle processing space, line-haul services, and the IT requirements are also commercially available.

The source selection authority further stated:

> This includes access to existing shipping lanes for ocean transportation, including the use of the Government's Universal Services Contract (USC) and Regional Domestic Contracts (RDC); the Government-provided vehicle processing center facilities in many of the OCONUS locations; the availability of commercial warehousing and vehicle processing center space, availability of commercial line-haul services to and from the major POV processing centers, and the basic, commercial-based IT requirements.

"While price differential may be taken into account to determine a best value award, 'it is not solely dispositive; we must consider all the surrounding circumstances.'" See, e.g., Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 120 (quoting Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1368); see also E.W. Bliss Co. v. United States, 77 F.3d at 449; Emax Fin. & Real Estate Advisory Servs., LLC, B-408260, 2013 WL 3872144, at *6 (Comp. Gen. July 25, 2013) (citing American Med. Info. Servs., B-288627, 2001 WL 1382255, at *1 (Comp. Gen. Nov. 7, 2001). In a performance price tradeoff, courts will be careful when overruling an agency's business or technical judgment. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Sperry Flight Sys. Div. v. United States, 212 Ct. Cl. at 339, 548 F.2d at 920–21; Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 120; Omega World Travel v. United States, 54 Fed. Cl. at 578. Based on the record before the court, the source selection authority properly balanced price and past performance, and considering her reasonable determination that the risk of poor performance with the intervenor was low, in part due to the commercial nature of the activity, the source selection authority was not irrational when she found that American Auto Logistics' superior performance rating "in the current commercial marketplace is not worth the $38,301,734.66 price premium." The solicitation affirmatively states that the government "will not pay a price premium that it considers to be disproportionate to the benefits associated with the proposed margin of service superiority." This statement gives the source selection authority discretion to consider other factors that could help in her determination of what is a "disproportionate" price premium, as well as what is an offeror's "margin of service superiority." The source selection authority was, therefore, within the solicitation's requirements when she concluded, based on her business judgment, that "[a]warding to AAL, with a $38,301,734.66 higher price would represent a price premium disproportionate to the benefits associated with the proposed margin of service superiority."[27]

---

[27] Protestor's claim that the source selection authority failed to consider that "prices could fluctuate depending on ordered quantities," also does not undermine the source selection authority's decision. The agency was not under an obligation to consider speculative fluctuations in price when coming to its final determination. The solicitation only required the source selection authority to examine the "total evaluated price" in her final, integrated assessment, with the total evaluated price representing a fixed price value defined within the solicitation. Nonetheless, the source selection authority recognized when coming to her final source selection decision that the "[a]ctual

Working with Debarred or Suspended Contractors

In a hearing before this court, petitioner alleged that International Auto Logistics had subcontracted with "a fairly notoriously debarred company," referred to at the hearing as Agility International or Agility Defense and Government Services, to perform under the contract if awarded. As defendant and intervenor repeatedly note in their filings, this allegation was not formally made in protestor's complaint. Protestor's allegations and defendant's responses at times raise more questions than answers. According to protestor, protestor's counsel discovered on February 5, 2014, that entities operating under the names "Agility International" and "Agility Defense & Government Services" were soliciting to fill management positions for vehicle processing centers connected to performance of the GPC III contract. Protestor alleges that this discovery indicates that either one or both of the alleged Agility entities is acting as a subcontractor to International Auto Logistics for performance of the GPC III contract. Protestor indicates that it informed TRANSCOM of its discovery two days before the court hearing. To support its contention, protestor provided website images of vehicle processing center management job postings, allegedly related to the GPC III program, originating from either Agility International or Agility Defense & Government Services websites. The alleged job postings protestor provided in its filings are summarized as follows:

- A job posting from Agility Logistics,[28] viewed on December 15, 2013, for a "Vehicle Processing Center Manager" for the locations of "BH (Primary)," "Madison, AL 35758 US" "KR-27 KR," "KR-11 KR," "KR," and "GU."[29] Under "Job Description," it was stated: "THESE POSITIONS ARE CONTINGENT ON WINNING THE CONTRACT." (capitalization in original). The posting "SUMMARY" stated: "As a component of the United States Transportation Command (USTRANSCOM), the Military Surface Deployment and Distribution Command (SDDC) manages Department of Defense (DoD) sponsored shipments of privately-owned vehicles (POVs) belonging to military service members and DoD Civilian employees. This requirement is for complete

difference in cost to the Government is dependent on POV shipping and storage volume during contract performance."

[28] Although the name of the specific Agility entity posting the job offerings is unclear, the corporate logo at the top of the job posting websites states "**Agility**," with the phrase "A New Logistics Leader" following in smaller font below. (emphasis in original). The job postings appear to have been placed on the website domain https://agilitylogistics.mua.hrdepartment.com.

[29] Although the documents themselves do not make clear what the acronyms mean, based on context, it appears these acronyms refer to: Bahrain, Guam, Madison, Alabama, and South Korea (Korean Republic). For all Agility Logistics job posts, under "Job Type" it was stated "Non-U.S. Job."

transportation and processing services for the area of Bahrain, Guam, Seoul, South Korea, Taegu, South Korea." (capitalization in original). The summary also indicated that the position would serve "as the Agility DGS, Inc. [Defense & Government Services] secondary interface/representative for communications with the customer."

- A job posting from Agility Logistics, viewed on December 15, 2013, for a "VPC Assistant SiteManager [sic]" for the locations of "GU (Primary)," "BH," "Madison, AL 35758 US" "KR-27 KR," and "KR-11 KR." Under "Job Description," it was stated: "THESE POSITIONS ARE CONTINGENT ON WINNING THE CONTRACT." (capitalization in original). The posting "SUMMARY" stated: "As a component of the United States Transportation Command (USTRANSCOM), the Military Surface Deployment and Distribution Command (SDDC) manages Department of Defense (DoD) sponsored shipments of privately-owned vehicles (POVs) belonging to military service members and DoD Civilian employees. This requirement is for complete transportation and processing services for the area of Guam, Bahrain, Seoul. South Korea, and Daegu, South Korea." (capitalization in original). The summary also indicated that the position would serve "as the Agility DGS, Inc. secondary interface/representative for communications with the customer."

- A job posting from Agility Logistics, viewed on January 1, 2014, for a "VPC Assistant Site Manager," for the locations of "CAP BH (Primary)," "NOR BH," "CEN BH," and "SOU BH." This posting does not reference a contract with TRANSCOM, but does indicate that the applicant "[m]ust be able to access US Military installations." The summary also indicated that the position would serve "as the Agility DGS, Inc. secondary interface/representative for communications with the customer."

- A job posting from Agility Logistics, viewed on January 1, 2014, for a "Vehicle Processing Center Manager," for the locations of KR-11 KR (Primary)," and "KR-27 KR." This posting does not reference a contract with TRANSCOM, but does indicate that the applicant "[m]ust be able to access US Military installations." The summary also indicated that the position would serve "as the Agility DGS, Inc. secondary interface/representative for communications with the customer."

- A job posting from Agility Logistics, viewed on January 1, 2014, for a "VPC Assistant Site Manager," for the locations of KR-11 KR (Primary)," and "KR-27 KR." This posting does not reference a contract with TRANSCOM, but does indicate that the applicant "[m]ust be able to access US Military installations." The summary also indicated that the position would serve "as the Agility DGS, Inc. secondary interface/representative for communications with the customer."

- A job posting from Agility Logistics, viewed on January 1, 2014, for a "Vehicle Processing Center Manager," for the location of "KR-27 KR (Primary)." This posting does not reference a contract with TRANSCOM, or directly reference

work with the United States military. The summary does not indicate any joint role with Agility Defense & Government Services.

- The results of a search of job postings from Agility Logistics, viewed on January 21, 2014, showing results for "**Vehicle Processing Center Manager**," and/or "VPC Assistant Site **Manager**," for the locations of "KR-27 KR," "KR-11 KR," "CAP BH," "NOR BH," "CEN BH," "SOU BH," "MUH BH," "GU," "MT GU," "SR GU," "IN GU," "BA GU," "AT GU," "MA GU," and "TM GU." (emphasis in original).

- A job posting, undated, from "*Agility Defense & Government Services*" soliciting for a "Vehicle Processing Manager" and "Vehicle Processing Center Assistant Manager" for Hagatna, Guam. (emphasis in original). The positions were stated to be "Contingent Upon Winning Contract." The posting was indicated to be placed on the website http://guam.jobs.

Protestor also alleges that International Auto Logistics has ties to Agility through its key personnel, which, according to the protestor, the intervenor is intentionally hiding. According to protestor,

Mr. Tipton, who was employed by Plaintiff's parent company from April 2003 to September 2008, worked for an Agility company from 2008 until joining Intervenor in June 2012. Mr. Tipton's resume in Intervenor's proposal contains no reference to his four-year employment with Agility, and his LinkedIn profile reflects this four-year employment gap.

(internal citations omitted). Protestor also notes that another International Auto Logistics executive, Rod Mallette, also worked for Agility prior to coming over to International Auto Logistics. In support, protestor appended to its February 21, 2014 filing a copy of Mr. Tipton's and Mr. Mallette's LinkedIn profiles, which indicate that Mr. Mallette was a "**Global Account Manager**" for "**Agility Logistics**" from "2008–2010." (emphasis in original). Protestor alleges that Agility International and Agility Defenses & Government Services are debarred contractors, and, therefore, International Auto Logistics' alleged contracting with them is in violation of procurement regulations.

FAR 9.405 (2013) states in relevant part:

(a) Contractors debarred, suspended, or proposed for debarment are excluded from receiving contracts, and agencies shall not solicit offers from, award contracts to, or consent to subcontracts with these contractors, unless the agency head determines that there is a compelling reason for such action (see 9.405–1(b), 9.405–2, 9.406–1(c), 9.407–1(d), and 23.506(e)). Contractors debarred, suspended, or proposed for debarment are also excluded from conducting business with the Government as agents or representatives of other contractors.

(b) Contractors included in the SAM [System for Award Management] Exclusions as having been declared ineligible on the basis of statutory or other regulatory procedures are excluded from receiving contracts, and if applicable, subcontracts, under the conditions and for the period set forth in the statute or regulation. Agencies shall not solicit offers from, award contracts to, or consent to subcontracts with these contractors under those conditions and for that period.

. . .

(d)(1) After the opening of bids or receipt of proposals, the contracting officer shall review the SAM Exclusions.

. . .

(4) Immediately prior to award, the contracting officer shall again review the SAM Exclusions to ensure that no award is made to a listed contractor.

FAR 9.405; see also FAR 9.405-2 (2013) (stating that "contracting officers shall not consent to subcontracts with such contractors unless the agency head states in writing the compelling reasons for this approval action").

In order to support its claim that Agility International and Agility Defense and Logistics are ineligible contractors, and were so at the time of the award of the GPC III contract, protestor provided a copy of a May 16, 2012 letter from Walter Thomas, Special Assistant for Contracting Integrity, of the United States Defense Logistics Agency, to the "Agility Public Warehousing Company, K.S.C.," of Sulaibiya, Kuwait. The letter, located in protestor's filings but not in the Administrative Record, discusses the circumstances involved, stating:

On behalf of the Defense Logistics Agency (DLA), on and after November 16, 2009, the Suspension and Debarment Official (SDO) suspended The Public Warehousing Company KSC (also known as Agility) (PWC/Agility) and more than 120 of its affiliates from Government contracting and from directly or indirectly receiving the benefits of federal assistance programs or from purchasing surplus Government property under the Federal Property and Management Regulations. Since that time, additional affiliates of PWC/Agility have been identified. Therefore, I have initiated this action pursuant to the authority of, and the debarment procedures contained in, the Federal Acquisition Regulation (FAR) Subpart 9.4. For your information, FAR Subpart 9.4, the Defense FAR Supplement (DFARS) 209.4, and 2 C.F.R. Part 1125 may be located on the Internet at http://www.acq.osd.mil/dpap/dars/dfarspgi/current/index.html            and https://www.acquisition.gov/Far/.

The letter continued:

> Pursuant to FAR 9.407-1(c), suspension may be extended to affiliates of a contractor, as defined in FAR 9.403 ("Affiliates."). Because PWC/Agility is the parent of the attached companies, which are listed by address and DUNs [sic] numbers [Dunn & Bradstreet Numbers], they are each suspended based on their affiliation with PWC/Agility, a criminally indicted company. These suspensions are temporary pending the completion of the legal proceedings against PWC. This letter constitutes written notice to each of the affiliates pursuant to FAR Subpart 9.407-1 (c)(2).

Along with the letter, protestor attached a list of company DUNS identification numbers, allegedly representing the list of entities listed as suspended pursuant to the letter from the Defense Logistics Agency. Among this list are numerous United States entities under the names "**AGILITY INTERNATIONAL, INC.**," and "**AGILITY LOGISTICS, CORP**." (capitalization and emphasis in original). The list does not contain any United States entities under the name Agility Defense and Government Services. To supplement this list, protestor appends a February 20, 2014 list of entities allegedly found from a search of the System for Award Management by protestor, using the search term, "**Agility Defense & Government Services**." (emphasis in original). The list contains, in relevant, part two Virginia and two Guam entities under the name "AGILITY DEFENSE & GOVERNMENT SERVICES, INC.," listed as excluded as of November 16, 2009 and January 6, 2010 respectively. (capitalization in original). The same list also contains two Madison, Alabama entities under the name "Agility Defense and Government Services, Inc.," with DUNS number 788495232, that are not listed as excluded. In addition, protestor appended a list of entities allegedly found from a February 21, 2014 search of the System for Award Management, using the search terms "**agility**" and "**international**." (emphasis in original). That last list contains, in relevant part, a Kuwaiti entity under the name "Agility Logistics International BV," and two United States, New York entities under the name "Agility Logistics Corp aka Agility GIL" listed as excluded from contracting. This list, however, also includes one Alexandria, United States, Virginia entity under the name "AGILITY INTERNATIONAL INC.," with DUNS number 155340052, listed as not excluded from contracting. (capitalization in original).

Despite the obvious, potential evidentiary issues raised by protestor's attachment of website images as exhibits and informal submission of documents, defendant and intervenor have not formally objected to the introduction of protestor's exhibits into the protest. Intervenor, however, contends that it "cannot address the purported announcements that Plaintiffs [sic] counsel asserts to have been found on the Internet." Defendant does not provide new facts to counter protestor's allegations, but maintains that "IAL's proposal did not include the company at issue, Agility Defense & Government Services (Agility) or any of its affiliates, divisions, or branches." Defendant also maintains that "IAL has unequivocally stated to the agency, U.S. Transportation Command, and the Court that it does not intend to subcontract with any entity affiliated with Agility to perform the contract at issue in this case." Defendant claims that the job

postings protestor refers to "had been deleted and were not active on February 6, 2014," and were otherwise only contingent upon winning the contract. Defendant also notes that, "[c]ounsel for intervenor provided the Government two DUNS numbers for two Agility affiliates: 788495232 (Taos Industries, Inc.)[30] and 155340052 (Agility International, Inc.). The Government searched the System for Award Management (SAM), and found that neither DUNS number is associated with a suspended or debarred Agility affiliate." (footnote omitted). Defendant does admit, however, that the job posting related to the vehicle processing center in Hagatna, Guam "directed job applicants to apply at an office of a suspended Agility affiliate."

> Intervenor presents its own version of events. According to intervenor:

> On November 16, 2009, the Public Warehousing Company was indicted by the U.S. Government, and suspended from government contracting. Over the course of the next several days, hundreds of the Public Warehousing Company's affiliates were also suspended, including Agility Defense and Agility International. Agility Defense and Agility International have never been accused of any wrongdoing, and no legal proceedings have ever been initiated against them.

(emphasis in original). Intervenor claims that, after two years, "Agility Defense and Agility International filed suit in the United States District Court for the Northern District of Alabama (No.5:11-cv-04111-CLS)" to challenge their suspensions. According to intervenor, on December 19, 2012, the United States District Court for the Northern District of Alabama "ordered the suspensions terminated," which the government did on December 21, 2012. In support, intervenor attaches a December 21, 2012 letter, signed by Joyce White Vance, United States Attorney, Northern District of Alabama, United States Department of Justice, addressed to Maynard Cooper & Gale, P.C., the counsel of record in the current case, stating:

> In accordance with the Court's Order entered December 19, 2012, please see the enclosed two screen shots from the government's Excluded Parties List computer system (now System for Award Management) showing that the plaintiffs' suspensions from government contracting have been lifted and that the plaintiffs have been removed from the Excluded Parties List.

The System for Award Management screen shots provided by intervenor show two System for Award Management entries, for "TAOS INDUSTRIES, INC.," DUNS number 788495232,[31] and "AGILITY INTERNATIONAL INC.," with DUNS number 155340052,

---

[30] Intervenor indicates that "Agility Defense was formerly known as Taos Industries, Inc. The DUNS number assigned to the former Taos Industries is now assigned to Agility Defense."

[31] This is the same DUNS number reflected in protestor's filing as belonging to "Agility Defense and Government Services, Inc."

indicating no exclusions from government contracting. (capitalization in original). Protestor has not objected to the court's consideration of these exhibits.

According to intervenor, the government successfully appealed, and in the appellate decision Agility Defense & Government Services, Inc., et al., v. United States Department of Defense, et al., 739 F.3d 586 (11th Cir. 2013), "[o]n December 31, 2013, the Eleventh Circuit reversed the District Court and rendered judgment in favor of the government." According to intervenor, "prior to the issuance of the Eleventh Circuit's mandate, Agility Defense and Agility International filed a Petition for Panel Rehearing or in the Alternative, for Rehearing En Banc." Intervenor claims that, because appellate proceedings were ongoing as of the date of the intervenor's filing: "As of the date of this filing, Agility Defense and Agility International are not suspended, nor have they been since December 21, 2012. Thus, Intervenor could have lawfully subcontracted with Agility Defense and/or Agility International at any time since December 21, 2012 up to and including this date [February 28, 2014]."[32] (internal citations omitted).

Regarding the specifics of the relationship between the Agility entities and intervenor, intervenor states that, after being awarded the GPC III contract, "Mr. Rich Brooks, who is the president of Agility Defense and Agility International - - the non-excluded entities identified in the Appendix - - requested Intervenor's consideration of a potential subcontract for a limited amount of the work required by the subject contract." Intervenor maintains that, "[a]lthough Intervenor did consider Mr. Brooks' request and discuss the same with him, Intervenor never entered into a subcontract (or other business relationship) with Agility Defense, Agility International or any of their affiliates." The intervenor further indicates: "The day before the hearing on February 7, 2014, Intervenor learned that Plaintiff had written the Agency and raised the issue of Intervenor's potential subcontract with Agility Defense and/or Agility International." According to the intervenor, "[u]pon learning of the same, Intervenor made the final decision to terminate any discussions with Mr. Brooks and to reject any subcontract or other business relationship with Agility Defense, Agility International or any of their affiliates." In addition, intervenor's counsel represented the same at the hearing, when counsel stated: "'Agility does not have a subcontract with [Intervenor]. We spoke with the president of [Intervenor] yesterday to confirm that. There is no subcontract in place, and there is no subcontract being entertained at this time.'" (modifications in original). Intervenor also stated: "To avoid all doubt, Intervenor states that it has not entered into a subcontract or other business relationship with Agility Defense, Agility International or any of its affiliates, and that it does not intend to do so." As to protestor's claim that intervenor's counsel had potentially inside knowledge of the issue because it represented the Agility entities in the Eleventh Circuit, intervenor's counsel disclaimed knowledge, stating that "undersigned counsel serve Intervenor and their other clients, including certain Agility entities, solely as their lawyers. Undersigned counsel are not

---

[32] Although not determinative to the court's opinion, the court notes that, after intervenor's filing, the petition for rehearing was denied and the Eleventh Circuit's mandate issued on April 9, 2014.

involved in all of the business transactions conducted by Intervenor, Agility, or their other clients."

According to the District Court decision in <u>Agility Defense and Government Services, Inc. v. United States Department of Defense</u>, Civ. No. CV–11–S–4111–NE, 2012 WL 2480484, at *1 (N.D. Ala., June 26, 2012):

> Agility Defense and Government Services, Inc., and Agility International, Inc., commenced this action against the United States Department of Defense, Secretary of Defense Leon E. Panetta, the Defense Logistics Agency, and the Director of the Defense Logistics Agency, Vice Admiral Mark D. Harnitchek, seeking declaratory and injunctive relief to lift plaintiffs' suspension from government contracting.

The United States District Court for the Northern District of Alabama, in <u>Agility Defense</u>, explained that "[t]he genesis of this action lies in plaintiffs' corporate relationship to Public Warehousing Company, K.S.C. ('PWC'), a Kuwaiti corporation that specializes in logistics." <u>Id.</u> at *2. The District Court explained that after the Public Warehousing Company was indicted for fraud related to food contracts for the United States military, "numerous other PWC subsidiaries were suspended, including plaintiff Agility on November 23, 2009. The subsidiaries, including plaintiffs, were not accused of any involvement in the wrongdoing for which PWC was indicted; rather the sole basis for their suspension was their status as affiliates of PWC." <u>Id.</u> at *3 (footnotes omitted). In the United States District Court for the Northern District of Alabama case, the two Agility entities that brought suit appear to be the same Madison, Alabama Agility Defense & Government Services company, and the Alexandria, Virginia Agility International company, that, as reflected in protestor's submissions to this court, are currently not listed as excluded from contracting on the System for Award Management:

> Plaintiff Agility Defense and Government Services, Inc. ("DGS") is a Delaware corporation with its principal place of business in Madison County, Alabama, and an indirect subsidiary of PWC. There are three layers of subsidiaries between PWC and DGS. Plaintiff Agility International, Inc. ("Agility") is a Delaware corporation with its principal place of business in Alexandria, Virginia, and a direct subsidiary of DGS; therefore, it also is an indirect subsidiary of PWC.

<u>Id.</u> at *2 (footnotes omitted). The plaintiffs in <u>Agility Defense</u> argued that FAR 9.407-4(b) (2013) prohibited a suspension of longer than eighteen months. <u>See</u> <u>Agility Def. and Gov't Servs., Inc. v. United States Dept' of Def.</u>, 2012 WL 2480484, at *7–8. The District Court concluded "that the interpretation of the regulation proposed by plaintiffs is the correct one. That is, no contractor may be suspended for greater than eighteen months unless legal proceedings are initiated against that contractor itself, regardless of the basis for the initial decision to suspend the company." <u>Id.</u> at *10. The District Court ordered the termination of their suspensions, and, from the parties' exhibits, it appears that the government complied shortly thereafter.

The United States Department of Defense appealed, and on December 31, 2013, the United States Court of Appeals for the Eleventh Circuit found for the United States Department of Defense in Agility Defense & Government Services. v. United States Department of Defense, 739 F.3d at 589. The Eleventh Circuit reasoned:

> The central issue in this appeal is whether the United States or its agencies must initiate legal proceedings against an affiliate of an indicted government contractor to toll the 18–month time limit on the suspension of the affiliate even though the affiliate was suspended solely on account of its affiliate status. The regulation states, "In no event may a suspension extend beyond 18 months, unless legal proceedings have been initiated within that period." 48 C.F.R. § 9.407–4(b). The agency argues that we must interpret "legal proceedings" as legal proceedings against the indicted government contractor. The affiliates argue that we must interpret "legal proceedings" as legal proceedings against the suspended affiliate of the indicted government contractor. We agree with the agency.

Id. at 589. The appellate court did not remand to the district court, but instead, stated: "We **REVERSE** the summary judgment in favor of the affiliates, Agility Defense and Agility International, and **RENDER** a judgment in favor of the defendants." Id. at 592 (capitalization and emphasis in original). On February 13, 2014, as indicated by intervenor, the Agility entities filed a petition for rehearing en banc. See Appellees' Petition for Reh'g or, in the Alternative, Reh'g En Banc, Agility Def. & Gov't Servs. v. United States Dep't of Def., No. 13-10757 (11th Cir. Feb. 13, 2014). On March 31, 2014, the Eleventh Circuit denied the petition. See Order Denying Petition(s) for Reh'g and Petition(s) for Reh'g En Banc, Agility Def. & Gov't Servs. v. United States Dep't of Def., No. 13-10757 (11th Cir. Mar. 31, 2014). The mandate by the Eleventh Circuit issued on April 9, 2014. See Mandate of Judgment, Agility Def. & Gov't Servs. v. United States Dep't of Def., No. 13-10757 (11th Cir. Apr. 9, 2014).[33] A review of the parties' filings and the record before the court, however, indicates that as of the award date of the GPC III contract, October 24, 2013, both these Agility entities were allowed to contract with the government. At the time of the procurement award, the decision from the United States District Court for the Northern District of Alabama in Agility Defense still stood. At the time of the award, even if International Auto Logistics had agreed to subcontract with Agility International or Agility Defense and Government Services, there would have been no violation of the FAR at that time. The FAR itself only requires that the agency, when making a final procurement decision, examine to see if a contractor is debarred or suspended before or at the time of award. See FAR 9.405(d)(4)

---

[33] It appears that Agility International, DUNS number 155340052, and Agility Defense and Government Services, DUNS number 788495232 are again excluded from government contracting in the System for Award Management. See Exclusion Summary, Agility International, Inc., Sys. Award Mgmt., available at www.sam.gov (last visited June 23, 2014); Exclusion Summary, Agility Defense and Government Services, Inc., Sys. Award Mgmt., available at www.sam.gov (last visited June 23, 2014).

("Immediately prior to award, the contracting officer shall again review the SAM Exclusions to ensure that no award is made to a listed contractor."). At the time the agency selected intervenor as the contract awardee, Agility International, DUNS number 155340052, and Agility Defense and Government Services, DUNS number 788495232, were not debarred or suspended from government contracting. The court does not reach the question of whether or not International Auto Logistics did in fact form a business relationship with any Agility entity at the time of award. Although not dispositive in the instant protest, the agency is on notice of the potential issue and will have to monitor the intervenor's performance, including that of its subcontractors, to be in conformance with the FAR and the contract requirements, as it must with all its contractors.

## CONCLUSION

As previously communicated to the parties, the government's past performance determination and final integrated assessment were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Protestor's requests for a temporary restraining order and preliminary injunction are **DENIED**. Defendant's and intervenor's cross-motions for judgment on the administrative record are **GRANTED**. The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**